# EXHIBIT A



**Douglas B. Moylan**
**Attorney General of Guam**
Office of the Attorney General
General Crimes Division
134 W. Soledad Avenue
Bank of Hawaii Building, 3rd Floor Suite 301
Hagåtña, Guam 96910 • USA
671-475-3324 • 671-475-3390 (fax)
prosecution@oagguam.org • www.oagguam.org

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

GUAM POWER AUTHORITY,                    Civil Case No. 1:24-cv-00029

    Petitioner,

 vs.

ATTORNEY GENERAL OF GUAM,

    Respondent.

_____)

**RESPONDENT ATTORNEY GENERAL OF GUAM'S**
**<u>NOTICE OF REMOVAL</u>**

TO: THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF GUAM;

HON. DANA A. GUTIERREZ
Judge, Superior Court of Guam
Hagatna, Guam; and

MARIANNE WOLOSCHUK
Legal Counsel
Guam Power Authority, Gloria B. Nelson, Public Service Bldg.
688 Route 15, Fadian, Mangilao, Guam 96913
Ph: (671) 300-6848 / Fax: (671) 648-3290
E-Mail: mwoloschuk@gpagwa.com

1

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, the Respondent Attorney General of Guam ("Attorney General"), hereby removes the entire case styled *Guam Power Authority v. Attorney General of Guam*, Case No. SP-0089-25 filed by Petitioner Guam Power Authority ("GPA") to the United States District Court for the District of Guam based on the following grounds:

1.     This action is removable to the United States District Court under 28 U.S.C. § 1331 and 1441 on the grounds that Petitioner's request to the Superior Court of Guam for the issuance of an alternative writ of mandate to compel the Attorney General to appoint conflict-free counsel to review certain GPA procurements "turns on substantial questions of federal law" and "implicate significant federal issues" related to whether GPA has impermissibly obligated or expended funds under the American Rescue Plan Act of 2021 (ARPA). *See* ARPA § 9901, Pub. L. 117-2, 135 Stat. 4 (2021) (amending 42 U.S.C. § 802(c)(1) (states, territories, and tribal governments) & 803 (c)(2) (local governments) (Social Security Act Title VI §§ 602 (c)(1) & 603 (c)(2)) and the rules promulgated by the Coronavirus State and Local Fiscal Recovery Funds ("SLFRF"), a program established to distribute ARPA funds. *See Grable & Sons Metal Products, Inc. v. Darue*, 545 U.S. 308, 312 (2005).

2.     This action is also removable to the United States District Court under 28 U.S.C. § 1331 and 1441 on the grounds that Petitioner's request to the Superior Court of Guam for the issuance of an alternative writ of mandate to compel the Attorney General to appoint conflict-free counsel to review certain GPA procurements violates the 1950 Organic Act of Guam (Title 48 USC Chapter 8A) in that  the Consolidated Commission on Utilities ("CCU") impermissibly obligated and expended ARPA/SLFRF funds when it "authorized GPA's GM to sign a subgrant agreement with GEDA [footnote omitted] $35,448,983.87 in SLFRF monies to provide funding for the

2

installation of electrical power infrastructure project in Mangilao,[1]" in that Petitioner GPA lacks standing to sue in violation of said federal law governing this territory.

3.      Further, the CCU controls Petitioner GPA. According to the Attorney General's Opinion dated October 6, 2023, a copy of which is attached hereto as Exhibit "C," the CCU is an illegal body that "deprives the Governor of Guam … of the Governor's Organic Act authority to supervise the government and to appoint the heads of executive branch agencies as part of the Governor's cabinet." *Id.* at p. 1. Accordingly, the Petitioner GPA lacks standing to sue in violation of federal law governing this territory.

4.      In its Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate, the Petitioner states:

"The Governor obligated some $104.5 million in SLFRF funds to the establishment of a new Mangilao Medical Campus (MMC) on three adjoining parcels of land, two acquired by condemnation[2], and the third purchased outright by the Guam Housing and Urban Renewal Authority (GHURA).[3]"

*Id*. at p. 2.

5.      The Respondent agrees with the Petitioner that the Superior Court case directly relates to *Government of Guam; Douglas B. Moylan v. Lourdes A. Leon Guerrero; Guam Housing and Urban Renewal Authority*, District Court of Guam Case No. 1:24-CV-00029 (filed Dec. 20, 2024) which involves the legality of the use of the ARPA/SLFRF funds on MMC project. Accordingly, the removal of this action is absolutely necessary to conserve judicial resources, promote efficiency, and avoid the possibility of conflicting decisions on the same subject matter.

---

[1] *Petitioner's Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate* at p. 4. Attached as Part of Exhibit A.

[2] "These two parcels are currently the subject of an eminent domain lawsuit in GHURA v. 169,795 Square Meters of Land, Superior Court of Guam Case No. CV0692-24 (filed Dec. 18, 2024)."

[3] "The latter parcel is currently the subject of a lawsuit by the Attorney General alleging improprieties in the sale, Moylan v. Leon Guerrero, District Court of Guam Case No. 1:24-CV-00029 (filed Dec. 20, 2024). The Governor's motion to dismiss has been fully briefed by the parties and the district court is expected to hear the matter soon."

6. Federal question jurisdiction lies in this Court because those ARPA/SLFRF funds, which are the subject of the litigation pending in this Court already, could potentially be clawed back by the U.S. Government if the Government of Guam and sub-recipients like Petitioner GPA obligated or expended those funds impermissibly. On March 25, 2025, the United States Department of the Treasury published a notice entitled "Notice to Recipients of Coronavirus State and Local Fiscal Recovery Funds – U.S. Department of Treasury – Compliance Reviews and Related Recoupment Efforts," which reads, in part:

"Through this notice, the U.S. Department of Treasury (Treasury) is informing recipients of … (SLFRF) awards that the Treasury intends to vigorously monitor recipients' methods of obligating funds by the December 31, 2024, deadline. Treasury is committed to recouping funds that recipient obligated or expended impermissibly, as well as to recapturing funds that they did not obligate by the deadline. … If the recipient does not repay the amount owed by the specified date, Treasury will establish a debt and follow standard debt collection policy and procedures in coordination with Treasury's Bureau of the Fiscal Service. Interest and penalties will accrue once the debt is established."

This US Treasury notice is attached hereto as Exhibit "B."

7. Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is filed within thirty days of June 12, 2025, the date on which Respondent received the Verified Petition.

8. Pursuant to 28 U.S.C. § 1446(a), attached hereto as Exhibit "A" are the copies of the following documents: all process, pleadings and orders received by Respondent in this action.

9. Upon receipt of this Notice, no further action shall be taken in the Superior Court of Guam.

10. A copy of this Notice of Removal is being filed with the Clerk of the Superior Court of Guam, and another copy is being served upon the Petitioner through its counsel of record, in accordance with law.

**PRAYER**

WHEREFORE, Respondent respectfully requests that the above-described civil action pending before the Superior Court of Guam be removed to the United States District Court for the District of Guam, and that this Court assume full jurisdiction over the matter as provided by law.

This 17th day of June, 2025.

Respectfully submitted,

_W. Lyle Stamps_
WILLIAM LYLE STAMPS

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Guam Power Authority

## DEFENDANTS

Attorney General of Guam

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Marianne Woloschuk
688 Route 15, Fadian
Mangilao, Guam 96913

Attorneys *(If Known)*
Joseph A. Guthrie and W. Lyle Stamps
134 W. Soledad Avenue, Suite 412
Hagatna, Guam 96910

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☒ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court |
| ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |
| ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
28 U.S.C. 1331, 1441, and 1446

Brief description of cause:
Removal of Case from Superior Court to Federal Court due to substantial questions of federal law and related case No. 24-cv-00029

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*
JUDGE Chief Judge Frances M. Tydingco-Gatewood
DOCKET NUMBER 1:24-cv-00029

DATE
Jun 17, 2025

SIGNATURE OF ATTORNEY OF RECORD
*W. Lyle Stamps*

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

6/12/25  ET



**SUPERIOR COURT OF GUAM**

NON-CRIMINAL CASE COVER SHEET

**RECEIVED**

JUN 1 2 2025

SUPERIOR COURT OF GUAM

**CASE NUMBER** *(For Clerk Use Only)*: SP 0089-25

**NOTICE**: Plaintiff/Petitioner must submit this cover sheet with the first paper filed in the action or proceeding as required by local court rule. See General Rule 5.1(c)(4) of the Local Rules of the Superior Court of Guam. Failure to file may result in sanctions. If this case is a *civil case and complex,* you must serve a copy of this cover sheet on all other parties to the action or proceeding.

| 1. Plaintiff(s)/Petitioner(s): | Defendant(s)/Respondent(s)/Party-in-Interest: |
|---|---|
| **Name(s):** Guam Power Authority | **Name(s):** Attorney General of Guam |
| **Address:** Gloria B. Nelson, Public Service Bldg. 688 Route 15, Fadian Mangilao, GU 96913 | **Address:** 134 W Soledad Avenue, Suite 412 Hagatna, Guam 96910 |
| **Email:** mwoloschuk@gpagwa.com **Telephone:** (671) 300-6848; (671) 648-3227 **Attorney for Plaintiff(s)/Petitioner(s):** Marianne Woloschuk | **Email:** guamattorneygeneral.org; dbmoylan@oagguam.org **Telephone:** (671) 475-3324  [Attach additional page as necessary to list all parties.] |

**2. Check ONE box below for the case type that is the PRIMARY cause of action:**

| CIVIL | | DOMESTIC RELATIONS | |
|---|---|---|---|
| **TORT:** | **CONTRACT:** | ***Dissolution/Divorce/Annulment*** | **Support** |
| ☐ Automobile Tort ☐ Intentional Tort *Malpractice* ☐ Medical ☐ Other ☐ Premises Liability ☐ Product Liability ☐ Slander/ Libel / Defamation ☐ Other | ☐ Buyer Plaintiff ☐ Fraud *Employment* ☐ Discrimination ☐ Other *Landlord Tenant* ☐ Unlawful Detainer ☐ Other ☐ Mortgage Foreclosure ☐ Seller Plaintiff (Debt Collection) | ☐ Uncontested Divorce ☐ Divorce ☐ Annulment ☐ Paternity ☐ Custody ☐ Visitation ☐ Adoption ☐ Civil Protection/Restraining Orders (Plaintiff's DOB:_____) (Defendant's DOB:_____) ☐ Other: _____ | ☐ Child Support – IV-D ☐ Child Support – Private (Non-IV-D) ☐ Support – Other |
| **OTHER CIVIL:** | ☐ Other | **PROBATE, MENTAL HEALTH, AND GUARDIANSHIP** | |
| ☐ Restraining Order ☐ Foreign Judgment ☐ Petition for Judicial Review ☐ Procurement Appeal ☐ Civil Forfeiture ☑ Petition for Writs ☐ Other | **REAL PROPERTY:** ☐ Eminent Domain ☐ Quiet Title / Partition ☐ Other | ***Probate*** ☐ Wills/Intestate ☐ Other Probate ***Mental Health*** ☐ Involuntary Hospitalization ☐ Other | **Guardianship** ☐ Adult (Ward's DOB:_____) ☐ Juvenile |

**For CIVIL CASES ONLY:**

**3. This case ☐ is / ☑ is not complex. If the case *is complex*, mark the factors requiring exceptional judicial management:**

☐ Large number of separately represented parties
☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
☐ Substantial amount of documentary evidence
☐ Large number of experts

☐ Large number of witnesses
☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in federal court
☐ Substantial post-judgment judicial supervision.

**4. Remedies sought (check all that apply):**

☐ Monetary
☑ Non-monetary – Declaratory or injunctive relief

☐ Punitive
☐ Other: _____

**5. Cause(s) of Action (specify):** Petition for Writ

**6. This case ☐ is / ☑ is not a class action suit.**

**7. Jury Demanded in Pleading?: ☐ Yes / ☑ No → If *yes*: ☐ Jury of 6 / ☐ Jury of 12**

**8. If there are any known related cases, list the case name(s) and number(s):** none

RECEIVED
12:27  6/12/25
OFFICE OF THE ATTORNEY GENERAL
CIVIL DIVISION
175918

CCM Rev. 07/01/2019

1  **MARIANNE WOLOSCHUK**
2  Legal Counsel
   Guam Power Authority                    **RECEIVED**
3  Gloria B. Nelson, Public Service Bldg.
4  688 Route 15, Fadian
   Mangilao, Guam 96913                     JUN 1 2 2025
5  Ph: (671) 300-6848
6  Fax: (671) 648-3290
   E-mail: mwoloschuk@gpagwa.com          CLERK'S OFFICE
7                                         SUPERIOR COURT OF GUAM

8  *Attorney for the Guam Power Authority*

9                      **IN THE SUPERIOR COURT OF GUAM**

10
11 GUAM POWER AUTHORITY,               )  SPECIAL PROCEEDINGS
                                       )  CASE NO. **SP     0089 -25**
12                      Petitioner,    )
                                       )
13                                     )
        vs.                            )
14                                     )  **ALTERNATIVE WRIT OF MANDATE**
15 ATTORNEY GENERAL OF GUAM,           )  **AND ORDER DIRECTING ISSUANCE**
                                       )
16                      Respondent.    )
17                                     )
                                       )
18

19     Upon the filing of a verified petition for writ of mandate, and it appearing from the verified

20 petition in this action that the respondent Attorney General Douglas B. Moylan has failed to take
21
22 ministerial action mandated by 5 GCA § 5150 and the Guam Supreme Court's opinion in *In re*

23 *Leon Guerrero*, 20024 Guam 18, and that petitioner Guam Power Authority is beneficially
24
25 interested and has no plain, speedy, and adequate remedy in the ordinary course of law;

26     THEREFORE, IT IS HEREBY ORDERED that an alternative writ of mandate shall issue

27 and respondent Moylan, in his official capacity as Attorney General of Guam, is COMMANDED,
28
29 immediately after the receipt of this writ, to assign conflict-free counsel to the review of GPA's

30 procurements for the Mangilao Medical Campus project under 5 GCA § 5150, and to erect an
31
32 ethical wall screening himself and his prosecutors from the 5150 review and provide GPA

   forthwith with evidence of the establishment of that wall.
   Page 1
   *Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
   Alternative Writ of Mandate and Order Directing Issuance

IN THE ALTERNATIVE, respondent Moylan shall show cause before this court on

_____ (date) at _____ (time) why respondent Moylan has not done so.

SO ORDERED: _____

_____
Judge, Superior Court of Guam

Submitted by:

*M. Woloschuk*
_____
Marianne Woloschuk
GPA Legal Counsel
Date: June 11, 2025

Page 2
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Alternative Writ of Mandate and Order Directing Issuance

Case 1:25-cv-00029   Document 9-12   Filed 06/05/25   Page 131 of 154

FILED
SUPERIOR COURT
OF GUAM

2025 JUN 12 PM 12: 05

CLERK OF COURT

BY:_____

**MARIANNE WOLOSCHUK**
Legal Counsel
Guam Power Authority
Gloria B. Nelson, Public Service Bldg.
688 Route 15, Fadian
Mangilao, Guam 96913
Ph: (671) 300-6848
Fax: (671) 648-3290
E-mail: mwoloschuk@gpagwa.com

*Attorney for the Guam Power Authority*

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| GUAM POWER AUTHORITY, | ) SPECIAL PROCEEDINGS |
| | ) CASE NO. |
| Petitioner, | ) **SP** **0089 -25** |
| | ) |
| vs. | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES IN SUPPORT OF GPA'S** |
| ATTORNEY GENERAL OF GUAM, | ) **VERIFIED PETITION FOR WRIT OF** |
| | ) **MANDATE** |
| Respondent. | ) |
| | ) |
| | ) |

## I. Introduction

The Guam Power Authority (GPA) seeks an alternative writ of mandate to compel the

Attorney General to perform his ministerial duty to appoint evidence-based conflict-free counsel

to review certain GPA procurements.

Under the American Rescue Plan Act of 2021 (ARPA), the Coronavirus State and Local

Fiscal Recovery Funds (SLFRF) program has delivered billions of dollars to state, territorial, and

other governments to support the response to and recovery from the COVID-19 public health

emergency. The program's rules permit the recipient governments to use SLFRF funds to respond

to the public health impacts of the pandemic, as well as invest in water and sewer infrastructure.

*See* ARPA § 9901, Pub. L. 117-2, 135 Stat. 4 (2021) (amending 42 U.S.C. § 802(c)(1) (states,

Page 1
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

OFFICE OF THE ATTORNEY GENERAL

Case 1:25-cv-00002 Document 9-12 Filed 06/05/25 Page 12 of 154

territories, and tribal governments) & § 803(c)(2) (local governments) (Social Security Act Title VI §§ 602(c)(1) & 603(c)(2)).

The Guam Procurement Law assigns the Attorney General the task of legal advisor to review procurements for projects costing $500,000 or more, 5 GCA § 5150, a threshold exceeded by GPA's SLFRF-funded procurements. The Guam Supreme Court has identified the type of conflict of interest that the Attorney General has in this case as one that prevents him from conducting the review and requires him to assign conflict-free counsel, yet the Attorney General has not followed the Guam Supreme Court's instructions for dealing with his conflict. For this reason, GPA has applied to this court for a writ to compel the Attorney General to follow the law.

## II. Factual and Procedural Background

### A. The Government of Guam has received grant funding.

The United States Department of the Treasury awarded approximately $600 million in SLFRF funds to the Government of Guam. The Governor of Guam had until December 31, 2024, to obligate all remaining SLFRF funds. The Governor obligated some $104.5 million in SLFRF funds to the establishment of a new Mangilao Medical Campus (MMC) on three adjoining parcels of land, two acquired by condemnation[1] and the third purchased outright by the Guam Housing and Urban Renewal Authority (GHURA).[2]

The Governor obligated SLFRF funds to the MMC project in the approximate amounts of $35.4 million for electrical infrastructure, $26.1 million for water infrastructure, and $36.7 million

---

[1] These two parcels are currently the subject of an eminent domain lawsuit in *GHURA v. 169,795± Square Meters of Land*, Superior Court of Guam Case No. CV0692-24 (filed Dec. 18, 2024).

[2] The latter parcel is currently the subject of a lawsuit by the Attorney General alleging improprieties in the sale, *Moylan v. Leon Guerrero*, District Court of Guam Case No. 1:24-CV-00029 (filed Dec. 20, 2024). The Governor's motion to dismiss has been fully briefed by the parties and the district court is expected to hear the matter soon.

Page 2
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

for wastewater infrastructure. On December 27, 2024, the Department of Administration (DOA), on behalf of the Governor, entered into an interagency grant agreement with the Guam Economic Development Authority (GEDA) for GEDA to administer the remaining SLFRF monies to fund the completion of the initial phase of the MMC to include the design and construction of the primary utility infrastructure (electrical power, water, and sewer), and to complete sampling and analysis of environmental, archaeological, physical, geological and other site characteristics. *See* Pet. for Writ of Mandate, Ex. A (CCU Resolution FY2025-09, Ex. A).

## B. The Attorney General is criminally investigating GWA and the CCU in relation to the MMC.

At its meeting on January 28, 2025, the Consolidated Commission on Utilities (CCU) approved the use of SLFRF funds for professional services to conduct necessary surveys of the property where the MMC will be located. Immediately thereafter, the Attorney General had the Deputy Attorney General of the Government Corruption Division send a letter to the General Manager (GM) of the Guam Waterworks Authority (GWA) and other GWA certifying officers. *See* Pet., Ex. D. The letter stated that, according to two opinions of the Attorney General, any attempt to build the MMC violated Guam law, that the CCU's authorization of SLFRF monies for survey was "illegal", and that the matter "is now under criminal investigation." *Id.* The letter also stated that the GM "may be held personally and criminally culpable" for violations of the Guam law governing the accountability of certifying officers. *Id.*

/ / /

Page 3
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

**C. The Attorney General has taken an adversarial position against GPA in relation to the MMC.**

At its next meeting, on February 25, 2025, the CCU authorized GPA's GM to sign a subgrant agreement with GEDA[3] for $35,448,983.87 in SLFRF monies to provide funding for the installation of electrical power infrastructure project in Mangilao. *See* Pet., Exs. A (CCU Resolution FY2025-09) & B (Subgrant Agreement Between GEDA & GPA). The infrastructure will include a substation, electrical tie-ins, and underground transmission lines. These will benefit not only the MMC but also the wider community by serving the growing number of ratepayers in Mangilao, including area educational institutions, namely, the Guam Community College, George Washington High School, Price Elementary School and the University of Guam, as well as assisting with faster recovery times after natural disasters.

Shortly after the CCU meeting, the Attorney General made statements reported in the press, voicing his opinion that the MMC project is "illegal" and that he would "not [ ] approve any contract for the construction of the new hospital." *See* Pet., Ex. C (PDN Article, Mar. 4, 2025). He added that project contractors "could see money 'clawed back'" by the federal government. *Id.* "They will assume the consequences of the law if in fact they are breaking them [*sic*]." *Id.* The Attorney General later advised that government employees should seek his "guidance" before involving themselves in the infrastructure project. *See* Ex. J (PDN Article, Apr. 21, 2025).

///

---

[3] GEDA's authority to enter into the agreement arises under 12 GCA § 50103, which governs the purposes and authorized activities of GEDA and permits it to enter into agreements to build hospitals.

Page 4
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029   Document 9-2   Filed 06/05/25   Page 15 of 174

**D. GPA has asked the Attorney General in vain to appoint unconflicted counsel to its procurement review.**

Under ARPA deadlines, GPA has until December 31, 2026, to expend the SLFRF funds on the MMC electrical infrastructure project. The extensive scope of work provides a tight timeline for accomplishing the project goals. GPA prepared three IFBs (invitations for bid) to procure contractors to perform the necessary work.

Given the Attorney General's publicly stated position that the MMC project is illegal and that he will not approve any procurements for it, GPA asked the Attorney General to appoint conflict-free counsel screened behind an ethical wall to conduct GPA's MMC-related procurement reviews and provide legal advice under section 5150. Correspondence between GPA and the Attorney General, *see* Pet., Exs. D, F, G, H, & I, shows that the Attorney General does not intend to provide evidence of an ethical wall to ensure that assigned counsel is and remains conflict-free.

GPA now seeks a writ of mandate compelling the Attorney General to erect a conflict wall to screen himself and his prosecutors from the section 5150 review of GPA's MMC-related procurements.

## III. Argument

**A. Mandamus is the proper remedy to compel a governmental officer to perform a ministerial duty.**

Under Guam law, a writ of mandate "may be issued by any court . . . to any . . . person to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station". 7 GCA § 31202. The issuance of a writ of mandamus is an extraordinary remedy that lies within the court's discretion. *In re Dep't of Agriculture v. Civil Serv. Comm'n*, 2009 Guam 19 ¶ 9. A court will order a writ of mandamus "where the respondent has a clear,

Page 5
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

present and ministerial duty to act, and the petitioner has a clear, present and beneficial right to performance of that duty." *Id.* A writ of mandate is appropriate whenever "there is not a plain, speedy, and adequate remedy in the ordinary course of law." *Id.*

Writs of mandate are appropriate when a governmental officer refuses to comply with a clear ministerial duty. *Limtiaco v. Guam Fire Dep't*, 2007 Guam 10 ¶ 15 ("[A] writ of mandamus would be an appropriate vehicle for relief in seeking the performance of ministerial duties."). Writs of mandate have been issued against various governmental actors, such as the Attorney General in this case, who have failed to implement a directive of the court. *See Guam Int'l Airport Auth. v. Moylan*, 2005 Guam 5 ¶ 66 (affirming grant of mandamus relief to GIAA and holding that the Attorney General must approve GIAA's legal services contract). Court directives necessarily include the opinions of the Guam Supreme Court and the Guam Rules of Professional Conduct (GRPC).

"[I]f the Attorney General neglects or otherwise refuses to perform a mandatory duty of his office ... a writ of mandate is the proper vehicle to compel performance of his nondiscretionary duties." *In re Leon Guerrero*, 2024 Guam 18 ¶ 77. As discussed below, the Attorney General's refusal to assign conflict-free counsel and provide proof of the ethical wall enforcing the conflict screening implicates his ministerial duty and is properly raised in a petition for a writ of mandate.

**B. Mandamus is the proper remedy to compel the Attorney General to appoint conflict-free counsel and provide evidence of the lack of conflict.**

The Attorney General has an attorney-client relationship with GPA to which the GRPC apply. *Id.* ¶¶ 45-46 ("[T]he Attorney General has an attorney-client relationship with executive branch agencies in Guam. . . . [T]he Attorney General must conform his conduct to that prescribed

Page 6
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

by the rules of professional ethics."). The GRPC impose upon the Attorney General the following duties to GPA:

> (1) to exhibit undivided loyalty;
> (2) to exercise the utmost good faith to protect GPA's interests;
> (3) to preserve GPA's confidences to the extent lawfully permitted;
> (4) to exercise independent judgment on GPA's behalf; and
> (5) to represent GPA zealously within the bounds of the law.

*Id.* ¶¶ 46-47 (internal citations and quotation marks omitted).

Because governmental agencies such as GPA communicate and act through their individual officers and employees, the Attorney General may develop an actual conflict of interest when he criminally prosecutes an agency official: "an actual conflict of interest exists when the Attorney General has advised a government officer in their official capacity on matters *related* to the offenses charged." *Id.* ¶ 54. The Attorney General violates the duty of loyalty when he prosecutes a GPA official for the same matter on which he has advised GPA. In other words, "[t]he Attorney General may not represent [GPA] one day, give [GPA] officials legal advice regarding certain issues, withdraw, and then prosecute the same [GPA] officials the next day for following his legal advice." *Id.*

The Guam Supreme Court has recognized that "[t]he Office of the Attorney General may concurrently represent conflicting interests if the Attorney General can ensure independent representation for the competing parties." *Id.* ¶ 52. To avoid violating ethical duties and still represent an agency in a civil matter while investigating and prosecuting an official in that agency in a related criminal matter, the Attorney General must assign his staff "in a way that affords independent legal counsel and representation in the civil matter, and so long as such representation does not result in prejudice to the official in the criminal matter." *Id.* ¶ 60.

Page 7
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029    Document 9-2    Filed 06/05/25    Page 18 of 174

GRPC 1.7 prohibits legal representation in the face of concurrent conflicts of interest. GRPC 1.7(a). If the Attorney General learns an agency's confidential information and then oversees the prosecution of that agency's officer in a related matter, the Attorney General has an actual conflict of interest. In such a case, the conflict is imputable to the entire Office of the Attorney General. *Id.* ¶ 56. However, if the conflicted Attorney General and any other disqualified attorney in his office are screened from participation in the matter, then the conflict is not imputed to the rest of the office and vicarious liability is avoided. *Id.* ¶ 65.

In *In Re Leon Guerrero*, the Guam Supreme Court held that

> when the responsibilities of the Attorney General to represent the government and the public come into conflict, he must assign his staff in a way that both (1) affords independent legal counsel and representation to the agencies and (2) seeks justice in prosecutions brought in the People's name. Because the public's interest in prosecutions—even of government corruption—is not elevated above the Attorney General's duty to represent executive branch agencies, nothing prevents the Attorney General from withdrawing from a prosecution in an appropriate case. But if he does not, then *he must allow assigned or specially appointed counsel to represent the agency unfettered and uninfluenced by the Attorney General.*

*Id.* ¶ 41 (emphasis added).

Section 5150 of the Guam Procurement Law provides that, for a solicitation that will result in an award of $500,000 or more, the Attorney General or his designee "shall act as legal advisor during all phases of the solicitation or procurement process." 5 GCA § 5150. In a section 5150 review, the governmental agency—here, GPA—is the Attorney General's client, and "the Attorney General must still act as legal advisor during all phases of the solicitation or procurement process [involving an award of $500,000 or more]". *In re Leon Guerrero*, 2024 Guam 18 ¶ 24 (citation and internal quotations marks omitted).

Because the Attorney General has withdrawn the special assistant attorneys general appointments from the autonomous agencies, he has a duty to act as GPA's legal advisor for

Page 8
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029   Document 9-2   Filed 06/05/25   Page 19 of 174

purposes of section 5150 and cannot withdraw from this duty. *In re Leon Guerrero*, 2024 Guam 18 ¶ 42. In the face of a conflict of interest where the Attorney General wants to prosecute a government agency such as GPA and at the same time represent GPA in a section 5150 review, the Attorney General must exercise his discretion and do one of three things: recuse himself from the prosecution, erect a conflict wall, or change his mind and appoint a Special Assistant Attorney General to GPA. *In re Leon Guerrero*, 2024 Guam 18 ¶ 70. The one thing the Attorney General cannot do is "simply choose to do nothing." *Id.*

In this case, as shown below, the three choices have dwindled down to one and the Attorney General nevertheless has done the one thing the Guam Supreme Court has stated that he must not do: nothing. "[I]f the Attorney General neglects or otherwise refuses to perform a mandatory duty of his office—such as reviewing contracts over $500,000 for form and legality—a writ of mandate is the proper vehicle to compel performance of his nondiscretionary duties." *Id.* ¶ 77. Because the Attorney General has a duty to ensure GPA has conflict-free representation in the section 5150 review of its MMC procurements, and because GPA has no plain, speedy, adequate remedy in the ordinary course of law, a writ of mandamus by the court directing the Attorney General to take action is appropriate in this case.

## C. The Attorney General here has a conflict of interest that necessitates the appointment of conflict-free counsel and the client is entitled to evidence of the conflict screening.

### 1. The Attorney General will not appoint a SAAG to represent GPA.

Of the three things the Attorney General could do to deal with his conflict of interest, he has already eliminated two. First, by withdrawing the SAAG appointments of all autonomous agency counsel, he has indicated that he will not appoint a SAAG to represent GPA in a section 5150 review of the MMC procurements. Indeed, in his letter of April 9, 2025, *see* Pet. Ex. H, he

Page 9
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029   Document 9-2   Filed 06/05/25   Page 20 of 174

tells GPA to rely on his attorneys in the OAG Solicitors Division, thus showing that he intends to assign one of his own attorneys to represent GPA in the section 5150 review.

### 2. The Attorney General will not recuse himself from the prosecution of GPA.

Second, the Attorney General, by his deeds, has shown that he will not recuse himself from the criminal prosecution of GPA. The Attorney General has publicly taken positions indicating that he intends to investigate the utility agencies involved in infrastructure development for the MMC and the Mangilao area more broadly. He has had his government corruption unit send letters threatening to criminally prosecute GWA's certifying officers if GWA proceeds with a CCU-authorized MMC-related project which he has deemed "illegal". The OAG's letters to GWA threaten investigation under section 14110 of the Guam law governing the accountability of disbursing and certifying officers, which provides:

> It is unlawful for an officer, clerk or other person charged with disbursements of public funds appropriated by *I Liheslatura* (Guam Legislature) to exceed the amounts and purposes stated in the appropriation or to change or shift appropriations from one (1) item to another. Only *I Liheslaturan Guåhan* (Guam Legislature) in any appropriation act may authorize transfers. An officer, clerk or other person violating the provisions of this Section is guilty of malfeasance in office. They are subject to suspension and investigation of conduct. Upon conviction, the person is guilty of a misdemeanor and must be fined in the discretion of the court or imprisoned not more than three (3) years.

4 GCA § 14110 (governing violations of appropriations and transfer); *see* 4 GCA § 14117 (providing for additional penalties in the event of a violation of the law governing the accountability of disbursing and certifying officers).

Because the source of the funding for both GWA's and GPA's projects stems from grants awarded by the federal government, the funds cannot have been appropriated by the Legislature. As a result, Guam's certifying officer liability statutes do not apply. Despite this, the Attorney

Page 10
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029   Document 9-2   Filed 06/05/25   Page 21 of 174

General continues to issue not-so-veiled threats invoking certifying officer liability. *See* Ex. J (PDN Article, Apr. 21, 2025).

Furthermore, the Attorney General has announced in the press, on more than one occasion, that he is criminally investigating GPA for reasons related to the infrastructure project in Mangilao. He has not specified the exact reason for investigating GPA, other than his unsupported conviction that the infrastructure project is "illegal". By his announcements, however, he has taken a definite position in the potential or actual criminal matter.

### 3. The Attorney General must erect a screening wall to avoid vicarious disqualification of his entire office.

There remains only one thing for the Attorney General to do: assign conflict-free counsel and erect a conflict wall to avoid having his conflict of interest imputed to the entire office.

To date, the Attorney General has indicated that his Solicitors Division will provide conflict-free counsel to represent GPA in the section 5150 procurement review. However, despite repeated requests, the Attorney General has refused to provide any evidence to show that he has established an ethical screen to ensure the independence of the counsel assigned from the OAG Solicitors Division. In the absence of evidence that the conflict wall has been erected, and given Attorney General Moylan's past history respecting conflicts of interest, *see People v. Tennessen*, 2009 Guam 3 ¶ 50 (finding that Attorney General Moylan's lack of screening from the defendant's prosecution created a public perception of impropriety that undermined the criminal process), the court may presume that no such conflict wall exists here.

As the lead prosecutor in a criminal investigation of the MMC infrastructure project, the Attorney General has a conflict of interest that prevents him from reviewing the MMC procurements under section 5150. The same is true of the prosecutors who report to the Attorney General in the criminal investigation. The Attorney General and his prosecutors must be walled

Page 11
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029    Document 9-2    Filed 06/05/25    Page 22 of 154

off to preclude their participation in the section 5150 review of the MMC project. For this reason, in accordance with the Supreme Court's directive in *In re Leon Guerrero*, the Attorney General must appoint an independent conflict counsel, unfettered and uninfluenced by himself and his prosecutors, to advise GPA and review GPA's procurements concerning the MMC project.

Mandamus is the proper remedy for the Attorney General's failure to erect a conflict wall and assign conflict-free counsel. The Attorney General in this case, having shown himself to be conflicted, has abused his discretion in failing to assign counsel that stands behind an ethical wall. Because the Attorney General cannot be counted on to appoint conflict-free counsel and erect a conflict wall himself, the court must compel him to do his duty by issuing the writ.

### IV. Conclusion

In light of the foregoing, the court should issue a writ of mandate ordering the Attorney General to assign conflict-free counsel to review GPA's procurements for the MMC project and provide GPA with competent evidence of a conflict wall screening himself and his prosecutors from participating in any way in those procurement reviews. Because the awarded funds must be spent by December 31, 2026, time is of the essence and GPA therefore requests expeditious review.

Dated this 11th day of June, 2025.

*Attorney for the Guam Power Authority*

By: M. Woloschuk

**Marianne Woloschuk**
GPA Legal Counsel

Page 12
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
Memorandum of Points and Authorities in Support of GPA's Verified Petition for Writ of Mandate

**MARIANNE WOLOSCHUK**
Legal Counsel
Guam Power Authority
Gloria B. Nelson, Public Service Bldg.
688 Route 15, Fadian
Mangilao, Guam 96913
Ph: (671) 300-6848
Fax: (671) 648-3290
E-mail: mwoloschuk@gpagwa.com

*Attorney for the Guam Power Authority*

FILED
SUPERIOR COURT
OF GUAM

2025 JUN 12 PM 12: 05

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| GUAM POWER AUTHORITY, | ) SPECIAL PROCEEDINGS |
| | ) CASE NO. SP **0089 -25** |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) **GPA'S VERIFIED PETITION FOR** |
| ATTORNEY GENERAL OF GUAM, | ) **WRIT OF MANDATE** |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

### I. Introduction

Petitioner Guam Power Authority (GPA) hereby petitions the Court for an alternative writ of mandate against respondent Douglas B. Moylan, Attorney General of Guam, to compel him to do his duty and appoint conflict-free counsel to represent GPA in the review of certain procurements, and in support thereof alleges as follows.

### II. Jurisdiction

1.     This court has jurisdiction over this subject matter and parties pursuant to 7 GCA §§ 3105 (governing the jurisdiction of the Superior Court) and 4101 (governing the nature and composition of the Superior Court); 7 GCA §§ 31202, 31205, and 31401 (governing, respectively when and by what court a writ of mandate may be issued; when application is made

Page 1
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029    Document 9-2    Filed 06/05/25    Page 24 of 154

without notice; and that a writ may issue and be heard at any time); and the opinion of the Guam Supreme Court in *In re Leon Guerrero*, 2024 Guam 18.

2. Section 31204 of Title 7 of the Guam Code Annotated authorizes this court in the first instance to issue an alternative writ in the form submitted by petitioner GPA commanding respondent Moylan to perform immediately after the receipt of the writ the acts required to be performed by law or to show cause before this court why he has not done so.

3. Petitioner GPA does not have a plain, speedy, and adequate remedy available in the ordinary course of law.

4. Respondent Moylan has a clear, present, and ministerial duty to act in conformance with the laws that petitioner GPA prays this court to enforce.

5. Respondent Moylan has refused to comply with the laws of Guam, the Supreme Court of Guam mandates, and the Guam Rules of Professional Conduct, and has refused to perform his ministerial duty, thereby entitling petitioner GPA to an alternative writ of mandate.

### III. The Parties

6. Petitioner GPA is a public corporation established and existing under the laws of Guam with the authority under 12 GCA § 8104(a) to generate, transmit, distribute, sell and exchange electric power on Guam, and is petitioning the aid of this court to compel the performance of an act which the law specifically enjoins as a duty resulting from an office.

7. Respondent Moylan is the Attorney General of Guam, a resident of Guam, and an officer exercising administrative functions subject to the review of this court in that he is the government officer charged specifically with responsibility for representing governmental agencies, including GPA, in procurement review under 5 GCA § 5150 and complying with the Supreme Court of Guam's opinion in *In re Leon Guerrero*, 2024 Guam 18.

Page 2
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
GPA's Verified Petition for Writ of Mandate

## IV. Background

8.     On February 25, 2025, the Consolidated Commission on Utilities (CCU) passed Resolution No. FY2025-09, authorizing the GPA General Manager (GM) to sign a subgrant agreement with the Guam Economic Development Authority (GEDA) for Coronavirus State and Local Fiscal Recovery Funds (SLFRF) available under the American Rescue Plan Act (ARPA) in the amount of $35,448,983.87 to provide funding for the installation of power infrastructure and to proceed with the procurement of design and construction services for the new Mangilao substation and related work. *See* Ex. A (GPA Resolution No. FY2025-09, Feb. 25, 2025).

9.     GPA and GEDA signed the subgrant agreement, effective on February 28, 2025, for the installation of power infrastructure to support the Mangilao Medical Campus (MMC) project, including a substation, electrical tie-ins, and transmission lines. *See* Ex. B (Gov't of Guam Subgrant Agreement, Feb. 28, 2025).

10.    On March 4, 2025, the Pacific Daily News reported that Attorney General Moylan called the MMC an "illegal project" and "promised not to approve any contract for the construction of the new [MMC] hospital." *See* Ex. C (Joe Taitano II, AG: Spending on new hospital illegal, funds could be 'clawed back' from vendors, Pacific Daily News, Mar. 4, 2025).

11.    In a related development, after the CCU authorized the Guam Waterworks Authority (GWA) GM in Resolution No. 17-FY2025 to use $750,000 in ARPA SLFRF monies to increase the amount of funding available to survey the land where the MMC would be located, the Attorney General sent letters threatening GWA's GM and other certifying officers with criminal prosecution. *See* Ex. D (Attorney General Letter to GWA GM, Jan. 31, 2025).

12.    GPA has prepared three invitations for bid (IFBs) for the MMC project: geotechnical services, Fadian substation, and new underground transmission, each of which

Page 3
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029    Document 9-2    Filed 06/05/25    Page 26 of 174

exceeds the $500,000 threshold; thus section 5150 of the Guam Procurement Law, 5 GCA § 5150, requires the Attorney General to provide legal advice and review the procurements.

13. On March 7, 2025, in light of the Attorney General's publicly stated opinion as to the illegality of the MMC project and his vow to disapprove any related procurement, GPA wrote the Attorney General, requesting the assignment of conflict-free counsel to conduct the section 5150 procurement review, as well as documentation showing a conflict wall to screen off the conflicted attorneys in his office. *See* Ex. E (GPA GM Letter to Attorney General, Mar. 7, 2025).

14. On March 13, 2025, the Attorney General wrote GPA, asking GPA to produce various publicly available documents retrievable on the CCU website to assist the Attorney General in making a decision on GPA's request concerning conflict-free counsel and ethical wall documentation. *See* Ex. F (Attorney General Letter to GPA GM, Mar. 13, 2025).

15. On March 31, 2025, GPA wrote the Attorney General, clarifying that GPA did not necessarily consider the entire Office of the Attorney General disqualified, but only the Attorney General himself, as he had already taken a position on the criminality of the MMC project, as well as the subordinates who reported to him on the criminal matter. *See* Ex. G (GPA GM Letter to Attorney General, Mar. 31, 2025).

16. On April 9, 2025, the Attorney General wrote GPA, indicating that the attorneys of his office's Solicitors Division were capable of conducting a section 5150 review of GPA's MMC-related procurements. The Attorney General did not provide any documentation evidencing the establishment of an ethical wall to screen himself and his direct reports from the MMC procurement review. *See* Ex. H (Attorney General Letter to GPA GM, Apr. 9, 2025).

Page 4
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029   Document 9-2   Filed 06/05/25   Page 27 of 174

17. On April 10, 2025, GPA wrote the Attorney General, reiterating the request for documentation of an ethical wall. *See* Ex. I (GPA GM Letter to Attorney General, Apr. 10, 2025).

18. The Attorney General did not respond to GPA's request.

19. On April 21, 2025, the Pacific Daily News reported that Attorney General Moylan advised governmental employees involved in the "illegal" MMC infrastructure project should contact the OAG "for guidance." *See* Ex. J (Joe Taitano II, Moylan: GovGuam employees should contact AG's office for guidance on hospital project, Pacific Daily News, Apr. 21, 2025).

20. Because the conflicted Attorney General refuses to set up a screen to wall off himself and his prosecutors from the matter of GPA's MMC procurements, there is no independent counsel to conduct the section 5150 review and serve as GPA's section 5150 legal advisor, free from interference by the conflicted Attorney General and his prosecutors.

21. As a result of his actions, the Attorney General risks making himself and his entire office unavailable, as contemplated in the Guam Supreme Court's opinion in *In re Leon Guerrero*, 2024 Guam 18.

### V. Petitioner's Claims

22. Through this petition, petitioner GPA seeks to compel the Attorney General to appoint conflict-free counsel to advise GPA, i.e., the performance of an act which the law especially enjoins, as a duty resulting from an office, and further to compel respondent Moylan to perform his ministerial duty allowing petitioner GPA the use and enjoyment of its rights and entitlements to conflict-free legal advice in a section 5150 review, and from which respondent Moylan unlawfully precludes petitioner GPA notwithstanding the clear mandates of his office

Page 5
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029    Document 9-2    Filed 06/05/25    Page 28 of 174

and position as detailed in *In re Leon Guerrero*, 2024 Guam 18, 5 GCA § 5150, and the Guam Rules of Professional Conduct.

23.    Despite repeated requests by petitioner GPA, respondent Moylan has refused to perform his lawful obligations and will continue to fail to abide by these legal mandates unless this court orders respondent Moylan to comply with his ministerial duties under *In re Leon Guerrero*, 2024 Guam 18, 5 GCA § 5150, and the Guam Rules of Professional Conduct.

24.    The plain language of *In re Leon Guerrero*, 2024 Guam 18, 5 GCA § 5150, and the Guam Rules of Professional Conduct impose on respondent Moylan in these circumstances a non-discretionary duty to assign conflict-free attorney and erect a properly documented ethical wall screening himself and his prosecutors from the conflict-free attorney performing the MMC section 5150 review and serving as legal advisor.

25.    The language is unequivocal and mandatory, demonstrating petitioner GPA's entitlement to mandamus relief as requested herein.

26.    The Guam Supreme Court's opinion in *In re Leon Guerrero*, 2024 Guam 18, provides no discretion to respondent Moylan with respect to his recusal and that of his prosecutors from the section 5150 review of the MMC procurements.

27.    Petitioner GPA is expressly entitled to conflict-free counsel and a properly documented ethical wall screening respondent Moylan and his prosecutors from the section 5150 review of the MMC procurements.

28.    Petitioner GPA does not have an adequate remedy at law.

29.    Compelling respondent Moylan to assign conflict-free counsel and erect a properly documented ethical wall is the only adequate remedy available that provides petitioner

Page 6
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
GPA's Verified Petition for Writ of Mandate

GPA with its beneficial right and interest in a proper section 5150 review of the MMC procurements.

30.     Petitioner GPA submits concurrently with its petition a legal memorandum of points and authorities in support of the petition.

## VI. Prayer for Relief

WHEREFORE, petitioner GPA prays that the Superior Court of Guam issue the following relief:

1.     Issue an Alternative Writ of Mandate in the form concurrently submitted herewith, directed to respondent Moylan, compelling him to assign conflict-free counsel to GPA's procurement review and to erect an ethical wall in his office screening off all conflicted attorneys, including himself, and provide documentation thereof to petitioner GPA, or, in the alternative, to show good cause before this court at a time and date to be set forth by this court, or as soon thereafter as the matter can be heard, why he has failed to do so.

2.     Enter an order and judgment issuing the writ and making the mandamus absolute;

3.     For such relief as the court deems appropriate.

Respectfully submitted this 11th day of June, 2025.

*Attorney for the Guam Power Authority*

By: _M. Woloschuk_

_____

**Marianne Woloschuk**
GPA Legal Counsel

## Verification

I, the General Manager of the Guam Power Authority and its duly authorized representative in the above-entitled matter, declare under penalty of perjury that I have read the

Page 7
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
GPA's Verified Petition for Writ of Mandate

foregoing verified petition for writ of mandate, that I know the contents thereof, and the same is true and correct to the best of my knowledge, except as to those matters which are therein stated on information and belief, and as to those matters I believe them to be true.

Executed this 11th day of June, 2025.

**John M. Benavente, P.E.**

Page 8
*Guam Power Authority, Petitioner v. Attorney General of Guam, Respondent*
GPA's Verified Petition for Writ of Mandate

Case 1:25-cv-00029    Document 9-2    Filed 06/03/25    Page 31 of 174



**CONSOLIDATED COMMISSION ON UTILITIES**
Guam Power Authority | Guam Waterworks Authority
P.O. Box 2977 Hagåtña, Guam 96932 | (671) 648-3002 | guamccu.org

## GPA RESOLUTION NO. FY2025-09

### RELATIVE TO AUTHORIZING GPA TO BUILD A GRANT-FUNDED LINE EXTENSION AND RELATED POWER INFRASTRUCTURE IN MANGILAO

**WHEREAS,** on March 11, 2021, the American Rescue Plan Act (ARPA) was signed into law by the President, and section 9901 of ARPA amended Title VI of the Social Security Act to add section 602, which established the Coronavirus State Fiscal Recovery Fund, and section 603, which established the Coronavirus Local Fiscal Recovery Funds, which together make up the Coronavirus State and Local Fiscal Recovery Funds (SLFRF) program, which is intended to provide support to State, territorial, local, and Tribal governments (recipients) in responding to the economic and public health impacts of COVID-19 and in their efforts to contain impacts on their communities, residents, and businesses; and

**WHEREAS,** section 602(c)(1) and 603(c)(2) provide that an award of SLFRF funds may be used by the recipient to exercise substantial discretion to use the award funds in the ways that best suit the needs of their constituents, as long as such uses fit into one of the seven statutory categories, including responding to the COVID-19 public health emergency or its negative economic impacts; and

**WHEREAS,** the Department of the Treasury notified the Governor of Guam in 2022 of an award of ARPA funding, of which the Governor set aside the amount of $104,843,733.97 for the Mangilao Medical Campus (MMC) Project, which will respond to the COVID-19 public health emergency or its negative economic impacts; and

**WHEREAS,** sections 602(c)(3) and 603(c)(3) authorize a local government recipient to transfer SLFRF monies to a number of entities specified in a non-exclusive list, including a special-purpose unit of state or local government, and the 2022 Final Rule interpreting SLFRF, 31 CFR Part 35, clarifies that a recipient may transfer funds to any entity to carry out, as a subrecipient, an eligible activity on behalf of the SLFRF recipient, as long as they comply with the SLFRF Award Terms and Conditions and other applicable requirements; and

1



**CONSOLIDATED COMMISSION ON UTILITIES**
Guam Power Authority | Guam Waterworks Authority
P.O. Box 2977 Hagåtña, Guam 96932 | (671) 648-3002 | guamccu.org

1    **WHEREAS,** the Governor has designated the Guam Economic Development Authority
2    (GEDA), a public non-profit corporation, as subrecipient or subgrantor to administer the ARPA
3    grant for the MMC Project pursuant to GEDA's authority under section 50103 of Title 12 of the
4    Guam Code Annotated, *see* Exhibit A; and
5
6    **WHEREAS,** GEDA has prepared a subgrant agreement with the Guam Power Authority
7    (GPA) through which GEDA will subaward the subgrant agreement amount of $35,448,983.87 in
8    SLFRF funds to GPA as subgrantee to provide funding for the installation of power infrastructure
9    to support the MMC Project, *see* Exhibit B; and
10
11    **WHEREAS,** GPA is a public corporation established and existing under the laws of Guam
12    with the authority under section 8104(a) of Title 12 of the Guam Code Annotated to generate,
13    transmit, distribute, sell and exchange electric power on Guam; and
14
15    **WHEREAS,** the Consolidated Commission on Utilities (CCU), pursuant to section 8107
16    of Title 12 of the Guam Code Annotated, has plenary authority over financial, contractual, and
17    policy matters relative to the Guam Power Authority (GPA); and
18
19    **WHEREAS,** the MMC Project does not use public funds appropriated by I Liheslatura
20    (the Guam Legislature) and therefore does not implicate section 14110 or section 14117 of Title 4
21    of the Guam Code Annotated (governing violations of appropriations and transfer by accountable
22    or certifying officers); and
23
24    **WHEREAS,** the Guam Housing and Urban Renewal Authority (GHURA) is the owner of
25    the property where the MMC Project will be constructed, has agreed to have the property rezoned
26    for public facilities use, and has agreed to transfer a two-acre portion of the property in fee simple
27    to GPA, upon which GPA will construct an electrical substation; and
28
29    **WHEREAS,** GPA will survey the property and provide a map of the property to GHURA
30    to facilitate the transfer; and



**CONSOLIDATED COMMISSION ON UTILITIES**
Guam Power Authority | Guam Waterworks Authority
P.O. Box 2977 Hagåtña, Guam 96932 | (671) 648-3002 | guamccu.org

**WHEREAS,** the Governor has pledged that the government of Guam will assist GPA in expediting any necessary permits for GPA's part of the MMC Project; and

**WHEREAS,** the MMC Project is located in Mangilao, an area which has grown over the years and is expected to grow substantially more over the next few years, and GPA has been working to address power quality issues in the Mangilao area including searching for land to site a substation in order to address the need; and

**WHEREAS,** the new electrical infrastructure for the MMC Project will not only provide reliable energy to the MMC but will also have the benefit of improving power quality and expansion capacity in Mangilao and adjacent vicinities for the foreseeable future, by giving GPA the opportunity to fund a much-needed new substation in Mangilao and meet the growing needs of its ratepayers in the area; and

**WHEREAS,** the location of the substation at the MMC in Mangilao with underground transmission lines will also service educational institutions including the Guam Community College, George Washington High School, Price Elementary School and the University of Guam, as well as the general community within the area, and will assist with faster recoveries after natural disasters; and

**WHEREAS,** GPA must move quickly and efficiently to ensure that the grant funds are expended by December 31, 2026, as required by law; and

**WHEREAS,** GPA has already prepared the Invitation for Bid for design and construction of the new Mangilao substation, and further solicitation(s) for other necessary work are ongoing.

**NOW, THEREFORE BE IT RESOLVED,** by the Consolidated Commission on Utilities, it hereby does approve and authorize the following:

3



**CONSOLIDATED COMMISSION ON UTILITIES**
Guam Power Authority | Guam Waterworks Authority
P.O. Box 2977 Hagåtña, Guam 96932 | (671) 648-3002 | guamccu.org

1. The CCU authorizes the GPA General Manager sign the subgrant agreement between GEDA as subgrantor and GPA as subgrantee for SLFRF funds in the amount of $35,448,983.87 to provide funding for the installation of power infrastructure as set forth in the subgrant agreement in Exhibit B.

2. The CCU authorizes GPA to proceed under paragraph 2 of the Guam Public Utilities Commission's Contract Review Protocol for GPA for the procurement for design and construction of the new Mangilao substation and related work.

   **NOW, THEREFORE BE IT RESOLVED,** that the Chairman certifies and the Board Secretary attests to the adoption of this Resolution.

   **DULY AND REGULARLY ADOPTED AND APPROVED THIS 25th DAY OF FEBRUARY 2025.**

Certified by:                                    Attested by:

**FRANCIS E. SANTOS**                    **MELVIN F. DUENAS**
Chairperson                                      Secretary
Consolidated Commission on Utilities    Consolidated Commission on Utilities

4



**CONSOLIDATED COMMISSION ON UTILITIES**
Guam Power Authority | Guam Waterworks Authority
P.O. Box 2977 Hagåtña, Guam 96932 | (671) 648-3002 | guamccu.org

**I, Melvin F. Duenas**, Secretary for the Consolidated Commission on Utilities (CCU), as evidenced by my signature above do certify as follows:

The foregoing is a full, true, and accurate copy of the resolution duly adopted at a regular meeting of the members of Guam Consolidated Commission on Utilities, duly and legally held at a place properly noticed and advertised at which meeting a quorum was present and the members who were present voted as follows:

Ayes: 4

Nays: 1

Absent: 0

Abstain: 0



5



# OFFICE OF LEGAL COUNSEL

*Ufisinan I Maga'hågan Guåhan*
OFFICE OF THE GOVERNOR

LOURDES A. LEON GUERRERO
GOVERNOR OF GUAM

JOSHUA F. TENORIO
LIEUTENANT GOVERNOR OF GUAM

<u>TRANSMITTED VIA CENTRAL FILES</u>

December 27, 2024

**MELANIE MENDIOLA**, *CEO/Administrator*
DEPARTMENT OF PARKS AND RECREATION
Guam Economic Development Authority
ITC Building, Suite 511
590 S. Marine Corps Drive
Tamuning, Guam 96913
mel.mendiola@investguam.com

**RE:   GOVGUAM INTERAGENCY GRANT AGREEMENT | LEGAL-002**

*Håfa Adai* Administrator Mendiola:

Transmitted with this letter is the Government of Guam Interagency Grant Agreement for the Mangilao Medical Campus Project:

### GUAM ECONOMIC DEVELOPMENT AUTHORITY | LEGAL-002
Interagency Grant Agreement to fund the initial phase of the Mangilao Medical Campus Project, including design and construction of primary utility infrastructure; Agreement # 2024- 2024-DOAARPA-GEDA-0002.

Any questions or concerns can be sent directly to the Legal Counsels via email at: leslie.travis@guam.gov, jeffrey.moots@guam.gov, daniel.morris@guam.gov, or you may call our office at (671) 473-1117/8.

*Senseramente,*

**JEFFERY A. MOOTS**
*Legal Counsel*

Enclosure(s):  Grant Agreement | Legal-002

cc via email:  *Maga'hågan Guåhan*
              *Segundo Maga'låhen Guåhan*

Ricardo J. Bordallo Governor's Complex, Adelup, Hagåtña, Guam 96910 | P.O. Box 2950 Hagåtña, Guam Plant. Ex. A pg. 6 of 70

Case 1:25-cv-00029    Document 9-2    Filed 06/03/25    Page 29 of 154

## Government of Guam Interagency Grant Agreement

| | |
|---|---|
| **Paying State Agency**<br>Department of Administration | **Agreement Number**<br>2024-DOAARPA-GEDA-0002 |
| **Performing State Agency**<br>Guam Economic Development Authority | **Agreement Performance Beginning Date**<br>December 27, 2024 |
| **UEI/SAMS Number** | **Initial Agreement Expiration Date**<br>December 01, 2026 |
| **Agreement Maximum Amount**<br>  SLRLF                                    $104,843,733.97 | **Fund Expiration End Date**<br>December 31, 2026 |
| **Total:**                                            $104,843,733.97 | **Agreement Authority**<br>These funds are awarded and obligated pursuant to the Governor's Organic Act authority and the American Rescue Plan Act of 2021, P.L. 117-2. |

**Agreement Purpose:** The Department of Administration is entering into this Federal Award with the Guam Economic Development Authority to fund the completion of the initial phase of the Mangilao Medical Campus Project, including design and construction of primary utility infrastructure (electrical power, water, and sewer), and completion of sampling and analysis of environmental, archaeological, physical, geology and other site characteristics.

**Exhibits**

The following exhibits and attachments are included with this Interagency Grant Agreement:
1. Exhibit A. Statement of Work.
2. Exhibit B. Budget.
   a. Exhibit B1. Guam Power Authority Cost Estimate
   b. Exhibit B2. Guam Waterworks Authority Cost Estimate
   c. Exhibit B3. Civil Engineering Cost Estimate
3. Exhibit C. Federal Provisions.
4. Exhibit D. SLFRF Reporting Modification Form

| **Principal Representatives** | ʻ |
|---|---|
| **For the Government of Guam:**<br>Edward Birn, Director<br>Department of Administration<br>ITC Building, Suite 224<br>590 S. Marine Corps Drive<br>Tamuning, Guam 96913<br>edward.birn@doa.guam.gov | **For Grantee:**<br>Melanie Mendiola, CEO/Administrator<br>Guam Economic Development Authority<br>ITC Building, Suite 511<br>590 S. Marine Corps Drive<br>Tamuning, Guam 96913<br>mel.mendiola@investguam.com |

## FEDERAL AWARD(S) APPLICABLE TO THIS GRANT AWARD

1

## 1. PARTIES

This Interagency Grant Agreement ("IGA" or "Agreement") is entered into by and between the Department of Administration ("DOA" or the "Paying Agency"), and the Guam Economic Development Authority ("GEDA" or the "Performing Agency"). DOA and GEDA may each individually be referred to as a "Party" and collectively as the "Parties." Each Party is an agency of the government of Guam.

## 2. GRANT

As of the Grant Issuance Date, DOA hereby obligates and awards to GEDA grant funds in the amounts shown on the first page of this IGA. By accepting the grant funds provided under this IGA, GEDA agrees to comply with the terms and conditions of this IGA and requirements and provisions of all Exhibits to this IGA.

## 3. TERM

### A. Initial Grant Term and Extension

The Parties' respective performances under this IGA shall commence on the Agreement Performance Beginning Date shown on the Cover Page for this Agreement and shall terminate on the Initial Agreement Expiration Date shown on the Cover Page for this Agreement (the "Initial Term") unless sooner terminated or further extended in accordance with the terms of this Agreement.

### B. Early Termination in the Public Interest

DOA is entering into this IGA to serve the public interest of the Government of Guam. If this IGA ceases to further the public interest of Guam or if Government of Guam, Federal or other funds used for this IGA are not appropriated, or otherwise become unavailable to fund this IGA, DOA, in its discretion, may terminate this IGA in whole or in part by providing at least ten (10) days' written notice to GEDA that includes, to the extent practicable, the public interest justification for the termination. If DOA terminates this IGA in the public interest, DOA shall pay GEDA an amount equal to the percentage of the total reimbursement payable under this IGA that corresponds to the percentage of Work satisfactorily completed, as determined by DOA, less payments previously made. Additionally, DOA, in its discretion, may reimburse GEDA for a portion of actual, out-of-pocket expenses not otherwise reimbursed under this IGA that are incurred by GEDA and are directly attributable to the uncompleted portion of GEDA's obligations, provided that the sum of any and all reimbursements shall not exceed the maximum amount payable to GEDA hereunder. This subsection shall not apply to a termination of this IGA by DOA for breach by GEDA.

2

## C. GEDA's Termination Under Federal Requirements

GEDA may request termination of this IGA by sending notice to DOA, or to the Federal Awarding Agency with a copy to DOA, which includes the reasons for the termination and the effective date of the termination. If this IGA is terminated in this manner, then GEDA shall return any advanced payments made for work that will not be performed prior to the effective date of the termination.

## 4. STATEMENT OF WORK

GEDA shall complete the Work as described in this IGA and in accordance with the provisions of Exhibit A. Neither DOA nor the Government of Guam (and its other agencies) shall have any liability to compensate or reimburse GEDA for the delivery of any goods or the performance of any services not specifically set forth in or consistent with this IGA.

## 5. PAYMENTS TO PERFORMING AGENCY

### A. Maximum Amount

GEDA shall complete the Work as described in this Agreement and in accordance with the provisions of Exhibit A. DOA shall have no liability to compensate GEDA for the delivery of any goods or the performance of any services that are not specifically set forth in this IGA.

### B. Payment Procedures

i. GEDA shall initiate payment requests by invoice to DOA, in a form and manner approved by DOA. To facilitate Fiscal Year End closing, final invoices for each Fiscal Year should be submitted to DOA by November 15th of the following Fiscal Year.

ii. DOA shall pay each invoice within 10 days following the DOA's receipt of that invoice, so long as the amount invoiced correctly represents work completed by the GEDA and previously accepted by the DOA during the term that the invoice covers.

DOA shall pay GEDA's allowable costs, not exceeding the maximum total amount described in this IGA for all allowable costs described in this IGA and shown in the Budget, except that GEDA may adjust the amounts between each line item of the Budget without formal modification to this IGA as long as GEDA provides notice to DOA of the change, the change does not modify the total maximum amount of this IGA or the maximum amount for any Government of Guam fiscal year, and the change does not modify any requirements of the Work. GEDA may request, and DOA may make direct payment to vendors or subcontractors for allowable costs as authorized by the Treasury Rules, and only in satisfaction of costs incurred as a result of the IGA. DOA shall only pay allowable costs if those costs are: (i) reasonable and necessary to accomplish the Work and for the Goods

3

and Services provided; and (ii) equal to the actual net cost to GEDA (i.e. the price paid minus any items of value received by GEDA that reduce the cost actually incurred).

The U.S. Department of the Treasury has issued a 2024 Compliance Supplement for Assistance Listing 21.027 Coronavirus State and Local Fiscal Recovery Funds ("Compliance Supplement"). The Compliance Supplement provides guidance to auditors and grant recipients regarding the ARP SLRF and applicable federal regulations, and also provides a guide on how to audit the federal funds.

The procurement requirement under the Compliance Supplement states that, "recipients may use award funds to enter into contracts to procure goods and services necessary to complement one or more of the eligible purposes . . . recipients are expected to have procurement policies and procedures in place that comply with the procurement standards outlined in the Uniform Guidance." Uniform Guidance procurement methods are stated in 2 CFR Part 200 Subpart D - Procurement Standards.

In addition, under Procurement Standards 2 CFR §200.324(c), procurement funded by federal funds "must not use the cost plus a percentage of cost and percentage of construction cost methods of contracting."

### C. Close-Out

GEDA shall close out this IGA within 45 days after the Grant Expiration Date. To complete close out, GEDA shall submit to DOA all deliverables (including documentation) as defined in this IGA and GEDA's final reimbursement request or invoice. DOA will withhold 5% of allowable costs set forth in reimbursement requests or invoices submitted by GEDA during the final three months of the performance period, until all final documentation has been submitted and accepted by DOA as substantially complete.

## 6. REPORTING - NOTIFICATION

### A. Performance and Final Status

GEDA shall submit all financial, performance and other reports to DOA no later than the end of the close out described in §5C, containing an evaluation and review of GEDA's performance and the final status of GEDA's obligations hereunder.

### B. Violations Reporting

GEDA shall disclose, in a timely manner, in writing to DOA and the Federal Awarding Agency, all violations of federal, state, or Guam criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal Award. DOA or the Federal Awarding Agency may seek to impose any penalties for noncompliance allowed under 2 CFR Part 180 and 31 U.S.C. 3321, which may include, without limitation, suspension or debarment.

4

## 7. PERFORMING AGENCY RECORDS

### A. Maintenance and Inspection

GEDA shall make, keep, and maintain, all official records, documents, communications, notes and other written materials, electronic media files, and communications, pertaining in any manner to this IGA for a period of five years following the completion of the close out of this IGA. GEDA shall permit the DOA and its delegees to audit, inspect, examine, excerpt, copy and transcribe all such records at all reasonable times and places during the term of this IGA, unless DOA determines that an audit or inspection is required without notice at a different time to protect the interests of DOA or the Government of Guam.

### B. Monitoring

DOA will monitor GEDA's performance of its obligations under this IGA using procedures as determined by DOA. GEDA shall allow DOA to perform all monitoring required by the Uniform Guidance and otherwise, based on DOA's risk analysis of GEDA. DOA shall have the right, in its sole discretion, to change its monitoring procedures and requirements at any time during the term of this IGA. DOA shall monitor GEDA's performance in a manner that does not unduly interfere with GEDA's performance of the Work. If GEDA enters into a subcontract or subgrant with an entity that would be considered a Subrecipient, then the subcontract or subgrant entered into by GEDA shall contain provisions permitting both GEDA and DOA to perform all monitoring of that Subcontractor in accordance with the Uniform Guidance or as otherwise determined necessary by DOA in its sole discretion.

### C. Final Audit Report

GEDA shall promptly submit to DOA a copy of any final audit report of an audit performed on GEDA's records that relates to or affects this IGA or the Work, whether the audit is conducted by GEDA or a third party.

## 8. CONFIDENTIAL INFORMATION-GOVERNMENT OF GUAM RECORDS

### A. Confidentiality

Each Party shall treat the confidential information of the other Party with the same degree of care and protection it affords to its own confidential information, unless a different standard is set forth in this Agreement. Each Party shall notify the other Party immediately if it receives a request or demand from a third party for records or information of the other Party.

5

## 9. CONFLICTS OF INTEREST

GEDA shall not engage in any business or activities, or maintain any relationships that conflict in any way with the full performance of GEDA's obligations under this IGA. GEDA acknowledges that, with respect to this IGA, even the appearance of a conflict of interest is harmful to the Government of Guam's interests and absent DOA's prior written approval, GEDA shall refrain from any practices, activities or relationships that reasonably appear to be in conflict with the full performance of GEDA's obligations under this IGA. If a conflict or the appearance of a conflict arises, or if GEDA is uncertain whether a conflict or the appearance of a conflict has arisen, GEDA shall submit to DOA a disclosure statement setting forth the relevant details for DOA's consideration. DOA shall inform GEDA of its position as to GEDA's disclosure statement within ten (10) business days of receiving said disclosure.

## 10. DISPUTE RESOLUTION

The failure of a Party to perform its respective obligations in accordance with the provisions of this IGA is a breach of this IGA. In the event of disputes concerning performance hereunder or otherwise related to this IGA, the Parties shall attempt to resolve them at the agency level. Except as herein specifically provided otherwise or as required or permitted by federal regulations related to any Federal Award that provided any of the Grant Funds, disputes concerning the performance of this IGA that cannot be resolved by agency representatives shall be referred in writing to the Office of the Governor for resolution.

## 11. NOTICES AND REPRESENTATIVES

Each individual identified as a Principal Representative on the Cover and Signature Pages for this Agreement shall be the Principal Representative of the designating Party. All notices required or permitted to be given under this Agreement shall be in writing, and shall be delivered (A) by hand with receipt required, (B) by certified or registered mail to such Party's Principal Representative at the address set forth on the Cover Page or (C) as an email with read receipt requested to the Principal Representative at the email address, if any, set forth on the Cover Page for this Agreement. Either Party may change its Principal Representative by notice submitted in accordance with this section without a formal amendment to this Agreement. Unless otherwise provided in this Agreement, notices shall be effective upon delivery of the written notice.

## 12. GENERAL PROVISIONS

### A. Assignment

GEDA's rights and obligations under this IGA are personal and may not be transferred or assigned without the prior, written consent of DOA. Any attempt at assignment or transfer without such consent shall be void. Any assignment or transfer of GEDA's rights and obligations approved by DOA shall be subject to the provisions of this IGA.

6

## B. Captions and References

The captions and headings in this IGA are for convenience of reference only, and shall not be used to interpret, define, or limit its provisions. All references in this IGA to sections (whether spelled out or using the § symbol), subsections, exhibits or other attachments, are references to sections, subsections, exhibits or other attachments contained herein or incorporated as a part hereof, unless otherwise noted.

## C. Entire Understanding

This IGA represents the complete integration of all understandings between the Parties related to the Work, and all prior representations and understandings related to the Work, oral or written, are merged into this IGA.

## D. Modification

DOA may modify the terms and conditions of this IGA by issuance of an Amended IGA, which shall be effective if GEDA countersigns the IGA or accepts Grant Funds following its receipt of the Amended IGA. The Parties may also agree to modification of the terms and conditions of the IGA in a formal amendment to this IGA, properly executed and approved in accordance with applicable Guam law.

## E. Statutes, Regulations, Fiscal Rules, and Other Authority

Any reference in this IGA to a statute, regulation, rule, fiscal policy, or other authority shall be interpreted to refer to such authority then current, as may have been changed or amended since the Grant Issuance Date. GEDA shall strictly comply with all applicable Federal, State, and Guam laws, rules, and regulations in effect or hereafter established, including, without limitation, laws applicable to discrimination and unfair employment practices.

## F. Severability

The invalidity or unenforceability of any provision of this IGA shall not affect the validity or enforceability of any other provision of this IGA, which shall remain in full force and effect, provided that the Parties can continue to perform their obligations under the IGA in accordance with the intent of the IGA.

## G. Survival of Certain IGA Terms

Any provision of this IGA that imposes an obligation on a Party after termination or expiration of the IGA shall survive the termination or expiration of the IGA and shall be enforceable by the other Party.

7

### H. Third Party Beneficiaries

Except for the Parties' respective successors and assigns described above, this IGA does not and is not intended to confer any rights or remedies upon any person or entity other than the Parties. Any services or benefits which third parties receive as a result of this IGA are incidental to the IGA, and do not create any rights for such third parties.

### I. Waiver

A Party's failure or delay in exercising any right, power, or privilege under this IGA, whether explicit or by lack of enforcement, shall not operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise of such right, power, or privilege.

### J. Compliance with Guam and Federal Law, Regulations, and Executive Orders

GEDA shall comply with all Guam and Federal law, regulations, executive orders, Guam and Federal Awarding Agency policies, procedures, directives, and reporting requirements at all times during the term of this IGA.

### K. Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the Government of Guam. The Parties agree that any legal action or proceeding arising out of or relating to this Agreement shall be brought exclusively in the courts of the Government of Guam, and the Parties hereby irrevocably consent to the jurisdiction of such courts.

[Signature page follows.]

8

IN WITNESS of the above provisions, the Parties have executed this Interagency Grant Agreement on the last of the dates below stated.

**For the Department of Administration:**

_____

**EDWARD M. BIRN**, Director

December 30, 2024

Date

**For the Guam Economic Development Authority:**

_____

**MELANIE A. MENDIOLA**, CEO/Administrator

12/27/24

Date

**Certified Funds Available:**
$104,843,733.97
Account No. 681-21-9266203

**CLEARED PER BBMR'S REVIEW**

**DEC 27 2024**

_____

**LESTER L. CARLSON, JR.**, Director,
Bureau of Budget and Management Research
Certifying Officer

9

## EXHIBIT A: STATEMENT OF WORK

### I.  Purpose

The Department of Administration ("DOA") is entering into this Federal Award with the Guam Economic Development Authority ("GEDA") to fund the completion of the initial phase of the Mangilao Medical Campus ("MMC") project, including completion of the design and construction of primary utility infrastructure (electrical power, water, and sewer), and completion of the sampling and analysis of environmental, archaeological, physical, geological and other site characteristics.

For details on the ARPA funding, see Cover Page, Federal Award(s) Applicable to This Grant Award.

### II.  Notification

**To the DOA:**

> Edward Birn, Director
> edward.birn@doa.guam.gov
> Department of Administration
> ITC Building, Suite 224
> 590 S. Marine Corps Drive
> Tamuning, Guam 96913

**To GEDA:**

> Melanie Mendiola, CEO/Administrator
> mel.mendiola@investguam.com
> Guam Economic Development Authority
> ITC Building, Suite 511
> 590 S. Marine Corps Drive
> Tamuning, Guam 96913

### III.  Performance Period

> The performance period and expiration date are stated on the IGA cover page.

> DOA shall not be responsible or liable for goods or services delivered or performed prior to issuance of this IGA.

10

## IV. Definitions

- **"ARPA"** means the American Rescue Plan Act of 2021.
- **"SLFRF"** means State and Local Fiscal Recovery Fund.

## V. Personnel

### A. Responsible Administrator

GEDA's performance hereunder shall be under the direct supervision of Melanie Mendiola, Chief Executive Officer/Administrator of GEDA, who is hereby designated as the responsible administrator of this project.

The responsible administrator may delegate oversight of the Work – not including contracting authority–to another Government of Guam employee, if prior notice of the delegation is provided to DOA and the delegee meets at least the following minimum qualifications:

1. College degree or minimum of four years' experience in government administration, procurement, project administration, and/or construction management.

2. Strong oral and written communication and interpersonal skills.

3. Strong organizational and problem-solving skills.

4. Familiarity with Guam governmental operations.

### B. Other Personnel

1. GEDA represents that, in addition to the expertise of its current employees, GEDA will leverage the available expertise of other Government of Guam agencies where it believes such expertise can be productively applied.

2. GEDA may use its budgeted "Administrative Fee" as set forth herein to defray its staffing expenses attributable to the Services.

3. Further notwithstanding the above, DOA and GEDA expressly agree that efficient, effective completion of the scope of work will require GEDA to procure professional services including but not limited to design and engineering services as well as inspection and construction management services, and that such procured professional services are eligible expenses for Grant Funds.

### C. Secondment from Other Government of Guam Agencies

If GEDA determines that it would be advantageous to formally second staff with particular expertise from another Government of Guam agency to GEDA, GEDA may make such request to the contact designated by DOA and in the manner prescribed by DOA. The

11

request should, at a minimum, include the expertise requested, together with any suggestions for Government of Guam staff possessing the needed expertise, the anticipated timeframe of the secondment, and the proposed funding source for the secondment. All such requests will be promptly considered but will necessarily involve balancing the utility of the secondment against the disadvantage, if any, to the proposed secondee's default agency and responsibilities.

**D. Procured Professional Services**

DOA and GEDA expressly contemplate that GEDA will contract for the provision of certain professional services in support of the Work and the Services, including but not limited to architectural and engineering design, environmental assessment, construction, and construction management and inspection services.

**VI.  Work Tasks and Deliverables**

A. **Work tasks:** GEDA will develop a project strategy for efficient completion of the Work, consistent with the below budget narrative. GEDA, working in close coordination with GHURA and other Guam agencies as necessary, will procure, as necessary, professional and construction services and organize the assistance of other Government of Guam agencies and, as appropriate, enter into memoranda of agreement with those agencies and other entities. GEDA will oversee all activities, ensure that all activities are consistent with this IGA and process invoices for payment as required in memoranda of agreement with other agencies and entities. GEDA will, in coordination with the Office of the Governor, lead public communication efforts. GEDA will be lead communicator with Guam regulatory and inspection agencies for the project. GEDA will oversee the budget against project completion and will coordinate the preparation of periodic reports as described below.

GEDA is authorized by 12 GCA § 50103 to finance, acquire, construct, reconstruct, rehabilitate, or improve hospital facilities, and provide such hospital facilities to serve the general public and to make reasonably accessible to all the people of Guam modern and efficient hospital facilities. To assist in achieving this objective, GEDA will complete the initial phase of the Mangilao Medical Campus Project, including design and construction of primary utility infrastructure (electrical power, water and wastewater), and prepare an Environmental Condition of Property report which analyzes environmental, archaeological, physical, geology and other characteristics of the MMC property or portions thereof in compliance with local and federal laws and regulations. The MMC property will be identified by DOA. GEDA may request and DOA may approve acquisition by GEDA of other properties as may be necessary to perform its obligations under this IGA.

Preliminary analysis indicates that the proposed location for the medical campus lacks basic infrastructure to support not only the MMC but also developments within the surrounding area. As a result, GEDA will execute interagency agreements with government of Guam utility and infrastructure agencies to provide infrastructure design and construction services for off-site infrastructure that will service the MMC in compliance with local and federal law and regulations.

**Electrical Power**

Guam Power Authority (GPA) provides power and power infrastructure to Guam through the use of oil-fired power generators (94.3%) and renewable power generation (5.7%). Currently electricity is distributed to the grid around the medical campus site. New development would require additional electrical infrastructure. GEDA intends to enter into an interagency agreement with GPA to design and construct the additional electrical infrastructure. Once completed, GPA will apportion sufficient electrical supply from the generating capacity installed to meet the needs of the MMC.

Preliminary analysis indicates that the following electrical infrastructure may be required:

- Power substation
- Power tie-ins from GU-15
- Transmission lines that intercept Barrigada-Pulantat for aboveground transmission lines
- Dedicated feeder serving the new hospital
- Additional circuit utilized for backfeed capabilities

The design process that will be instituted by GPA will confirm electrical infrastructure requirements.

**Potable Water and Wastewater**

The Guam Waterworks Authority (GWA) provides water and wastewater infrastructure on Guam. The hospital campus water demand has been calculated as double the Guam Memorial Hospital's current water consumption, in addition to public health and behavioral health water consumption. The sewer load is estimated to be 90 percent of the water demand.

GEDA will execute an interagency agreement with GWA to design and construct water and wastewater improvements and apportion sufficient water and wastewater capacity to meet the needs of the MMC.

Based on the initial review of the water demand analysis by GWA, the medical campus would require the following off-site water infrastructure:

- Two (2) Wells design and exploration
- 6-inch water line extensions to 2 new wells
- Storage tank(s) with total volume of 2.5 million gallons and piping

- Pumping system

Offsite Wastewater Facilities preliminarily include:

- Lalo Street gravity sewer main upgrade
- Route 10 gravity sewer main upgrade (pipes & manholes)
- Barrigada sewer pump station upgrade
- Barrigada force main upgrade
- Route 8 gravity sewer upgrade
- Route 1 gravity sewer upgrade (pipes & manholes)
- Hagåtña Main sewer pump station
- Hagåtña Main force main

The design process that will be instituted by GWA will confirm water and wastewater infrastructure requirements.

B. **Specific deliverables:**

1. Registration of the unified MMC property in a single parcel, appropriately zoned, with all necessary rights and registrations recorded with the Division of Land Management.   *GHURA*

2. Architectural and engineering design of plans and construction specifications for electrical power infrastructure to bring needed infrastructure to the campus site, including as necessary power substations, power tie-ins from Route 15, transmission lines that intercept Barrigada-Pulantat for above-ground transmission lines, a dedicated feeder serving the new campus, an additional circuit utilized for backfeed capabilities, and other electrical facilities as determined to be advisable in consultation with the Guam Power Authority.   *GPA*

3. Architectural and engineering design of plans and construction specifications for potable water infrastructure to bring needed infrastructure to the campus site, including as necessary Offsite Water System improvements to include design and exploration of two (2) water wells, six-inch water line extensions to two (2) new wells, storage tank(s) with total volume of 2.5 million gallons and piping, pumping system and potable water facilities as determined to be advisable in consultation with the Guam Waterworks Authority and the Guam Environmental Protection Agency.   *GWA*

4. Architectural and engineering design of plans and construction specifications for wastewater disposal infrastructure to bring needed infrastructure to the campus site, including as necessary offsite sewer system improvements, new sewer pump stations, force mains, gravity sewer upgrades, gravity sewer main upgrade (pipes and manholes), sewer pump station upgrades, and related work as determined to be   *GWA*

advisable in consultation with the Guam Waterworks Authority and the Guam Environmental Protection Agency.

5. Required environmental studies of site characteristics to enable facility design and to satisfy any permitting requirements including hydrology, karst topography, geology, archaeology, cultural and historic resources, groundwater quality, endangered species, environment, noise, impacts on residents living nearby, and other characteristics as determined to be advisable for analysis pursuant to the National Environmental Policy Act and Guam law.

C. **Optional Additions:** If funding becomes available, GEDA may prepare estimates and proposals to include additional related work to the Specific Deliverables, which DOA may accept or decline, including but not limited to:

1. Analysis of required broadband and communication infrastructure improvements.

2. Architectural and engineering design of plans and construction specifications for highway infrastructure including as necessary widening of GU-15 to six (6) lanes of travel and related improvements, traffic signals at arterial road intersections, main entrance road, road dedicated for emergency and employee ingress and egress, secondary public ingress and egress, pedestrian crossings and sidewalks, and other highway improvements as determined to be advisable in consultation with the Guam Department of Public Works and consistent with applicable federal highway requirements.

3. Engineering design of plans and construction specifications for broadband and communication infrastructure improvements to bring needed infrastructure to the campus site.

4. Procurement of a construction manager for construction of the MMC.

5. Architectural and engineering design of plans and construction specifications for a general service, community hospital facility, suitable for accreditation by as a Level I trauma center, with up to 300 beds, suitable to provide specialty services and have an outpatient clinic component and preparation of a draft Invitation for Bid.

## VII.    Reporting

### A. Annual and Final Report(s)

GEDA will fulfill the performance and financial reporting requirements as outlined in this section.

15

**B. Performance and Financial Reporting Requirements Due Date(s)**

    1. Core Performance:

Within 45 days of the execution of this IGA, GEDA will prepare for review and acceptance by DOA a master calendar with an anticipated schedule for the performance and completion of all core activities required for successful and timely completion of the Work, including but not limited to the specific deliverables detailed above. The Core Performance schedule will subdivide the project as a whole, assigning percentages to appropriate milestones quantified to appropriately state, on a weekly basis, the percentage complete the project as a whole is against the scheduled percentage of completion.

    2. Monthly:

Due by the fifth of the month, GEDA will submit its Monthly Report to DOA. The Monthly Report will include ((i) the Core Performance actual and scheduled percentages; (ii) milestones achieved in the last month; (iii) planned activities for the next two months; (iv) an abbreviated budget overview of expenses paid to date, unpaid expenses incurred, and Grant Funds that remain. The Monthly Report will also list vendor invoices received in the previous month and expected vendor billings for the next two months. The Monthly Report will also list Government of Guam staff other than GEDA staff employed on the project in the previous month and any expected other-than-GEDA Government of Guam staff participation requested for the next two months. Each Monthly Report should also include a brief narrative of the previous month's project successes and, as appropriate, a brief analysis of any challenges encountered.

    3. Quarterly:

GEDA will submit a quarterly Grant Itemization Report with evidence of expenditures in a form that complies with U.S. Department of Treasury reporting requirements and meet with DOA to resolve any questions or comments. If the U.S. Department of Treasury changes reporting requirements, GEDA agrees to comply with the revised requirements.

    4. Annually:

GEDA shall submit an annual report as specified below. These reports shall include but are not limited to a summary of the following:

- Progress as to Specific Deliverables
- Budget v. Actuals
- Anticipated potential upcoming challenges
- Project utilization of non-GEDA Government of Guam resources
- Upcoming project efficiency or other opportunities
- Economic impact reporting

16

The annual reports are due according to the schedule below:

- Report 1: June 2, 2025
- Report 2: June 1, 2026

GEDA shall provide DOA with an explanation and action plan for any performance measurements that are not on target.

## VIII.    Budget and Payment

Payments shall be made in accordance with the provisions set forth in the Grant and its attached exhibits, including this Exhibit A. The project budget is set forth in Exhibit B.

The maximum amount payable under the terms and conditions of this IGA shall not exceed $104,843,733.97. Any amount in excess of these totals, must be agreed to by both parties, must be provided by a properly executed option or amendment to this IGA.

### Matching Funds

No match required.

### Grant Funds

2024-DOAARPA-GEDA-0002    $104,843,733.97

## IX.    Administrative Requirements

### A.  Accounting

1. At all times from the Effective Date of this Grant until completion of the Work, GEDA shall maintain properly segregated books of Grant Funds, matching funds (if any), and other funds associated with the Work.

2. All receipts and expenditures associated with said Work shall be documented in a detailed and specific manner, and shall accord with the Work Budget set forth herein.

3. GEDA shall assume responsibility for seeing that all funding is expended, accounted for and reported, consistent with underlying agreements, program objectives and with allowable cost, applicable rules and regulations addressed by 2 CFR 200 and originating grant award provisions.

4. Adjustments of budget expenditure amounts in excess of ten percent (10%) must be authorized by DOA in an amendment to this IGA properly executed and approved pursuant to DOA procedures.

17

5. In no event shall GEDA's total consideration exceed the amount indicated in "Budget" above.

6. Reimbursement requests must include the standard reimbursement summary sheet and supporting documentation of the amounts listed on the summary sheet, including but not limited to an original ticked general ledger from the host accounting system.

## B. Monitoring

DOA shall monitor this Work on an as-needed basis. DOA may choose to audit the business activities performed under this Grant. GEDA shall maintain a complete file of all records, documents, communications, notes and other written materials or electronic media, files or communications, which pertain in any manner to the operation of activities undertaken pursuant to an executed Grant. Such books and records shall contain documentation of the participant's pertinent activity under this Grant in a form consistent with good accounting practice.

## C. Discretionary Audit

DOA, or any of its duly authorized representatives, including an independent Certified Public Accountant of DOA's choosing, or the federal government or any of its properly delegated or authorized representatives shall have the right to inspect, examine, and audit GEDA's (and any of GEDA's contractor's) records, books, accounts and other relevant documents. Such a discretionary audit may be requested at any time and for any reason from the effective date of this IGA until three (3) years after the date final payment for the project is received by GEDA or applicable federal audit period, whichever is later. The cost of a discretionary audit will be borne by the DOA.

## D. Mandatory Audit

Whether or not DOA calls for a discretionary audit as provided above, GEDA shall provide DOA copies of annual audit reports for the period of the project. In addition, GEDA shall supply DOA with copies of all correspondence from any auditor related to any findings relevant to the project. If an audit reveals evidence of non-compliance with applicable requirements, or other issues pertaining to the administration of federal funds, DOA reserves the right to institute compliance, or other appropriate measures, to address audit findings.

## E. Specific Terms and Conditions

1. Expenses incurred by GEDA in association with this project **prior to the Effective Date and after December 31, 2026** are not eligible Grant expenditures under this grant and will not be reimbursed by DOA.

18

2. GEDA will maintain an office conveniently located and easily accessible to the community.

3. GEDA will maintain a publicly listed telephone in the name of the "Guam Economic Development Authority" The phone will be answered "Guam Economic Development Authority" or "GEDA."

4. GEDA's office will be staffed and operational during normal business hours.

5. All advertising or other promotional materials developed or distributed in connection with conferences or other meetings or gatherings must contain the following statement: "Reasonable accommodations for persons with disabilities will be made, if requested in advance."

6. GEDA employees, volunteers, and paid consultants must sign and abide by the applicable conflict of interest policy.

7. The responsible administrator or her delegate must actively participate in any calls scheduled by DOA or the Office of the Governor concerning the Grant Work and must respond to all email inquiries from either as soon as reasonably possible.

8. All off-island travel using grant funds must be approved by DOA before travel occurs.

## X.  Additional Terms and Conditions

All terms and provisions from the following Exhibits apply in full effect for this Grant Award:

This Exhibit A: Statement of Work

Exhibit B: Budget

a. Exhibit B1. Guam Power Authority Cost Estimate
b. Exhibit B2. Guam Waterworks Authority Cost Estimate
c. Exhibit B3. Civil Engineering Cost Estimate

Exhibit C: Federal Provisions

Exhibit D: Sample SLFRF Reporting Modification Form

19

## EXHIBIT B: BUDGET

## 1. BUDGET BY US TREASURY EXPENDITURE CATEGORY

1.1 Expenditure Categories:

| BUDGET SUMMARY | |
|---|---|
| Power | $ 35,448,983.97 |
| Water | $ 26,130,000.00 |
| Wastewater | $ 36,772,250.00 |
| GEDA Administrative Fee | $1,000,000.00 |
| Civil Engineering | $5,492,500.00 |
| **TOTAL** | **$104,843,734.97** |

1.2 Power. The Guam Power Authority (GPA) has provided a cost estimate (attached as Exhibit B1) estimating costs to provide a new looped underground transmission line from Route 10 to the MCC, a new indoor substation, and new distribution upgrades to provide upgraded service to the MCC and surrounding areas.

| POWER COST ESTIMATE | |
|---|---|
| New indoor substation | $ 12,484,469.26 |
| New transmission underground lines | $15,876,635.62 |
| New underground dedicated feeder and backup tie-in | $ 7,087,879.09 |
| **TOTAL** | **$ 35,448,983.97** |

1.3 Water. The Guam Waterworks Authority (GWA) has provided a cost estimate estimating the cost to meet the estimated water consumption for the MCC (attached as Exhibit B2), which entails development of an offsite water system, including well design, well construction, water line extensions, storage tanks, and a pumping system.

| WATER COST ESTIMATE | |
|---|---|
| Well design and exploration | $ 1,950,000.00 |
| Well construction – 2 wells | $11,700,000.00 |
| 6-inch water line extension to 2 new wells | $ 2,340,000.00 |
| Storage tank(s) | $ 7,215,000.00 |
| Pumping system | $ 2,925,000.00 |
| **TOTAL** | **$ 26,130,000.00** |

1.4 Wastewater. GWA has additionally provided alternative wastewater cost estimates in Exhibit B2 based on whether an easement is attained from the U.S. military for a sewer connection point on Lalo Street in Mangilao or GWA is required to connect to a gravity sewer line near Dimas Street in Mangilao. The cost estimate utilized herein is based on the more conservative alternative that would require GWA to connect near Dimas Street. In the event an easement is attained from the U.S. military

for a sewer connect point on Lalo Street, the amounts needed to complete the wastewater needs of the MMC may be reduced and funds may be reprogrammed for other project needs.

GWA has additionally identified capital improvement projects it is planning to undertake for the Barrigada gravity system and force main, which will also be necessary for the MMC project, and may provide an opportunity for cost-sharing between the developer and GWA. Amounts included herein reflect the sum of estimated developer costs and 50% of estimated amounts for potential cost shares with GWA for the Barrigada gravity system project.

| WASTEWATER COST ESTIMATE | |
|---|---|
| Route 15 new sewer pump station | $2,500,000.00 |
| Route 15 new force main to Dimas Street | $6,800,000.00 |
| Route 15 SMH upgrades | $390,000.00 |
| Route 10 gravity sewer main (pipes) | $5,265,000.00 |
| | (50% of potential cost share) |
| Added Route 10 gravity sewer main upgrade to Mangilao SPS | $4,680,000.00 |
| Added Route 10 SMH upgrades to Mangilao SPS | $195,000.00 |
| Route 10 gravity sewer main upgrade (manholes) | $292,500.00 |
| | (50% of potential cost share) |
| Mangilao sewer pump station upgrade | $625,000.00 |
| | (50% of potential cost share) |
| Mangilao SPS force main upgrade | $2,100,000.00 |
| | (50% of potential cost share) |
| Added Route 10 gravity line upgrade (AMC to Lalo) | $3,607,500.00 |
| | (50% of potential cost share) |
| Added Route 10 SMH upgrade (AMC to Lalo) | $146,250.00 |
| | (50% of potential cost share) |
| Barrigada sewer pump station upgrade | $625,000.00 |
| | (50% of potential cost share) |
| Barrigada force main upgrade | $4,558,500.00 |
| | (50% of potential cost share) |
| Route 1 gravity sewer upgrade (pipes) | $4,500,000.00 |
| Route 1 gravity sewer upgrade (manholes) | $487,500.00 |
| | |
| **TOTAL** | **$36,772,250** |

1.5    GEDA Administrative Fee. As the grantee herein, GEDA will be entitled to an administrative fee of One Million dollars ($1,000,000.00) for services and costs associated with the tasks assigned to it under this IGA, to be paid in disbursements according to the following schedule:

| ADMINISTRATIVE FEE SCHEDULE | |
|---|---|
| 12/30/2024 | $111,111 |
| 03/30/2025 | $111,111 |
| 06/30/2025 | $111,111 |
| 09/30/2025 | $111,111 |
| 12/30/2025 | $111,111 |
| 03/30/2026 | $111,111 |
| 06/30/2026 | $111,111 |
| 09/30/2026 | $111,111 |
| 12/30/2026 | $111,112 |

21

Writ Pet. Ex. A p. 27 of 70
Case 1:25-cv-00029   Document 9-2   Filed 06/05/25   Page 58 of 154

1.6    Civil Engineering/Environmental Conditions. GEDA shall prepare or cause to be prepared a detailed inventory of data required for the preparation of the Environmental Condition of Property report and utilize the inventory as a guide for data collection efforts. Data from existing databases and studies shall be used to the extent available, supplemented with field surveys, sampling and exploration and interviews with knowledgeable individuals and local and federal agency personnel. Data concerning impacts on residents living nearby, utilities and infrastructure, cultural and historic resources, groundwater quality, endangered species, traffic and other factors must be collected and considered in the preparation of the EA, consistent with local and federal laws and regulations. All necessary consultation efforts with local and federal agencies shall also be conducted. The cost estimate for Environmental Engineering (attached as Exhibit B3) entails a Site Feasibility Study, including a Site Survey Analysis, Environmental Impact Assessment, and Section 106 Assessment for a +/- 105 acre project site, for a total of $5,492,500.00.

## 2.  EXPENDITURE CATEGORY MODIFICATION

2.1    Increase or decrease in any Expenditure Category must be requested by GEDA and approved by DOA.

22

# EXHIBIT B1: POWER COST ESTIMATE

The need for a new hospital in central Guam stems from the island's growing population, increased demand for healthcare services, and the strategic importance of the area. Central Guam is experiencing significant growth, driven by the military buildup and associated population increases, including both military personnel and their dependents. This growth places additional pressure on the island's existing healthcare facilities, which are already operating near or beyond capacity.

Guam Memorial Hospital (GMH), the island's public healthcare facility, faces numerous challenges, including aging infrastructure, limited bed space, and outdated medical equipment. These issues hinder its ability to meet the current and future healthcare needs of the population. A new hospital in central Guam would alleviate these pressures by providing additional capacity and state-of-the-art facilities to serve both civilian and military communities. Its location in central Guam would ensure better accessibility for a significant portion of the island's population, reducing travel time and improving emergency response capabilities.

However, this places additional strain on GPA's current electrical infrastructure, in particular the substations. GPA manages an extensive network of substations that play a critical role in the island's electrical distribution system. At present, there are 30 substations that service an estimated 53,000 customers. These substations are the backbone of Guam's power infrastructure. GPA operates both primary and secondary substations, which are located across the island to support efficient energy distribution and minimize transmission losses.

Many of these substations face challenges due to Guam's geographic and environmental conditions, including vulnerability to typhoons and salt water corrosion. To address these issues and improve resilience, GPA has been actively upgrading its substation assets by incorporating modern technologies such as automated monitoring systems and more robust structural designs. These upgrades are essential to support Guam's growing energy demands, particularly with the ongoing military buildup and the integration of renewable energy sources into the grid. By enhancing the reliability and capacity of its substation network, GPA is working to ensure a stable power supply for both the civilian population and critical infrastructure on the island.

In addition to the new hospital, the growing population in central Guam necessitates the construction of an additional substation to meet the rising energy demands and improve the reliability of the electrical grid. Existing substations in the area are already operating near capacity, and as more homes, businesses, and military facilities come online, the current grid infrastructure risks becoming overburdened. This could lead to higher rates of outages, inefficiencies in power distribution, and challenges in integrating renewable energy sources.

The Service Location Density Map and the Transformer Density maps provide a visual representation of Guam's substation locations and the areas they currently serve. The heatmap highlights population density, which correlates with energy demand. Central Guam, particularly the regions surrounding Dededo, Tamuning, Barrigada, and Harmon, exhibits the highest density of service areas. These regions are experiencing rapid population growth due to residential expansion, economic activity, and the ongoing military buildup, which is increasing the number of civilian residents, military personnel, and H-2B construction workers on the island.

1

Case 1:25-cv-00029   Document 9-2   Filed 06/03/25   Page 60 of 174   Writ Pet. Ex. A p. 29 of 70

This surge in population results in a proportional increase in energy demand for homes, businesses, and support infrastructure, such as schools, healthcare facilities, and military installations. The current substations in these densely populated areas may soon reach or exceed their capacity limits, leading to potential grid instability or inefficiencies in energy delivery. Furthermore, upcoming developments, including new housing, hospitals, and defense projects, will place additional strain on these substations, necessitating the construction of new energy infrastructure or the expansion of existing facilities.


SERVICE LOCATION DENSITY MAP


TRANSFORMER DENSITY MAP

Shown below are the estimated costs to provide a new looped underground transmission line from Route 10 to the new hospital site, a new indoor substation, and new distribution upgrades to provide upgraded service to the new hospital and surrounding areas.

| New Mangilao Hospital Substation | | |
|---|---|---|
| Updated 12/10/2024 | | |
| item | Description | Cost |
| 1 | New Indoor Substation | $ 12,484,469.26 |
| 2 | New Transmission Underground Lines | $ 15,876,635.62 |
| 3 | New Underground Dedicated Feeder and Back Up Tie-In | $ 7,087,879.09 |
| | Total Cost | $ 35,448,983.97 |

2

Investing in a new substation may involve significant short-term costs, but the long-term benefits far outweigh these initial expenditures. A new substation increases the capacity, reliability, and resilience of Guam's power grid—ensuring that growing demand from residential, commercial, and critical infrastructure, like hospitals and military facilities, can be met without strain or outages. In the long run, this investment minimizes the risks of blackouts, reduces maintenance costs associated with overburdened substations, and improves efficiency by preventing overloads and power losses. Furthermore, modern substations can better integrate renewable energy sources, which supports Guam's goals for sustainability and energy security. By investing now, Guam will avoid costly disruptions and emergency repairs in the future—securing a more reliable and adaptable power infrastructure for decades to come.

Along with a new substation, the construction of a new hospital in central Guam can be better served with the installation of underground power lines to provide a reliable, resilient, and efficient energy supply. Hospitals rely on uninterrupted power to operate essential medical equipment, maintain lighting, and power life-saving systems, such as ventilators and emergency response units. Any disruption in electricity can jeopardize patient care and hospital operations. As we have seen during Typhoon Mawar, underground power lines offer enhanced resilience against Guam's frequent typhoons and severe weather events, which can damage overhead lines through strong winds, debris, or falling trees. By protecting the power supply infrastructure from such hazards, underground lines help ensure the hospital remains operational during emergencies when it is needed most.

In addition to improving disaster resilience, underground lines minimize power outages caused by accidents or external interference, providing a consistent and dependable energy supply. Paired with a new indoor substation, this infrastructure will reduce strain on nearby power systems, preventing grid overload and ensuring stability even during peak energy demand. As Guam's population grows, the hospital's energy needs are expected to increase. A substation and underground lines offer the scalability required to support future expansions and long-term reliability. This investment is critical not only for the hospital's operational needs but also for strengthening Guam's overall energy infrastructure and supporting its growing central population.

3

# EXHIBIT B2: WATER AND WASTEWATER COST ESTIMATE

**Mangilao Hospital Water and Sewer**
**Rough Order of Magnitude (ROM) Cost Estimates**
**Updated by Guam Waterworks Authority**
**December 2024**

*The cost estimates provided herein by GWA are informational only, and GWA makes no guarantee, expressed or implied, for its application or use at any time.*

The hospital campus water demand was calculated as double GMH's current water consumption, in addition to public health and behavioral health water consumption. The sewer load was estimated to be 90 percent of the water demand. The following cost estimates are subject to changes in anticipated water demand and sewer load. Cost estimates include factors to account for design costs, construction management costs, and material cost increases due to supply chain issues. Actual costs may differ

## Offsite Water System

Offsite well development will be needed to offset water demand. New wells are estimated at 150 gallons per minute (gpm) production. Candidate well locations are to be drilled and pump tested during design to confirm viability of development of a production well. Property for each new well, approximately ¼ acre or 100ft x 100ft lots, will be provided by the developer, along with access easement and utility connections (power and waterline). It is assumed that the hospital developer can allow wells to be placed on the medical campus property or be able to negotiate with the Department of Defense to allow the wells to be placed on adjacent/nearby military property if hydrologically feasible. If developer cannot provide for installation of wells in this manner, alternative sites will need to be provided. Individual well site locations will determine the cost to extend power at water lines to the site; 2000 ft used for estimate purposes. One acre is needed for onsite water storage and pumping systems. The general scope and costs for this work are presented below.

| ESTIMATED WATER COSTS | |
|---|---|
| **Offsite Water System Improvements** | **Hospital Developer Cost** |
| Well design and exploration | $ 1,950,000.00 |
| Well construction - 2 wells (estimated at 150 gpm) | $11,700,000.00 |
| 6-inch water line extensions to 2 new wells | $ 2,340,000.00 |
| Storage tank(s) with total volume of 2.5 million gallons and piping | $ 7,215,000.00 |
| Pumping system | $ 2,925,000.00 |
| | **$26,130,000.00** |

# EXHIBIT B3: ENVIRONMENTAL ENGINEERING ESTIMATE

| Phase | Task | Details | For +/-10%-acre Project Site Assessment ($) |
|---|---|---|---|
| **Guam Medical Complex - Environmental Engineering Cost Estimate (Estimate good for 130 days)** | | | |
| Site Feasibility Study | Site Survey and Analysis | Topographic survey, geotechnical investigations, sinkhole assessment, environmental site assessment. | |
| | | Geotechnical Investigations: $5000 to $7000 per boring | 735,000.00 |
| | | Sinkhole Assessment: $25,000 to $40,000 per sinkhole | 120,000.00 |
| | | Geophysical Surveys: $150k to $300k for a 305-acre site | 900,000.00 |
| | | Topographic and boundary survey $200k to $400k | 400,000.00 |
| | | Environmental Assessment: Phase 1 (NEPA) | 750,000.00 |
| | | Hydrological Study: $80k to $170k | 120,000.00 |
| | Environmental Impact Assessment | Assessment of flora/fauna impact and water table concerns. (NEPA) | 400,000.00 |
| | Section 106 | National Historic Preservation Act Requirements | 300,000.00 |
| | | Project Management of all Specialties | 500,000.00 |
| | | 30% Contingency | 1,267,500.00 |
| | | **Total Government Estimate** | **5,492,500.00** |

27

## EXHIBIT C: FEDERAL PROVISIONS

1. **Applicability of Provisions**

   1.1. The Grant to which these Federal Provisions are attached has been funded, in whole or in part, with an Award of Federal funds. In the event of a conflict between the provisions of these Federal Provisions, the Special Provisions, the body of the Grant, or any attachments or exhibits incorporated into and made a part of the Grant, the provisions of these Federal Provisions shall control.

   1.2. DOA is accountable to Treasury for oversight of their subrecipients, including ensuring subrecipients comply with the SLFRF statute, SLFRF Award Terms and Conditions, Treasury's Final Rule, and reporting requirements, as applicable.

   1.3. Additionally, any subrecipient that issues a subaward to another entity (2nd tier or lower tier subrecipient), must hold the lower tier subrecipient accountable to these provisions and adhere to reporting requirements.

   1.4. These Federal Provisions are subject to the Award as defined in § 2 of these Federal Provisions, as may be revised pursuant to ongoing guidance from the relevant Federal or Government of Guam agency.

2. **Definitions**

   2.1. **For the purposes of these Federal Provisions,** the following terms shall have the meanings ascribed to them below.

   2.1.1. "Award" means an award of Federal financial assistance, and the Grant setting forth the terms and conditions of that financial assistance, that a non-Federal Entity receives or administers.

   2.1.2. "Unique Entity Identifier (UEI)" means the twelve-character alphanumeric ID assigned to an entity by SAM.gov

   2.1.3. "Entity" means:

   2.1.3.1. a Non-Federal Entity;

   2.1.3.2. a foreign public entity;

   2.1.3.3. a foreign organization;

   2.1.3.4. a non-profit organization;

   2.1.3.5. a domestic for-profit organization (for 2 CFR parts 25 and 170 only);

   2.1.3.6. a foreign non-profit organization (only for 2 CFR part 170) only);

   2.1.3.7. a Federal agency, but only as a Subrecipient under an Award or Subaward to a non-Federal entity (or 2 CFR 200.1); or

   2.1.3.8. a foreign for-profit organization (for 2 CFR part 170 only).

   2.1.4. "Executive" means an officer, managing partner or any other employee in a management position.

   2.1.5. "Expenditure Category (EC)" means the category of eligible uses as defined by the US Department of Treasury in "Appendix 1 of the Compliance and

Reporting Guidance, State and Local Fiscal Recovery Funds" report available at www.treasury.gov.

2.1.6. "Federal Awarding Agency" means a Federal agency providing a Federal Award to a Recipient as described in 2 CFR 200.1.

2.1.7. "Grant" means the Grant to which these Federal Provisions are attached.

2.1.8. "Grantee" means the party or parties identified as such in the Grant to which these Federal Provisions are attached. Grantee also means Subrecipient.

2.1.9. "Non-Federal Entity" means a State or Territory, local government, Indian tribe, institution of higher education, or nonprofit organization that carries out a Federal Award as a Recipient or a Subrecipient.

2.1.10. "Nonprofit Organization" means any corporation, trust, association, cooperative, or other organization, not including institutions of higher education, that:

    2.1.10.1. Is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest;

    2.1.10.2. Is not organized primarily for profit; and

    2.1.10.3. Uses net proceeds to maintain, improve, or expand the operations of the organization.

2.1.11. "OMB" means the Executive Office of the President, Office of Management and Budget.

2.1.12. "Pass-through Entity" means a non-Federal Entity that provides a Subaward to a Subrecipient to carry out part of a Federal program.

2.1.13. "Prime Recipient" means the Government of Guam or the Government of Guam agency or institution of higher education identified as the Grantor in the Grant to which these Federal Provisions are attached.

2.1.14. "Subaward" means an award to a Subrecipient funded in whole or in part by a Federal Award. The terms and conditions of the Federal Award flow down to the Subaward unless the terms and conditions of the Federal Award specifically indicate otherwise in accordance with 2 CFR 200.101. The term does not include payments to a Contractor or payments to an individual that is a beneficiary of a Federal program.

2.1.15. "Subrecipient" or "Subgrantee" means a non-Federal Entity (or a Federal agency under an Award or Subaward to a non-Federal Entity) receiving Federal funds through a Prime Recipient to support the performance of the Federal project or program for which the Federal funds were awarded. A Subrecipient is subject to the terms and conditions of the Federal Award to the Prime Recipient, including program compliance requirements. The term does not include an individual who is a beneficiary of a federal program.

2.1.16. "System for Award Management (SAM)" means the Federal repository into which an Entity must enter the information required under the Transparency Act, which may be found at http://www.sam.gov.

2.1.17. "Transparency Act" means the Federal Funding Accountability and Transparency Act of 2006 (Public Law 109-282), as amended by §6202 of Public Law 110-252.

2.1.18. "Uniform Guidance" means the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. The terms and conditions of the Uniform Guidance flow down to Awards to Subrecipients unless the Uniform Guidance or the terms and conditions of the Federal Award specifically indicate otherwise.

## 3. Compliance

3.1. GEDA shall comply with all applicable provisions of the Transparency Act and the regulations issued pursuant thereto, all applicable provisions of the Uniform Guidance, and all applicable Federal Laws and regulations required by this Federal Award Any revisions to such provisions or regulations shall automatically become a part of these Federal Provisions, without the necessity of either party executing any further instrument. DOA, at its discretion, may provide written notification to GEDA of such revisions, but such notice shall not be a condition precedent to the effectiveness of such revisions.

3.2. Per US Treasury Final Award requirements, grantee programs or services must not include a term or conditions that undermines efforts to stop COVID-19 or discourages compliance with recommendations and CDC guidelines.

## 4. System for Award Management (SAM) and Unique Entity ID (UEI) Requirements

4.1. SAM. GEDA shall maintain the currency of its information in SAM until GEDA submits the final financial report required under the Award or receives final payment, whichever is later. GEDA shall review and update SAM information at least annually after the initial registration, and more frequently if required by changes in its information.

4.2. UEI. GEDA shall provide its UEI number to its Prime Recipient, and shall update GEDA's information in SAM.gov at least annually after the initial registration, and more frequently if required by changes in GEDA's information.

## 5. Reporting

5.1. If GEDA is a Subrecipient of the Award pursuant to the Transparency Act, GEDA shall report data elements to SAM and to DOA as required in this Exhibit. No direct payment shall be made to GEDA for providing any reports required under these Federal Provisions and the cost of producing such reports shall be included in the Grant price. The reporting requirements in this Exhibit are based on guidance from the OMB, and as such are subject to change at any time by OMB. Any such changes shall be automatically incorporated into this Grant and shall become part of GEDA's obligations under this Grant.

## 6. Subrecipient Reporting Requirements

6.1. Subrecipient shall report as set forth below.

6.1.1. To SAM. A Subrecipient shall register in SAM and report the following data elements in SAM *for each* Federal Award Identification Number (FAIN) assigned by a Federal agency to a Recipient no later than the end of the month following the month in which the Subaward was made:

    6.1.1.1. Subrecipient Unique Entity ID;

    6.1.1.2. Subrecipient Unique Entity ID if more than one electronic funds transfer (EFT) account;

    6.1.1.3. Subrecipient parent's organization Unique Entity ID;

    6.1.1.4. Subrecipient's address, including: Street Address, City, State, Country, Zip + 4, and Congressional District;

    6.1.1.5. Subrecipient's top 5 most highly compensated Executives if the criteria in §4 above are met; and

    6.1.1.6. Subrecipient's Total Compensation of top 5 most highly compensated Executives if the criteria in §4 above met.

6.1.2. To Recipient. A Subrecipient shall report to its Recipient, upon the effective date of the Grant, the following data elements:

    6.1.2.1. Subrecipient's Unique Entity ID as registered in SAM.

    6.1.2.2. Primary Place of Performance Information, including: Street Address, City, State, Country, Zip code + 4, and Congressional District.

6.2. Subrecipient also agrees to comply with any reporting requirements established by the US Treasury, Governor's Office and DOA. DOA may need additional reporting requirements after this agreement is executed. If there are additional reporting requirements, DOA will provide notice of such additional reporting requirements via Exhibit D: SLFRF Reporting Modification Form.

## 7. PROCUREMENT STANDARDS

7.1 Procurement Procedures. GEDA's procurement procedures remain subject to Guam's Procurement Law, 5 GCA § 5001, *et seq.*, and the regulations thereto, 2 GAR Division 4. GEDA shall therefore use its procurement procedures, which reflect applicable Guam law and applicable regulations, and policies of the Procurement Policy Office, provided that the procurements conform to applicable Federal law and the standards identified in the Uniform Guidance, including without limitation, 2 CFR 200.318 through 200.327 thereof.

7.2 Domestic preference for procurements (2 CFR 200.322). As appropriate and to the extent consistent with law, the non-Federal entity should, to the greatest extent practicable under a Federal award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other

31

manufactured products). The requirements of this section must be included in all subawards including all agreements and purchase orders for work or products under this award.

7.3 Procurement of Recovered Materials. If a Subrecipient is a Government of Guam Agency, its Contractors must comply with section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 CFR part 247, that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired during the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

7.4 Never contract with the enemy (2 CFR 200.215). Federal awarding agencies and recipients are subject to the regulations implementing "Never contract with the enemy" in 2 CFR part 183. The regulations in 2 CFR part 183 affect covered contracts, grants and cooperative agreements that are expected to exceed $50,000 within the period of performance, are performed outside the United States and its territories, and are in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

7.5 Prohibition on certain telecommunications and video surveillance services or equipment (2 CFR 200.216). Subrecipient is prohibited from obligating or expending loan or grant funds on certain telecommunications and video surveillance services or equipment pursuant to 2 CFR 200.216.

8. **ACCESS TO RECORDS.**

   8.1. A Subrecipient shall permit Recipient and its auditors to have access to Subrecipient's records and financial statements as necessary for Recipient to meet the requirements of 2 CFR 200.332 (Requirements for pass-through entities), 2 CFR 200.300 (Statutory and national policy requirements) through 2 CFR 200.309 (Period of performance), and Subpart F-Audit Requirements of the Uniform Guidance.

9. **SINGLE AUDIT REQUIREMENTS.**

   9.1. If a Subrecipient expends $750,000 or more in Federal Awards during the Subrecipient's fiscal year, the Subrecipient shall procure or arrange for a single or program-specific audit conducted for that year in accordance with the provisions of Subpart F-Audit Requirements of the Uniform Guidance, issued pursuant to the Single Audit Act Amendments of 1996, (31 U.S.C. 7501-7507). 2 CFR 200.501.

   9.2. Election. A Subrecipient shall have a single audit conducted in accordance with Uniform Guidance 2 CFR 200.514 (Scope of audit), except when it elects

to have a program-specific audit conducted in accordance with 2 CFR 200.507 (Program-specific audits). The Subrecipient may elect to have a program-specific audit if Subrecipient expends Federal Awards under only one Federal program (excluding research and development) and the Federal program's statutes, regulations, or the terms and conditions of the Federal award do not require a financial statement audit of Prime Recipient. A program-specific audit may not be elected for research and development unless all of the Federal Awards expended were received from Recipient and Recipient approves in advance a program-specific audit.

9.3. Exemption. If a Subrecipient expends less than $750,000 in Federal Awards during its fiscal year, the Subrecipient shall be exempt from Federal audit requirements for that year, except as noted in 2 CFR 200.503 (Relation to other audit requirements), but records shall be available for review or audit by appropriate officials of the Federal agency, the State, and the Government Accountability Office.

9.4. Subrecipient Compliance Responsibility. A Subrecipient shall procure or otherwise arrange for the audit required by Subpart F of the Uniform Guidance and ensure it is properly performed and submitted when due in accordance with the Uniform Guidance. Subrecipient shall prepare appropriate financial statements, including the schedule of expenditures of Federal awards in accordance with 2 CFR 200.510 (Financial statements) and provide the auditor with access to personnel, accounts, books, records, supporting documentation, and other information as needed for the auditor to perform the audit required by Uniform Guidance Subpart F-Audit Requirements.

## 10. REQUIRED PROVISIONS FOR SUBRECEPIENT WITH SUBCONTRACTORS.

10.1. In addition to other provisions required by the Federal Awarding Agency or the Recipient, Subrecipients shall include all of the following applicable provisions;

10.1.1. For agreements with Subrecipients – Include the terms in the Grant Federal Provisions Exhibit (this exhibit)

10.1.2. For contracts with Subcontractors – Include all terms required by federal law and regulations.

## 11. CERTIFICATIONS.

11.1. Unless prohibited by Federal statutes or regulations, Prime Recipient may require Subrecipient to submit certifications and representations required by Federal statutes or regulations on an annual basis. 2 CFR 200.208. Submission may be required more frequently if Subrecipient fails to meet a requirement of the Federal award. Subrecipient shall certify in writing to DOA at the end of the Award that the project or activity was completed or the level of effort was expended. 2 CFR 200.201(3). If the required level of activity or effort was not carried out, the amount of the Award must be adjusted.

## 12.  EXEMPTIONS

12.1.   These Federal Provisions do not apply to an individual who receives an Award as a natural person, unrelated to any business or non-profit organization he or she may own or operate in his or her name.

12.2.   A grantee with gross income from all sources of less than $300,000 in the previous tax year is exempt from the requirements to report Subawards and the Total Compensation of its most highly compensated Executives.

## 13.  EVENT OF DEFAULT AND TERMINATION.

13.1.   Failure to comply with these Federal Provisions shall constitute an event of default under the Grant and DOA may terminate the Grant upon 30 days prior written notice if the default remains uncured five calendar days following the termination of the 30-day notice period. This remedy will be in addition to any other remedy available to DOA under the Grant, at law or in equity.

13.2.   Termination (2 CFR 200.340). The Federal Award may be terminated in whole or in part as follows:

13.2.1.   By the Federal Awarding Agency or Pass-through Entity, if a Non-Federal Entity fails to comply with the terms and conditions of a Federal Award;

13.2.2.   By the Federal awarding agency or Pass-through Entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

13.2.3.   By the Federal awarding agency or Pass-through Entity with the consent of the Non- Federal Entity, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;

13.2.4.   By the Non-Federal Entity upon sending to the Federal Awarding Agency or Pass- through Entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal Awarding Agency or Pass-through Entity determines in the case of partial termination that the reduced or modified portion of the Federal Award or Subaward will not accomplish the purposes for which the Federal Award was made, the Federal Awarding Agency or Pass-through Entity may terminate the Federal Award in its entirety; or

13.2.5.   By the Federal Awarding Agency or Pass-through Entity pursuant to termination provisions included in the Federal Award.

34

## EXHIBIT D: SAMPLE SLFRF REPORTING MODIFICATION FORM

| Grantee: | | | Grant Agreement No: | |
|---|---|---|---|---|
| Project Title: | | | Project No: | |
| Project Duration: | To: | | From: | |

This form serves as notification that there has been a change to the reporting requirements set forth in the original SLFRF Grant Agreement.

The following reporting requirements have been (add/remove additional rows as necessary):

| Updated Reporting Requirement (Add/Delete/Modify) | Project Number | Reporting Requirement |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

By signing this form, the Grantee agrees to and acknowledges the changes to the reporting requirements set forth in the original SLFRF Grant Agreement. All other terms and conditions of the original SLFRF Grant Agreement, with any approved modifications, remain in full force and effect. Grantee shall submit this form to the Department of Administration within 10 business days of the date sent by that Agency.

_____          _____
Grantee                                                          Date

_____          _____
Department of Administration                        Date

35

# Government of Guam Subgrant Agreement

| Subgrantor | Agreement Number |
|---|---|
| Guam Economic Development Authority | 2025-GEDA-GPA-0001 |

| Subgrantee | Agreement Performance Beginning Date |
|---|---|
| Guam Power Authority | February xx, 2025 |

| | Initial Agreement Expiration Date |
|---|---|
| **Subaward Agreement Amount** | December 1, 2026 |

| SLRF | $35,448,983.97 | **Fund Expenditure End Date** |
|---|---|---|
| | | December 31, 2026 |

| Total | $35,448,983.97 | **Agreement Authority** |
|---|---|---|
| | | Authority to enter into this Agreement exists in 12 GCA § 50103. |

**Agreement Purpose:** In accordance with 12 GCA § 50103, the purpose of this Agreement is to provide funding for the installation of power infrastructure to support the Mangilao Medical Campus Project. The work to be completed under this Agreement by the Subgrantee is more specifically described in Exhibit A.

## Exhibits and Order of Precedence

The following Exhibits and attachments are included with this Agreement:

1. Exhibit A – Statement of Work and Budget.
2. Exhibit B – Federal Provisions.
3. Exhibit C – Agreement with Subrecipient of Federal Recovery Funds

In the event of a conflict or inconsistency between this Agreement and any Exhibit or attachment, such conflict or inconsistency shall be resolved by reference to the documents in the following order of priority:

1. Exhibit B – Federal Provisions.
2. Exhibit C – Agreement with Subrecipient of Federal Recovery Funds
3. Provisions in the main body of this Agreement.
4. Exhibit A – Statement of Work and Budget.

## Principal Representatives

For the Subgrantor:

Melanie Mendiola
Guam Economic Development Authority
ITC Building, Suite 511
590 S. Marine Corps Drive
Tamuning, Guam 96913
mel.mendiola@investguam.com

For Subgrantee:

John M. Benavente, P.E.
Guam Power Authority
P.O. Box 2977
Hagåtña, Guam 96932-2977
jbenavente@gpagwa.com

1. **PARTIES.** This Agreement is entered into by and between the Guam Economic Development Authority ("GEDA") and the Guam Power Authority ("GPA") (collectively "the Parties"). The Parties agree to the terms and conditions in this Agreement.

2. **SUBGRANT.** As of the Subgrant Issuance Date, GEDA hereby obligates and awards to GPA grant funds in the amounts shown on the cover page of this Agreement. By accepting the grant funds provided under this Agreement, GPA agrees to comply with the terms and conditions of this Agreement and requirements and provisions of all Exhibits to this Agreement.

3. **TERM AND EFFECTIVE DATE**

   A. **Effective Date.** This Agreement shall not be valid or enforceable until the Effective Date, and the Grant Funds shall be expended by the Fund Expenditure End Date shown on the Cover Page for this Agreement. GEDA shall not be bound by any provision of this Agreement before the Effective Date, and shall have no obligation to pay GPA for any Work performed or expense incurred before the Effective Date or after the Fund Expenditure End Date.

   B. **Initial Term.** The Parties' respective performances under this Agreement shall commence on the Agreement Performance Beginning Date shown on the Cover Page for this Agreement and shall terminate on the Initial Agreement Expiration Date shown on the Cover Page for this Agreement (the "Initial Term") unless sooner terminated or further extended in accordance with the terms of this Agreement.

   C. **Early Termination in the Public Interest.** GEDA is entering into this Agreement to serve the public interest of Guam, as determined by the Department of Administration ("DOA") and provided in the Interagency Grant Agreement executed by and between DOA and GEDA on December 30, 2024. If DOA determines that this Agreement has ceased to further the public interest of Guam or if Government of Guam, Federal or other funds used for this Agreement are not appropriated, or otherwise become unavailable to fund this Agreement, GEDA may terminate this Agreement in whole or in part by providing at least forty-five (45) days' written notice to GPA that includes, to the extent practicable, the public interest justification for the termination. If GEDA terminates this Agreement in the public interest, GEDA shall pay GPA an amount equal to the percentage of the total reimbursement payable under this Agreement that corresponds to the percentage of Work satisfactorily completed, as determined by GEDA, less payments previously made. Additionally, GEDA, in its discretion, may reimburse GPA for a portion of actual, out-of-pocket expenses not otherwise reimbursed under this Subgrant Agreement that are incurred by GPA and are directly attributable to the uncompleted portion of GPA's obligations, provided that the sum of any and all reimbursements shall not exceed the maximum amount payable to GPA hereunder, and shall be in compliance with the 2021 Interim Final Rule, the 2022 Final Rule, and the 2023 Interim Final Rule ("Treasury Rules") issued by the U.S. Department of the Treasury ("Treasury"), and other applicable federal laws or regulations. This subsection shall not apply to a termination of this Agreement by GEDA for breach by GPA.

   D. **GPA's Termination Under Federal Requirements** GPA may request termination of this Agreement by sending notice to GEDA, or to the Federal Awarding Agency with a copy to GEDA and DOA, which includes the reasons for the termination and the effective date of the termination. If this Agreement is terminated in this manner, then GPA shall return any advanced payments made for work that will not be performed prior to the effective date of the termination.

4. **STATEMENT OF WORK AND BUDGET.** GPA shall complete the Work as described in this Agreement and in accordance with the provisions of Exhibit A. GEDA shall have no liability to compensate GPA for the delivery of any goods or the performance of any services that are not

specifically set forth in this Agreement.

## 5. PAYMENTS TO GPA

**A. Subaward Maximum Amount.** GPA shall complete the Work as described in this Agreement and in accordance with the provisions of Exhibit A. GEDA shall have no liability to compensate GPA for the delivery of any goods or the performance of any services that are not specifically set forth in this Agreement.

**B. Payment Procedures**

i. GPA shall initiate payment requests by invoice to GEDA, in a form and manner approved by GEDA. To facilitate Fiscal Year End closing, final invoices for each Fiscal Year should be submitted to GEDA by November 15th of the following Fiscal Year.

ii. GEDA shall pay each invoice within 21 days following the GEDA's receipt of that invoice, so long as the amount invoiced correctly represents work completed by GPA and previously accepted by GEDA during the term that the invoice covers.

iii. GEDA shall pay GPA's allowable costs, not exceeding the maximum total amount described in this Agreement for all allowable costs described in this Agreement and shown in the Budget, except that GPA may adjust the amounts between each line item of the Budget without formal modification to this Agreement as long as GPA provides notice to GEDA of the change, the change does not modify the total maximum amount of this Agreement or the maximum amount for any Government of Guam fiscal year, and the change does not modify any requirements of the Work. GEDA shall only pay allowable costs if those costs are: (i) reasonable and necessary to accomplish the Work and for the Goods and Services provided; and (ii) equal to the actual net cost to GPA (i.e. the price paid minus any items of value received by GPA that reduce the cost actually incurred).

The U.S. Department of the Treasury has issued a 2024 Compliance Supplement for Assistance Listing 21.027 Coronavirus State and Local Fiscal Recovery Funds ("Compliance Supplement"). The Compliance Supplement provides guidance to auditors and grant recipients regarding the American Rescue Plan Act ("ARPA") State and Local Fiscal Recovery Funds ("SLFRF") and applicable federal regulations, and also provides a guide on how to audit the federal funds.

The procurement requirement under the Compliance Supplement states that, "recipients may use award funds to enter into contracts to procure goods and services necessary to complement one or more of the eligible purposes . . . recipients are expected to have procurement policies and procedures in place that comply with the procurement standards outlined in the Uniform Guidance." Uniform Guidance procurement methods are stated in 2 CFR Part 200 Subpart D - Procurement Standards.

In addition, under Procurement Standards 2 CFR §200.324(c), procurement funded by federal funds "must not use the cost plus a percentage of cost and percentage of construction cost methods of contracting."

iv. If federal funds or funds from any other non-Government of Guam funds constitute all or some of the Grant Funds, GEDA's obligation to pay GPA shall be contingent upon such non-Government of Guam funding continuing to be made available for payment. Payments to be made pursuant to this Agreement shall be made only from Grant Funds, and GEDA's liability for such payments shall be limited to the amount remaining of such Grant Funds. If State, federal or other funds are not appropriated, or otherwise become unavailable to fund this Agreement, GEDA may, upon written notice, terminate this Agreement, in whole or in part, without incurring further liability. GEDA shall, however, remain obligated to pay for

Services and Goods that are delivered and accepted prior to the effective date of notice of termination, and this termination shall otherwise be treated as if this Agreement were terminated in the public interest as described in §3.C.

  v. The close-out of a Federal Award does not affect the right of the Federal Awarding Agency or the Government of Guam to disallow costs and recover funds on the basis of a later audit or other review. Any cost disallowance recovery is to be made within the Record Retention Period, as defined below.

**C.**  **Close-Out.** GPA shall close out this Award within 30 days after the Fund Expenditure End Date shown on the Cover Page for this Agreement. To complete close-out, GPA shall submit to GEDA all Deliverables (including documentation) as defined in this Agreement and GPA's final reimbursement request or invoice. GEDA will withhold 5% of allowable costs set forth in reimbursement requests or invoices submitted by GPA during the final 3 months of the performance period, until all final documentation has been submitted and accepted by GEDA as substantially complete.

## 6. REPORTING - NOTIFICATION

**A.**  **Quarterly Reports.** In addition to any reports required pursuant to any other Exhibit, for any Agreement having a term longer than three months, GPA shall submit, on a quarterly basis, a written report specifying progress made for each specified performance measure and standard in this Agreement. Such progress report shall be in accordance with the procedures developed and prescribed by GEDA. Progress reports shall be submitted to GEDA not later than five (5) Business Days following the end of each calendar quarter or at such time as otherwise specified by GEDA.

**B.**  **Performance and Final Status.** GPA shall submit all financial, performance and other reports to GEDA no later than the closeout described in §5C, containing an evaluation and review of GPA's performance and the final status of GPA's obligations hereunder.

**C.**  **Violations Reporting.** GPA shall disclose, in a timely manner, in writing to GEDA and DOA, all violations of federal, state, or Guam criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal Award. The Federal Awarding Agency may seek to impost any penalties for noncompliance allowed under 2 CFR Part 180 and 31 U.S.C. 3321, which may include, without limitation, suspension or debarment.

## 7. GPA RECORDS

**A.**  **Maintenance and Inspection.** GPA shall make, keep, and maintain, all official records, documents, communications, notes and other written materials, electronic media files, and communications, pertaining in any manner to this Agreement for a period of five years following the completion of the close out of this Agreement. GPA shall permit GEDA or DOA and its delegees to audit, inspect, examine, excerpt, copy and transcribe all such records at all reasonable times and places during the term of this Agreement, unless GEDA or DOA determines that an audit or inspection is required without notice at a different time to protect the interests of GEDA, DOA or the Government of Guam.

**B.**  **Monitoring.** GEDA will monitor GPA's performance of its obligations under this Agreement using procedures as determined by GEDA. GPA shall allow GEDA and DOA to perform all monitoring required by the Uniform Guidance and otherwise, based on GEDA and/or DOA's risk analysis of GPA. GEDA shall have the right, in its sole discretion, to change its monitoring procedures and requirements at any time during the term of this Agreement. GEDA shall monitor GPA's performance in a manner that does not unduly interfere with GPA's performance of the Work.

**C. Final Audit Report.** GPA shall promptly submit to GEDA a copy of any final audit report of an audit performed on GPA's records that relates to or affects this Agreement or the Work, whether the audit is conducted by GPA or a third party.

## 8. CONFIDENTIAL INFORMATION AND RECORDS

**A. Confidentiality.** Each Party shall treat the confidential information of the other Party with the same degree of care and protection it affords to its own confidential information, unless a different standard is set forth in this Agreement. Each Party shall notify the other Party immediately if it receives a request or demand from a third party for records or information of the other Party.

**B. Other Entity Access and Nondisclosure Agreements.** GPA may provide Government of Guam records to its agents, employees, assigns and Subcontractors as necessary to perform the Work, but shall restrict access to Government of Guam Confidential Information to those agents, employees, assigns and Subcontractors who require access to perform their obligations under this Agreement. GPA shall ensure all agents, employees, assigns, and Subcontractors sign agreements containing nondisclosure provisions at least as protective as those in this Agreement, and that the nondisclosure provisions are in force at all times the agent, employee, assign or Subcontractor has access to any Government of Guam Confidential Information. GPA shall provide copies of those signed nondisclosure provisions to the Government of Guam upon execution of the nondisclosure provisions if requested by the State.

## 9. CONFLICTS OF INTEREST

**A. Actual Conflicts of Interest.** GPA shall not engage in any business or activities or maintain any relationships that conflict in any way with the full performance of the obligations of GPA under this Agreement. GPA acknowledges that, with respect to this Agreement, even the appearance of a conflict of interest shall be harmful to the Government of Guam's interests. Absent GEDA's prior written approval, GPA shall refrain from any practices, activities or relationships that reasonably appear to be in conflict with the full performance of GPA's obligations under this Agreement.

## 10. INSURANCE. GPA shall ensure that each Subcontractor shall obtain and maintain, insurance as specified in this section at all times during the term of this Agreement. All insurance policies required by this Agreement that are not provided through self-insurance shall be issued by insurance companies as approved by the Government of Guam.

**A. Workers' Compensation.** Workers' compensation insurance as required by Guam law, and employers' liability insurance covering all Subcontractor employees acting within the course and scope of their employment.

**B. General Liability.** Commercial general liability insurance covering premises operations, fire damage, independent contractors, products and completed operations, blanket contractual liability, personal injury, and advertising liability with minimum limits as follows:

    i. $1,000,000 each occurrence;

    ii. $1,000,000 general aggregate;

    iii. $1,000,000 products and completed operations aggregate; and

    iv. $50,000 any 1 fire.

**C. Automobile Liability.** Automobile liability insurance covering any auto (including owned,

hired and non-owned autos) with a minimum limit of $1,000,000 each accident combined single limit.

**D. Additional Insured.** The Government of Guam shall be named as additional insured on all commercial general liability policies (leases and construction contracts require additional insured coverage for completed operations) required of GPA's Subcontractors.

**E. Primacy of Coverage.** Coverage required of each Subcontractor shall be primary over any insurance or self- insurance program carried by GPA or the Government of Guam.

**F. Cancellation.** All insurance policies shall include provisions preventing cancellation or non-renewal, except for cancellation based on non-payment of premiums, without at least 30 days prior notice to GPA and GPA shall forward such notice to GEDA and DOA in accordance with section 12 (Notices and Representatives) within seven days of GPA's receipt of such notice.

**G. Subrogation Waiver.** All insurance policies secured or maintained by GPA's Subcontractors in relation to this Agreement shall include clauses stating that each carrier shall waive all rights of recovery under subrogation or otherwise against GPA or the Government of Guam, its agencies, institutions, organizations, officers, agents, employees, and volunteers.

**H. Certificates.** GPA shall provide to GEDA and DOA certificates evidencing Subcontractor insurance coverage required under this Agreement prior to the Effective Date, except that, if GPA's subcontract is not in effect as of the Effective Date, GPA shall provide to GEDA and DOA certificates showing Subcontractor insurance coverage required under this Agreement within seven (7) Business Days following GPA's execution of the subcontract. No later than fifteen (15) days before the expiration date of GPA's or any Subcontractor's coverage, GPA shall deliver to GEDA and DOA certificates of insurance evidencing renewals of coverage. At any other time during the term of this Agreement, upon request by GEDA or DOA, GPA shall, within seven (7) Business Days following the request by GEDA or DOA, supply to GEDA or DOA evidence satisfactory to DOA of compliance with the provisions of this section.

**11. DISPUTE RESOLUTION.** The failure of a Party to perform its respective obligations in accordance with the provisions of this subgrant agreement is a breach of this subgrant agreement. In the event of disputes concerning performance hereunder or otherwise related to this subgrant agreement, the Parties shall attempt to resolve them at the agency level. Except as herein specifically provided otherwise or as required or permitted by federal regulations related to any Federal Award that provided any of the Grant Funds, disputes concerning the performance of this subgrant agreement that cannot be resolved by agency representatives shall be referred in writing to the Office of the Governor for resolution.

**12. NOTICES and REPRESENTATIVES.** Each individual identified as a Principal Representative on the Cover Page for this Agreement shall be the principal representative of the designating Party. All notices required or permitted to be given under this Agreement shall be in writing, and shall be delivered (A) by hand with receipt required, (B) by certified or registered mail to such Party's principal representative at the address set forth on the Cover Page for this Agreement or (C) as an email with read receipt requested to the principal representative at the email address, if any, set forth on the Cover Page for this Agreement. If a Party delivers a notice to another through email and the email is undeliverable, then, unless the Party has been provided with an alternate email contact, the Party delivering the notice shall deliver the notice by hand with receipt required or by certified or registered mail to such Party's principal representative at the address set forth on the Cover Page for this Agreement. Either Party may change its principal representative or principal representative contact information, or may designate specific other individuals to receive certain types of notices in addition to or in lieu of a principal representative, by notice submitted in accordance with this section without a formal amendment to this Agreement. Unless otherwise provided in this Agreement, notices shall be effective upon delivery of the written notice.

## 13. GENERAL PROVISIONS

**A. Assignment.** GPA's rights and obligations under this Agreement are personal and may not be transferred or assigned without the prior, written consent of GEDA and DOA. Any attempt at assignment or transfer without such consent shall be void. Any assignment or transfer of GPA's rights and obligations approved by GEDA and DOA shall be subject to the provisions of this Agreement.

**B. Subcontracts.** GPA shall not enter into any subaward or subcontract in connection with its obligations under this Agreement without the prior, written approval of GEDA. GPA shall submit to GEDA a copy of each such subaward or subcontract upon request by GEDA. All subawards and subcontracts entered into by GPA in connection with this Agreement shall comply with all applicable federal and Guam laws and regulations, shall provide that they are governed by the laws of Guam, and shall be subject to all provisions of this Agreement.

**C. Binding Effect.** All provisions of this Agreement, including the benefits and burdens, shall extend to and be binding upon the Parties' respective successors and assigns.

**D. Authority.** Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's obligations have been duly authorized.

**E. Captions and References.** The captions and headings in this Agreement are for convenience of reference only, and shall not be used to interpret, define, or limit its provisions. All references in this Agreement to sections (whether spelled out or using the § symbol), subsections, exhibits or other attachments, are references to sections, subsections, exhibits or other attachments contained herein or incorporated as a part hereof, unless otherwise noted.

**F. Counterparts.** This Agreement may be executed in multiple, identical, original counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

**G. Entire Understanding.** This Agreement represents the complete integration of all understandings between the Parties related to the Work, and all prior representations and understandings related to the Work, oral or written, are merged into this Agreement. Prior or contemporaneous additions, deletions, or other changes to this Agreement shall not have any force or effect whatsoever, unless embodied herein.

**H. Modification.** GEDA may modify the terms and conditions of this Agreement by issuance of an Amended Agreement, which shall be effective if GPA countersigns the Agreement or accepts Grant Funds following its receipt of the Amended Agreement. The Parties may also agree to modification of the terms and conditions of the Agreement in a formal amendment to this Agreement, properly executed and approved in accordance with applicable Guam law.

**I. Statutes, Regulations, Fiscal Rules, and Other Authority.** Any reference in this Agreement to a statute, regulation, rule, fiscal policy or other authority shall be interpreted to refer to such authority then current, as may have been changed or amended since the Grant Issuance Date. GPA shall strictly comply with all applicable Federal and Guam laws, rules, and regulations in effect or hereafter established, including, without limitation, laws applicable to discrimination and unfair employment practices.

**J. Severability.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect, provided that the Parties can continue to perform their obligations under this Agreement in accordance with the intent of this Agreement.

**Writ. Pet. Ex. A p. 48 of 70**

Case 1:25-cv-00029   Document 9-2   Filed 06/03/25   Page 79 of 174

**K. Survival of Certain Agreement Terms.** Any provision of this Agreement that imposes an obligation on a Party after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and shall be enforceable by the other Party.

**L. Waiver.** A Party's failure or delay in exercising any right, power, or privilege under this Agreement, whether explicit or by lack of enforcement, shall not operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise of such right, power, or privilege.

**M. Standard and Manner of Performance.** GPA shall perform its obligations under this Agreement in accordance with the highest standards of care, skill and diligence in GPA's industry, trade, or profession.

**N. Licenses, Permits, and Other Authorizations.** GPA shall secure and maintain at all times during the term of this Agreement, at its sole expense, all licenses, certifications, permits, and other authorizations required to perform its obligations under this Agreement, and shall ensure that all employees, agents and Subcontractors secure and maintain at all times during the term of their employment, agency or Subcontractor, all license, certifications, permits and other authorizations required to perform their obligations in relation to this Agreement.

**O. Federal Provisions.** GPA shall comply with all applicable requirements of Exhibits B and C at all times during the term of this Agreement.

**P. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of Guam. The Parties agree that any legal action or proceeding arising out of or relating to this Agreement shall be brought exclusively in the courts of Guam, and the Parties hereby irrevocably consent to the jurisdiction of such courts.

IN WITNESS of the above provisions, the Parties have executed this Agreement on the last of the dates below stated.

**For the Guam Economic Development Authority:**          **For the Guam Power Authority:**

_____                _____
**MELANIE A. MENDIOLA,**                         **JOHN M. BENAVENTE, P.E.**
CEO/Administrator                                General Manager

_____                         _____
Date                                             Date

# EXHIBIT A. STATEMENT OF WORK AND BUDGET

1. **PURPOSE.** GEDA is entering into this subaward of ARPA funds with GPA to fund the installation of power infrastructure for the Mangilao Medical Campus ("MMC") project. For details on the ARPA funding, see Interagency Grant Agreement executed by and between DOA and GEDA executed on December 31, 2024.

2. **NOTIFICATION**

   **To GEDA:**

   Melanie Mendiola, CEO/Administrator
   mel.mendiola@investguam.com
   Guam Economic Development Authority
   ITC Building, Suite 511
   590 S. Marine Corps Drive
   Tamuning, Guam 96913

   **To GPA:**

   John M. Benavente, P.E., General Manager
   jbenavente@gpagwa.com
   Guam Power Authority
   P.O. Box 2977
   Hagåtña, Guam 96932-2977

3. **PERFORMANCE PERIOD.** The performance period and expiration date are stated on the Agreement cover page. GEDA shall not be responsible or liable for goods or services delivered or performed prior to issuance of this Agreement.

4. **DEFINITIONS**

   - **"ARPA"** means the American Rescue Plan Act of 2021.
   - **"SLFRF"** means State and Local Fiscal Recovery Fund.

5. **PERSONNEL**

   A. **Responsible Administrator.** GPA's performance hereunder shall be under the direct supervision of John M. Benavente, P.E., General Manager of GPA, who is hereby designated as the responsible administrator of this project. The responsible administrator may delegate oversight of the Work – not including contracting authority–to another GPA employee, if prior notice of the delegation is provided to DOA and the delegee meets at least the following minimum qualifications:

   1. College degree or minimum of four years' experience in government administration, procurement, project administration, and/or construction management.

   2. Strong oral and written communication and interpersonal skills.

   3. Strong organizational and problem-solving skills.

   4. Familiarity with Guam governmental operations.

**B. Other Personnel**

1. GPA represents that, in addition to the expertise of its current employees, GPA will leverage the available expertise of other Government of Guam agencies where it believes such expertise can be productively applied.

2. Further notwithstanding the above, GEDA and GPA agree that efficient, effective completion of the scope of work will require GEDA to procure professional services including but not limited to design and engineering services as well as inspection and construction management services, and that such procured professional services are eligible expenses for Grant Funds.

**C. Secondment from Other Government of Guam Agencies.** If GPA determines that it would be advantageous to formally second staff with particular expertise from another Government of Guam agency to GPA, GPA may make such request to the contact designated by GEDA and in the manner prescribed by GEDA, who will forward such request to DOA. The request should, at a minimum, include the expertise requested, together with any suggestions for Government of Guam staff possessing the needed expertise, the anticipated timeframe of the secondment, and the proposed funding source for the secondment.

**D. Procured Professional Services.** GEDA and GPA expressly contemplate that GPA will contract for the provision of certain professional services in support of the Work and the Services, including but not limited to architectural and engineering design, environmental assessment, construction, and construction management and inspection services.

## 6. WORK TASKS AND DELIVERABLES

**A. Work tasks.** GPA will develop a project strategy for efficient completion of the Work, consistent with the below budget narrative. GPA will procure, as necessary, professional and construction services and organize the assistance of other Government of Guam agencies and, as appropriate, enter into memoranda of agreement with those agencies and other entities. GPA will oversee all activities, ensure that all activities are consistent with this Agreement and process invoices for payment as required in memoranda of agreement with other agencies and entities. GPA will, in coordination with the GEDA and the Office of the Governor, lead public communication efforts. GPA will be lead communicator with Guam regulatory and inspection agencies for the project. GPA will oversee the budget against project completion and will coordinate the preparation of periodic reports as described below.

GEDA is authorized by 12 GCA § 50103 to finance, acquire, construct, reconstruct, rehabilitate, or improve hospital facilities, and provide such hospital facilities to serve the general public and to make reasonably accessible to all the people of Guam modern and efficient hospital facilities. To assist in achieving this objective, GEDA is subawarding grant funds to and/or contracting with other entities, including GPA, to complete the initial phase of the Mangilao Medical Campus Project, including design and construction of primary utility infrastructure (electrical power, water and wastewater), and prepare an Environmental Condition of Property report which analyzes environmental, archaeological, physical, geology and other characteristics of the MMC property or portions thereof in compliance with local and federal laws and regulations. The MMC property will be identified by DOA.

Preliminary analysis indicates that the proposed location for the medical campus lacks basic infrastructure to support not only the MMC but also developments within the surrounding area.

**Electrical Power**

GPA provides power and power infrastructure to Guam through the use of oil-fired power generators (94.3%) and renewable power generation (5.7%). Currently electricity is distributed to the grid around the medical campus site. New development would require additional electrical infrastructure. Under this Agreement, GPA agrees to design and construct the additional

electrical infrastructure. Once completed, GPA will apportion sufficient electrical supply from the generating capacity installed to meet the needs of the MMC.

Preliminary analysis indicates that the following electrical infrastructure may be required:

- Power substation
- Power tie-ins from GU-15
- Transmission lines that intercept Barrigada-Pulantat for aboveground transmission lines
- Dedicated feeder serving the new hospital
- Additional circuit utilized for backfeed capabilities

The design process that will be instituted by GPA will confirm electrical infrastructure requirements.

**B. Specific deliverables:**

1. Architectural and engineering design of plans and construction specifications for electrical power infrastructure to bring needed infrastructure to the campus site, including as necessary power substations, power tie-ins from Route 15, transmission lines that intercept Barrigada-Pulantat for above-ground transmission lines, a dedicated feeder serving the new campus, an additional circuit utilized for backfeed capabilities, and other electrical facilities as determined to be advisable in consultation with the Guam Power Authority.

2. GPA will procure the construction of the new Fadian Substation, which will be equipped with a 30 MVA power transformer, indoor 34.5 kV and 13.8 kV breakers, underground conductors, protective relays, and other required equipment. Additionally, GPA will procure the construction of two new transmission lines to interconnect the new Fadian Substation with island power grid. These transmission lines will include manholes, risers, and #1000 KCMIL aluminum underground conductors, routed from the intersection of Route 10 and Route 15 to the Fadian Substation.

## 7. REPORTING

**A. Annual and Final Report(s).** GPA will fulfill the performance and financial reporting requirements as outlined in this section.

**B. Performance and Financial Reporting Requirements Due Date(s)**

1. **Core Performance.** Within 30 days of the execution of this Agreement, GPA will prepare for review and acceptance by GEDA a master calendar with an anticipated schedule for the performance and completion of all core activities required for successful and timely completion of the Work, including but not limited to the specific deliverables detailed above. The Core Performance schedule will subdivide the project as a whole, assigning percentages to appropriate milestones quantified to appropriately state, on a weekly basis, the percentage complete the project as a whole is against the scheduled percentage of completion.

2. **Monthly.** Due by the 1st of the month, GPA will submit its Monthly Report to GEDA. The Monthly Report will include ((i) the Core Performance actual and scheduled percentages; (ii) milestones achieved in the last month; (iii) planned activities for the next two months; (iv) an abbreviated budget overview of expenses paid to date, unpaid expenses incurred, and Grant Funds that remain. The Monthly Report will also list vendor invoices received in the previous month and expected vendor billings for the next two months. The Monthly Report will also list Government of Guam staff other than GPA staff employed on the project in the previous month and any expected other-than-GPA Government of Guam staff participation requested for the next two months. Each Monthly Report should also include a brief narrative

of the previous month's project successes and, as appropriate, a brief analysis of any challenges encountered.

3. **Quarterly.** GPA will submit a quarterly Grant Itemization Report with evidence of expenditures in a form that complies with U.S. Department of Treasury reporting requirements and meet with GEDA to resolve any questions or comments. If the U.S. Department of Treasury changes reporting requirements, GPA agrees to comply with the revised requirements.

4. **Annually.** GPA shall submit an annual report as specified below. These reports shall include but are not limited to a summary of the following:

   - Progress as to Specific Deliverables
   - Budget v. Actuals
   - Anticipated potential upcoming challenges
   - Project utilization of non-GPA Government of Guam resources
   - Upcoming project efficiency or other opportunities
   - Economic impact reporting

The annual reports are due according to the schedule below:

   - Report 1: May 15, 2025
   - Report 2: May 15, 2026

GPA shall provide GEDA with an explanation and action plan for any performance measurements that are not on target.

### BUDGET AND PAYMENT

Payments shall be made in accordance with the provisions set forth in the Grant and its attached exhibits, including this Exhibit A. The maximum amount payable under the terms and conditions of this Agreement shall not exceed $35,448,983.97. Any amount in excess of these totals, must be agreed to by both parties, must be provided by a properly executed option or amendment to this Agreement.

The Guam Power Authority (GPA) provided a cost estimate for the Interagency Agreement between DOA and GEDA executed on December 30, 2024, estimating costs to provide a new looped underground transmission line from Route 10 to the MCC, a new indoor substation, and new distribution upgrades to provide upgraded service to the MCC and surrounding areas. The cost estimate, which is attached to the Interagency Agreement is incorporated by reference herein as if fully set forth in its entirety in this Agreement.

| POWER COST ESTIMATE | |
|---|---|
| New indoor substation | $ 12,484,469.26 |
| New transmission underground lines | $15,876,635.62 |
| New underground dedicated feeder and backup tie-in | $ 7,087,879.09 |
| **TOTAL** | **$ 35,448,983.97** |

**Matching Funds**

No match required.

**Grant Funds**

2025-GEDA-GPA-0001     $35,448,983.97

8. **ADMINISTRATIVE REQUIREMENTS**

A. **Accounting**

1. At all times from the Effective Date of this Grant until completion of the Work, GPA shall maintain properly segregated books of Grant Funds, matching funds (if any), and other funds associated with the Work.

2. All receipts and expenditures associated with said Work shall be documented in a detailed and specific manner, and shall accord with the Work Budget set forth herein.

3. GPA shall assume responsibility for seeing that all funding is expended, accounted for and reported, consistent with underlying agreements, program objectives and with allowable cost, applicable rules and regulations addressed by 2 CFR 200 and originating grant award provisions.

4. Adjustments of budget expenditure amounts in excess of ten percent (10%) must be authorized by GEDA in an amendment to this Agreement properly executed and approved pursuant to GEDA procedures.

5. In no event shall GPA's total consideration exceed the amount indicated in "Budget" above.

6. Reimbursement requests must include the standard reimbursement summary sheet and supporting documentation of the amounts listed on the summary sheet, including but not limited to an original ticked general ledger from the host accounting system.

B. **Monitoring.** GEDA shall monitor this Work on an as-needed basis. GEDA may choose to audit the business activities performed under this Grant. GPA shall maintain a complete file of all records, documents, communications, notes and other written materials or electronic media, files or communications, which pertain in any manner to the operation of activities undertaken pursuant to an executed Grant. Such books and records shall contain documentation of the participant's pertinent activity under this Grant in a form consistent with good accounting practice.

C. **Discretionary Audit.** GEDA, or any of its duly authorized representatives, including an independent Certified Public Accountant of GEDA's choosing, or the federal government or any of its properly delegated or authorized representatives shall have the right to inspect, examine, and audit GPA's (and any of GPA's contractor's) records, books, accounts and other relevant documents. Such a discretionary audit may be requested at any time and for any reason from the effective date of this Agreement until three (3) years after the date final payment for the project is received by GPA or applicable federal audit period, whichever is later. The cost of a discretionary audit will be borne by the GEDA.

D. **Mandatory Audit.** Whether or not GEDA calls for a discretionary audit as provided above, GPA

shall provide GEDA copies of annual audit reports for the period of the project. In addition, GPA shall supply GEDA with copies of all correspondence from any auditor related to any findings relevant to the project. If an audit reveals evidence of non-compliance with applicable requirements, or other issues pertaining to the administration of federal funds, GEDA reserves the right to institute compliance, or other appropriate measures, to address audit findings.

**E. Specific Terms and Conditions**

1. Expenses incurred by GPA in association with this project **prior to the Effective Date** and **after December 31, 2026** are not eligible Grant expenditures under this grant and will not be reimbursed by GEDA.

2. GPA will maintain an office conveniently located and easily accessible to the community.

3. GPA will maintain a publicly listed telephone in the name of the "Guam Power Authority" The phone will be answered "Guam Power Authority" or "GPA."

4. GPA's office will be staffed and operational during normal business hours.

5. All advertising or other promotional materials developed or distributed in connection with conferences or other meetings or gatherings must contain the following statement: "Reasonable accommodations for persons with disabilities will be made, if requested in advance."

6. GPA employees, volunteers, and paid consultants must sign and abide by the applicable conflict of interest policy.

7. The responsible administrator or his delegate must actively participate in any calls scheduled by GEDA or DOA concerning the Grant Work and must respond to all email inquiries from either as soon as reasonably possible.

8. All off-island travel using grant funds must be approved by GEDA and DOA before travel occurs.

9. **Additional Terms and Conditions.** All terms and provisions from the following Exhibits apply in full effect for this Grant Award:

This Exhibit A: Statement of Work and Budget

Exhibit B: Federal Provisions

Exhibit C. Agreement with Subrecipient of Federal Recovery Funds

**EXHIBIT B. FEDERAL PROVISIONS**

## 1. APPLICABILITY OF PROVISIONS.

1.1. The Grant to which these Federal Provisions are attached has been funded, in whole or in part, with an Award of Federal funds. In the event of a conflict between the provisions of these Federal Provisions, the Special Provisions, the body of the Grant, or any attachments or exhibits incorporated into and made a part of the Grant, the provisions of these Federal Provisions shall control.

1.2. The Government of Guam is accountable to Treasury for oversight of their subrecipients, including ensuring their subrecipients comply with federal statutes, Award Terms and Conditions, applicable Treasury Rules, and reporting requirements, as applicable.

1.3. Additionally, any subrecipient that issues a subaward to another entity (2nd tier subrecipients), must hold the 2nd tier subrecipient accountable to these provisions and adhere to reporting requirements.

1.4. These Federal Provisions are subject to the Award as defined in §2 of these Federal Provisions, as may be revised pursuant to ongoing guidance from the relevant Federal or Government of Guam agency or institutions of higher education.

## 2. DEFINITIONS.

2.1. For the purposes of these Federal Provisions, the following terms shall have the meanings ascribed to them below.

2.1.1. "Award" means an award of Federal financial assistance, and the Grant setting forth the terms and conditions of that financial assistance, that a non-Federal Entity receives or administers.

2.1.2. "Entity" means:

2.1.2.1. a Non-Federal Entity;

2.1.2.2. a foreign public entity;

2.1.2.3. a foreign organization;

2.1.2.4. a non-profit organization;

2.1.2.5. a domestic for-profit organization (for 2 CFR parts 25 and 170 only);

2.1.2.6. a foreign non-profit organization (only for 2 CFR part 170) only);

2.1.2.7. a Federal agency, but only as a subrecipient under an Award or Subaward to a non-Federal entity (or 2 CFR 200.1); or

2.1.2.8. a foreign for-profit organization (for 2 CFR part 170 only).

2.1.3. "Executive" means an officer, managing partner or any other employee in a management position.

2.1.4. "Expenditure Category (EC)" means the category of eligible uses as defined by the US

Department of Treasury in "Appendix 1 of the Compliance and Reporting Guidance, State and Local Fiscal Recovery Funds" report available at www.treasury.gov.

2.1.5. "Federal Awarding Agency" means a Federal agency providing a Federal Award to a Recipient as described in 2 CFR 200.1

2.1.6. "Grant" means the Grant to which these Federal Provisions are attached.

2.1.7. "Grantee" means the party or parties identified as such in the Grant to which these Federal Provisions are attached.

2.1.8. "Non-Federal Entity means a State, local government, Indian tribe, institution of higher education, or nonprofit organization that carries out a Federal Award as a Recipient or a subrecipient.

2.1.9. "Nonprofit Organization" means any corporation, trust, association, cooperative, or other organization, not including IHEs, that:

    2.1.9.1. Is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest;

    2.1.9.2. Is not organized primarily for profit; and

    2.1.9.3. Uses net proceeds to maintain, improve, or expand the operations of the organization.

2.1.10. "OMB" means the Executive Office of the President, Office of Management and Budget.

2.1.11. "Pass-through Entity" means a non-Federal Entity that provides a Subaward to a subrecipient to carry out part of a Federal program.

2.1.12. "Prime Recipient" means the Government of Guam or institution of higher education identified as the Grantor in the Grant to which these Federal Provisions are attached.

2.1.13. "Subaward" means an award by a Prime Recipient to a subrecipient funded in whole or in part by a Federal Award. The terms and conditions of the Federal Award flow down to the Subaward unless the terms and conditions of the Federal Award specifically indicate otherwise in accordance with 2 CFR 200.101. The term does not include payments to a Contractor or payments to an individual that is a beneficiary of a Federal program.

2.1.14. "Subrecipient" or "Subgrantee" means a non-Federal Entity (or a Federal agency under an Award or Subaward to a non-Federal Entity) receiving Federal funds through a Prime Recipient or a subgrantor to support the performance of the Federal project or program for which the Federal funds were awarded. A subrecipient is subject to the terms and conditions of the Federal Award to the Prime Recipient, including program compliance requirements. The term does not include an individual who is a beneficiary of a federal program. For SLFRF Grants, a subrecipient relationship continues to exist for Expenditure Category 6.1 Revenue Replacement.

2.1.15. "System for Award Management (SAM)" means the Federal repository into which an Entity must enter the information required under the Transparency Act, which may be found at http://www.sam.gov.

2.1.16. "Transparency Act" means the Federal Funding Accountability and Transparency Act of 2006 (Public Law 109-282), as amended by §6202 of Public Law 110-252.

2.1.17. "Uniform Guidance" means the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. The terms and conditions of the Uniform Guidance flow down to Awards to GPAs unless the Uniform Guidance or the terms and conditions of the Federal Award specifically indicate otherwise.

2.2. "Unique Entity ID Number" means the Unique Entity ID established by the federal government for a Grantee/Subgrantee at https://sam.gov/content/home

## 3. COMPLIANCE.

3.1. GPA shall comply with all applicable provisions of the Transparency Act and the regulations issued pursuant thereto, all provisions of the Uniform Guidance, and all applicable Federal Laws and regulations required by this Federal Award. Any revisions to such provisions or regulations shall automatically become a part of these Federal Provisions, without the necessity of either party executing any further instrument. The Government of Guam, at its discretion, may provide written notification to Grantee of such revisions, but such notice shall not be a condition precedent to the effectiveness of such revisions.

3.2. Per US Treasury Final Award requirements, grantee programs or services must not include terms or conditions that undermine efforts to stop COVID-19 or discourage compliance with recommendations and CDC guidelines.

## 4. SYSTEM FOR AWARD MANAGEMENT (SAM) AND UNIQUE ENTITY ID SYSTEM (UEI) REQUIREMENTS.

4.1. SAM. GPA shall maintain the currency of its information in SAM until GPA submits the final financial report required under the Award or receives final payment, whichever is later. GPA shall review and update SAM information at least annually.

4.2. UEI. GPA shall provide its Unique Entity ID to GEDA and DOA, and shall update GPA's information in SAM.gov at least annually.

## 5. REPORTING.

5.1. If GPA is a subrecipient of the Award pursuant to the Transparency Act, GPA shall report data elements to SAM, to GEDA and to DOA as required in this Exhibit. No direct payment shall be made to GPA for providing any reports required under these Federal Provisions and the cost of producing such reports shall be included in the Grant price. The reporting requirements in this Exhibit are based on guidance from the OMB, and as such are subject to change at any time by OMB. Any such changes shall be automatically incorporated into this Grant and shall become part of GPA's obligations under this Grant.

## 6. SUBRECIPIENT REPORTING REQUIREMENTS

6.1. Subrecipient shall report as set forth below.

6.1.1. To SAM. A Subrecipient shall register in SAM and report the following data elements in SAM *for each* Federal Award Identification Number (FAIN) assigned by a Federal agency to a Recipient no later than the end of the month following the month in which the Subaward was made:

6.1.1.1. Subrecipient Unique Entity ID;

6.1.1.2. Subrecipient Unique Entity ID if more than one electronic funds transfer (EFT) account;

6.1.1.3. Subrecipient parent's organization Unique Entity ID;

6.1.1.4. Subrecipient's address, including: Street Address, City, State, Country, Zip + 4, and Congressional District;

6.1.1.5. Subrecipient's top 5 most highly compensated Executives if the criteria in §4 above are met; and

6.1.1.6. Subrecipient's Total Compensation of top 5 most highly compensated Executives if the criteria in §4 above met.

6.1.2. To Recipient. A Subrecipient shall report to its Recipient, upon the effective date of the Grant, the following data elements:

6.1.2.1. Subrecipient's Unique Entity ID as registered in SAM.

6.1.2.2. Primary Place of Performance Information, including: Street Address, City, State, Country, Zip code + 4, and Congressional District.

6.2. Subrecipient also agrees to comply with any reporting requirements established by the US Treasury, Governor's Office and DOA. DOA may need additional reporting requirements after this agreement is executed. If there are additional reporting requirements, DOA will provide notice of such additional reporting requirements via Exhibit D: SLFRF Reporting Modification Form.

# 7. PROCUREMENT STANDARDS.

7.1. Procurement Procedures. A subrecipient shall use its own documented procurement procedures which reflect applicable Guam law and applicable regulations, provided that the procurements conform to applicable Federal law and the standards identified in the Uniform Guidance, including without limitation, 2 CFR 200.318 through 200.327 thereof.

7.2. Domestic preference for procurements (2 CFR 200.322). As appropriate and to the extent consistent with law, the non-Federal entity should, to the greatest extent practicable under a Federal award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other manufactured products). The requirements of this section must be included in all subawards including all Agreements and purchase orders for work or products under this award.

7.3. Procurement of Recovered Materials. If a subrecipient is a Government of Guam Agency, its Contractors must comply with section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 CFR part 247, that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired during the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

7.4. Never contract with the enemy (2 CFR 200.215). Federal awarding agencies and recipients are subject to the regulations implementing "Never contract with the enemy" in 2 CFR part 183. The regulations in 2 CFR part 183 affect covered contracts, grants and cooperative agreements that are expected to exceed $50,000 within the period of performance, are performed outside the United States and its territories, and are in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

7.5. Prohibition on certain telecommunications and video surveillance services or equipment (2 CFR 200.216). Subrecipient is prohibited from obligating or expending loan or grant funds on certain telecommunications and video surveillance services or equipment pursuant to 2 CFR 200.216.

## 8. ACCESS TO RECORDS.

8.1. GPA shall permit GEDA and/or DOA and their auditors to have access to GPA's records and financial statements as necessary for DOA to meet the requirements of 2 CFR 200.332 (Requirements for pass-through entities), 2 CFR 200.300 (Statutory and national policy requirements) through 2 CFR 200.309 (Period of performance), and Subpart F-Audit Requirements of the Uniform Guidance.

## 9. SINGLE AUDIT REQUIREMENTS.

9.1. If GPA expends $750,000 or more in Federal Awards during GPA's fiscal year, GPA shall procure or arrange for a single or program-specific audit conducted for that year in accordance with the provisions of Subpart F-Audit Requirements of the Uniform Guidance, issued pursuant to the Single Audit Act Amendments of 1996, (31 U.S.C. 7501-7507). 2 CFR 200.501.

9.2. Election. GPA shall have a single audit conducted in accordance with Uniform Guidance 2 CFR 200.514 (Scope of audit), except when it elects to have a program-specific audit conducted in accordance with 2 CFR 200.507 (Program- specific audits). GPA may elect to have a program-specific audit if GPA expends Federal Awards under only one Federal program (excluding research and development) and the Federal program's statutes, regulations, or the terms and conditions of the Federal award do not require a financial statement audit of Prime Recipient. A program-specific audit may not be elected for research and development unless all of the Federal Awards expended were received from Recipient and Recipient approves in advance a program-specific audit.

9.2.1. Exemption. If GPA expends less than $750,000 in Federal Awards during its fiscal year, GPA shall be exempt from Federal audit requirements for that year, except as noted in 2 CFR 200.503 (Relation to other audit requirements), but records shall be available for review or audit by appropriate officials of the Federal agency, the Government of Guam, and the Government Accountability Office.

9.2.2. Subrecipient Compliance Responsibility. GPA shall procure or otherwise arrange for the audit required by Subpart F of the Uniform Guidance and ensure it is properly performed and submitted when due in accordance with the Uniform Guidance. GPA shall prepare appropriate financial statements, including the schedule of expenditures of Federal awards in accordance with 2 CFR 200.510 (Financial statements) and provide the auditor with access to personnel, accounts, books, records, supporting documentation, and other information as needed for the auditor to perform the audit required by Uniform Guidance Subpart F-Audit Requirements.

## 10. GRANT PROVISIONS FOR SUBRECIPIENT AGREEMENTS.

10.1. In addition to other provisions required by the Federal Awarding Agency or the Prime Recipient, Grantees that are Subrecipients shall comply with the following provisions.

Subrecipients shall include all of the following applicable provisions in all Subcontractors entered into by it pursuant to this Grant.

10.1.1. [Applicable to federally assisted construction Agreements.] Equal Employment Opportunity. Except as otherwise provided under 41 CFR Part 60, all Agreements that meet the definition of "federally assisted construction Agreement" in 41 CFR Part 60-1.3 shall include the equal opportunity clause provided under 41 CFR 60- 1.4(b), in accordance with Executive Order 11246, "Equal Employment Opportunity" (30 FR 12319, 12935, 3 CFR Part, 1964-1965 Comp., p. 339), as amended by Executive Order 11375, "Amending Executive Order 11246 Relating to Equal Employment Opportunity," and implementing regulations at 41 CFR part 60, Office of Federal Agreement Compliance Programs, Equal Employment Opportunity, Department of Labor.

10.1.2. [Applicable to on-site employees working on government-funded construction, alteration and repair projects.] Davis-Bacon Act. Davis-Bacon Act, as amended (40 U.S.C. 3141-3148).

10.1.3. Rights to Inventions Made Under a grant or agreement. If the Federal Award meets the definition of "funding agreement" under 37 CFR 401.2 (a) and the Prime Recipient or subrecipient wishes to enter into an Agreement with a small business firm or nonprofit organization regarding the substitution of parties, assignment or performance of experimental, developmental, or research work under that "funding agreement," the Prime Recipient or Subrecipient must comply with the requirements of 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Agreements and Cooperative Agreements," and any implementing regulations issued by the Federal Awarding Agency.

10.1.4. Clean Air Act (42 U.S.C. 7401-7671q.) and the Federal Water Pollution Control Act (33 U.S.C. 1251-1387), as amended. Agreements and subgrants of amounts in excess of $150,000 must contain a provision that requires the non-Federal awardees to agree to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act (42 U.S.C. 7401-7671q) and the Federal Water Pollution Control Act as amended (33 U.S.C. 1251-1387). Violations must be reported to the Federal Awarding Agency and the Regional Office of the Environmental Protection Agency (EPA).

10.1.5. Debarment and Suspension (Executive Orders 12549 and 12689). An Agreement award (see 2 CFR 180.220) must not be made to parties listed on the government wide exclusions in SAM, in accordance with the OMB guidelines at 2 CFR 180 that implement Executive Orders 12549 (3 CFR part 1986 Comp., p. 189) and 12689 (3 CFR part 1989 Comp., p. 235), "Debarment and Suspension." SAM Exclusions contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under statutory or regulatory authority other than Executive Order 12549.

10.1.6. Byrd Anti-Lobbying Amendment (31 U.S.C. 1352). Contractors that apply or bid for an award exceeding $100,000 must file the required certification. Each tier certifies to the tier above that it will not and has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a member of Congress, officer or employee of Congress, or an employee of a member of Congress in connection with obtaining any Federal Agreement, grant or any other award covered by 31 U.S.C. 1352. Each tier must also disclose any lobbying with non-Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier to tier up to the non-Federal award.

10.1.7. Never Contract with the Enemy (2 CFR 200.215). Federal awarding agencies and

recipients are subject to the regulations implementing "Never Contract with the Enemy" in 2 CFR part 183. The regulations in 2 CFR part 183 affect covered Agreements, grants and cooperative agreements that are expected to exceed $50,000 within the period of performance, are performed outside the United States and its territories, and are in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

10.1.8. Prohibition on certain telecommunications and video surveillance services or equipment (2 CFR 200.216). Grantee is prohibited from obligating or expending loan or grant funds on certain telecommunications and video surveillance services or equipment pursuant to 2 CFR 200.216.

10.1.9. Title VI of the Civil Rights Act. The Subgrantee, Contractor, Subcontractor, transferee, and assignee shall comply with Title VI of the Civil Rights Act of 1964, which prohibits recipients of federal financial assistance from excluding from a program or activity, denying benefits of, or otherwise discriminating against a person on the basis of race, color, or national origin (42 U.S.C. § 2000d et seq.), as implemented by the Department of Treasury's Title VI regulations, 31 CFR Part 22, which are herein incorporated by reference and made a part of this Agreement (or agreement). Title VI also includes protection to persons with "Limited English Proficiency" in any program or activity receiving federal financial assistance, 42 U. S. C. § 2000d et seq., as implemented by the Department of the Treasury's Title VI regulations, 31 CRF Part 22, and herein incorporated by reference and made part of this Agreement or agreement.

## 11. CERTIFICATIONS.

11.1. Subrecipient Certification. GPA shall sign a "Government of Guam Agreement with Recipient of Federal Recovery Funds" Certification Form in Exhibit C and submit to GEDA with signed grant agreement.

11.2. Unless prohibited by Federal statutes or regulations, GEDA and/or DOA may require GPA to submit certifications and representations required by Federal statutes or regulations on an annual basis. 2 CFR 200.208. Submission may be required more frequently if GPA fails to meet a requirement of the Federal award. GPA shall certify in writing to the Government of Guam at the end of the Award that the project or activity was completed or the level of effort was expended. 2 CFR 200.201(3). If the required level of activity or effort was not carried out, the amount of the Award must be adjusted.

## 12. EVENT OF DEFAULT AND TERMINATION.

12.1. Failure to comply with these Federal Provisions shall constitute an event of default under the Grant and GEDA may terminate the Grant upon 30 days prior written notice if the default remains uncured five calendar days following the termination of the 30-day notice period. This remedy will be in addition to any other remedy available to the GEDA under the Grant, at law or in equity.

12.2. Termination (2 CFR 200.340). The Federal Award may be terminated in whole or in part as follows:

12.2.1. By the Federal Awarding Agency or Pass-through Entity, if a Non-Federal Entity fails to comply with the terms and conditions of a Federal Award;

12.2.2. By the Federal awarding agency or Pass-through Entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

12.2.3. By the Federal awarding agency or Pass-through Entity with the consent of the Non-Federal Entity, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;

12.2.4. By the Non-Federal Entity upon sending to the Federal Awarding Agency or Pass- through Entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal Awarding Agency or Pass-through Entity determines in the case of partial termination that the reduced or modified portion of the Federal Award or Subaward will not accomplish the purposes for which the Federal Award was made, the Federal Awarding Agency or Pass-through Entity may terminate the Federal Award in its entirety; or

12.2.5. By the Federal Awarding Agency or Pass-through Entity pursuant to termination provisions included in the Federal Award.

**Exhibit C. AGREEMENT WITH SUBRECIPIENT OF FEDERAL RECOVERY FUNDS**

Section 602(b) of the Social Security Act (the Act), as added by section 9901 of the American Rescue Plan Act (ARPA), Pub. L. No. 117-2 (March 11, 2021), authorizes the Department of the Treasury (Treasury) to make payments to certain Subrecipients from the Coronavirus State Fiscal Recovery Fund. The Government of Guam has signed and certified a separate agreement with Treasury as a condition of receiving such payments from the Treasury. This agreement is between your organization and GEDA, a subrecipient of ARPA funds awarded to the Government of Guam, and your organization is signing and certifying the same terms and conditions included in the Government of Guam's separate agreement with Treasury. Your organization is referred to as a Subrecipient.

As a condition of your organization receiving federal recovery funds from GEDA, the authorized representative below hereby (i) certifies that your organization will carry out the activities listed in section 602(c) of the Act and (ii) agrees to the terms attached hereto. Your organization also agrees to use the federal recovery funds as specified by the Governor.

Under penalty of perjury, the undersigned official certifies that the authorized representative has read and understood the organization's obligations in the Assurances of Compliance and Civil Rights Requirements, that any information submitted in conjunction with this assurances document is accurate and complete, and that the organization is in compliance with the nondiscrimination requirements.

Subrecipient Name: <u>GUAM POWER AUTHORITY</u>

Authorized Representative: <u>JOHN M. BENAVENTE</u>

Title: <u>GENERAL MANAGER</u>

Signature: _____

# TERMS AND CONDITIONS

1. **USE OF FUNDS.**

   A. GPA understands and agrees that the funds disbursed under this award may only be used in compliance with section 602(c) of the Social Security Act (the Act) and Treasury's regulations implementing that section and guidance.

   B. GPA will determine prior to engaging in any project using this assistance that it has the institutional, managerial, and financial capability to ensure proper planning, management, and completion of such project.

2. **PERIOD OF PERFORMANCE.** The period of performance for this subaward is shown on page one of this Agreement. GPA may use funds to cover eligible costs incurred, as set forth in Treasury's implementing regulations, during this period of performance.

3. **REPORTING.** GPA agrees to comply with any reporting obligations established by Treasury as they relate to this award. GPA also agrees to comply with any reporting requirements established by the Governor's Office and DOA.

4. **MAINTENANCE OF AND ACCESS TO RECORDS.**

   A. GPA shall maintain records and financial documents sufficient to evidence compliance with section 602(c), Treasury's regulations implementing that section, and guidance issued by Treasury regarding the foregoing.

   B. The Treasury Office of Inspector General and the Government Accountability Office, or their authorized representatives, shall have the right of access to records (electronic and otherwise) of GPA in order to conduct audits or other investigations.

   C. Records shall be maintained by GPA for a period of five (5) years after all funds have been expended or returned to Treasury, whichever is later.

5. **PRE-AWARD COSTS.** Pre-award costs, as defined in 2 C.F.R. § 200.458, may not be paid with funding from this award.

6. **ADMINISTRATIVE COSTS.** GPA may use funds provided under this award to cover both direct and indirect costs. GPA shall follow guidance on administrative costs issued by the Governor's Office and DOA.

7. **COST SHARING.** Cost sharing or matching funds are not required to be provided by GPA.

8. **CONFLICTS OF INTEREST.** The Government of Guam understands and agrees it must maintain a conflict of interest policy consistent with 2 C.F.R. § 200.318(c) and that such conflict of interest policy is applicable to each activity funded under this award. GPA and Contractors must disclose in writing to the DOA or the pass-through entity, as appropriate, any potential conflict of interest affecting the awarded funds in accordance with 2 C.F.R. §200.112. DOA shall disclose such conflict to Treasury.

9. **COMPLIANCE WITH APPLICABLE LAW AND REGULATIONS.**

   A. GPA agrees to comply with the requirements of section 602 of the Act, regulations adopted by Treasury pursuant to section 602(f) of the Act, and guidance issued by Treasury regarding the

foregoing. Subrecipient also agrees to comply with all other applicable federal statutes, regulations, and executive orders, and GPA shall provide for such compliance by other parties in any agreements it enters into with other parties relating to this award.

B. Federal regulations applicable to this award include, without limitation, the following:

    i.    Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, other than such provisions as Treasury may determine are inapplicable to this Award and subject to such exceptions as may be otherwise provided by Treasury. Subpart F – Audit Requirements of the Uniform Guidance, implementing the Single Audit Act, shall apply to this award.

    ii.    Universal Identifier and System for Award Management (SAM), 2 C.F.R. Part 25, pursuant to which the award term set forth in Appendix A to 2 C.F.R. Part 25 is hereby incorporated by reference.

    iii.    Reporting Subaward and Executive Compensation Information, 2 C.F.R. Part 170, pursuant to which the award term set forth in Appendix A to 2 C.F.R. Part 170 is hereby incorporated by reference.

    iv.    OMB Guidelines to Agencies on Government wide Debarment and Suspension (Nonprocurement), 2 C.F.R. Part 180, including the requirement to include a term or condition in all lower tier covered transactions (Agreements and Subcontractors described in 2 C.F.R. Part 180, subpart B) that the award is subject to 2 C.F.R. Part 180 and Treasury's implementing regulation at 31 C.F.R. Part 19.

    v.    Subrecipient Integrity and Performance Matters, pursuant to which the award term set forth in 2 C.F.R. Part 200, Appendix XII to Part 200 is hereby incorporated by reference.

    vi.    Government wide Requirements for Drug-Free Workplace, 31 C.F.R. Part 20.

    vii.    New Restrictions on Lobbying, 31 C.F.R. Part 21.

    viii.    Uniform Relocation Assistance and Real Property Acquisitions Act of 1970 (42 U.S.C. §§ 4601-4655) and implementing regulations.

    ix.    Generally applicable federal environmental laws and regulations.

C. Statutes and regulations prohibiting discrimination applicable to this award include, without limitation, the following:

    i.    Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d et seq.) and Treasury's implementing regulations at 31 C.F.R. Part 22, which prohibit discrimination on the basis of race, color, or national origin under programs or activities receiving federal financial assistance;

    ii.    The Fair Housing Act, Title VIII of the Civil Rights Act of 1968 (42 U.S.C. §§ 3601 et seq.), which prohibits discrimination in housing on the basis of race, color, religion, national origin, sex, familial status, or disability;

    iii.    Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794), which prohibits discrimination on the basis of disability under any program or activity receiving federal financial assistance;

iv. The Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101 et seq.), and Treasury's implementing regulations at 31 C.F.R. Part 23, which prohibit discrimination on the basis of age in programs or activities receiving federal financial assistance; and

v. Title II of the Americans with Disabilities Act of 1990, as amended (42 U.S.C.§§ 12101 et seq.), which prohibits discrimination on the basis of disability under programs, activities, and services provided or made available by state and local governments or instrumentalities or agencies thereto.

10. **REMEDIAL ACTIONS.** In the event of GPA's noncompliance with section 602 of the Act, other applicable laws, Treasury's implementing regulations, guidance, or any reporting or other program requirements, Treasury may impose additional conditions on the receipt of a subsequent tranche of future award funds, if any, or take other available remedies as set forth in 2 C.F.R. § 200.339. In the case of a violation of section 602(c) of the Act regarding the use of funds, previous payments shall be subject to recoupment as provided in section 602(e) of the Act and any additional payments may be subject to withholding as provided in sections 602(b)(6)(A)(ii)(III) of the Act, as applicable.

11. **HATCH ACT.** GPA agrees to comply, as applicable, with requirements of the Hatch Act (5 U.S.C.§§ 1501-1508 and 7324-7328), which limit certain political activities of State or local government employees whose principal employment is in connection with an activity financed in whole or in part by this federal assistance.

12. **FALSE STATEMENTS.** GPA understands that making false statements or claims in connection with this award is a violation of federal law and may result in criminal, civil, or administrative sanctions, including fines, imprisonment, civil damages and penalties, debarment from participating in federal awards or Agreements, and/or any other remedy available by law.

13. **DEBTS OWED THE FEDERAL GOVERNMENT.**

A. Any funds paid to GPA (1) in excess of the amount to which the GPA is finally determined to be authorized to retain under the terms of this award; (2) that are determined by the Treasury Office of Inspector General to have been misused; or (3) that are determined by Treasury to be subject to a repayment obligation pursuant to sections 602(e) and 603(b)(2)(D) of the Act and have not been repaid by GPA shall constitute a debt to the federal government.

B. Any debts determined to be owed to the federal government must be paid promptly by GPA. A debt is delinquent if it has not been paid by the date specified in Treasury's initial written demand for payment, unless other satisfactory arrangements have been made or if the GPA knowingly or improperly retains funds that are a debt as defined in paragraph 14(a). Treasury will take any actions available to it to collect such a debt.

14. **DISCLAIMER.**

A. The United States expressly disclaims any and all responsibility or liability to GPA or third persons for the actions of GPA or third persons resulting in death, bodily injury, property damages, or any other losses resulting in any way from the performance of this award or any other losses resulting in any way from the performance of this award or any Agreement, or Subcontractor under this award.

B. The acceptance of this award by GPA does not in any way establish an agency relationship between the United States and GPA.

15. **PROTECTIONS FOR WHISTLEBLOWERS.**

A.  In accordance with 41 U.S.C. § 4712, GPA may not discharge, demote, or otherwise discriminate against an employee in reprisal for disclosing to any of the list of persons or entities provided below, information that the employee reasonably believes is evidence of gross mismanagement of a federal Agreement or grant, a gross waste of federal funds, an abuse of authority relating to a federal Agreement or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal Agreement (including the competition for or negotiation of an Agreement) or grant.

B.  The list of persons and entities referenced in the paragraph above includes the following:

   i.  A member of Congress or a representative of a committee of Congress;

   ii.  An Inspector General;

   iii.  The Government Accountability Office;

   iv.  A Treasury employee responsible for Agreement or grant oversight or management;

   v.  An authorized official of the Department of Justice or other law enforcement agency;

   vi.  A court or grand jury; or

   vii.  A management official or other employee of GPA, Contractor, or Subcontractor who has the responsibility to investigate, discover, or address misconduct.

C.  GPA shall inform its employees in writing of the rights and remedies provided under this section, in the predominant native language of the workforce.

16. **INCREASING SEAT BELT USE IN THE UNITED STATES.** Pursuant to Executive Order 13043, 62 FR 19217 (Apr. 18, 1997), GPA should encourage its Contractors to adopt and enforce on-the-job seat belt policies and programs for their employees when operating company- owned, rented or personally owned vehicles.

17. **REDUCING TEXT MESSAGING WHILE DRIVING.** Pursuant to Executive Order 13513, 74 FR 51225 (Oct. 6, 2009), GPA should encourage its employees, Subrecipients, and Contractors to adopt and enforce policies that ban text messaging while driving, and GPA should establish workplace safety policies to decrease accidents caused by distracted drivers.

## ASSURANCES OF COMPLIANCE WITH TITLE
## VI OF THE CIVIL RIGHTS ACT OF 1964

As a condition of receipt of federal financial assistance from the Department of the Treasury, GPA provides the assurances stated herein. The federal financial assistance may include federal grants, loans and Agreements to provide assistance to GPA's beneficiaries, the use or rent of Federal land or property at below market value, Federal training, a loan of Federal personnel, subsidies, and other arrangements with the intention of providing assistance. Federal financial assistance does not encompass Agreements of guarantee or insurance, regulated programs, licenses, procurement Agreements by the Federal government at market value, or programs that provide direct benefits.

The assurances apply to all federal financial assistance from or funds made available through the Department of the Treasury, including any assistance that the Subrecipient may request in the future.

The Civil Rights Restoration Act of 1987 provides that the provisions of the assurances apply to all of the operations of the Subrecipient's program(s) and activity(ies), so long as any portion of the Subrecipient's program(s) or activity(ies) is federally assisted in the manner prescribed above.

1. GPA ensures its current and future compliance with Title VI of the Civil Rights Act of 1964, as amended, which prohibits exclusion from participation, denial of the benefits of, or subjection to discrimination under programs and activities receiving federal financial assistance, of any person in the United States on the ground of race, color, or national origin (42 U.S.C. § 2000d *et seq.*), as implemented by the Department of the Treasury Title VI regulations at 31 CFR Part 22 and other pertinent executive orders such as Executive Order 13166, directives, circulars, policies, memoranda, and/or guidance documents.

2. GPA acknowledges that Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency," seeks to improve access to federally assisted programs and activities for individuals who, because of national origin, have Limited English proficiency (LEP). GPA understands that denying a person access to its programs, services, and activities because of LEP is a form of national origin discrimination prohibited under Title VI of the Civil Rights Act of 1964 and the Department of the Treasury's implementing regulations. Accordingly, GPA shall initiate reasonable steps, or comply with the Department of the Treasury's directives, to ensure that LEP persons have meaningful access to its programs, services, and activities. GPA understands and agrees that meaningful access may entail providing language assistance services, including oral interpretation and written translation where necessary, to ensure effective communication in the GPA's programs, services, and activities.

3. GPA agrees to consider the need for language services for LEP persons when GPA develops applicable budgets and conducts programs, services, and activities. As a resource, the Department of the Treasury has published its LEP guidance at 70 FR 6067. For more information on taking reasonable steps to provide meaningful access for LEP persons, please visit http://www.lep.gov.

4. GPA acknowledges and agrees that compliance with the assurances constitutes a condition of continued receipt of federal financial assistance and is binding upon GPA and GPA's successors, transferees, and assignees for the period in which such assistance is provided.

5. GPA acknowledges and agrees that it must require any sub-grantees, contractors,

subcontractors, successors, transferees, and assignees to comply with assurances 1-4 above, and agrees to incorporate the following language in every Agreement or agreement subject to Title VI and its regulations between the GPA and GPA's sub-grantees, Contractors, Subcontractors, successors, transferees, and assignees:

*The sub-grantee, Contractor, Subcontractor, successor, transferee, and assignee shall comply with Title VI of the Civil Rights Act of 1964, which prohibits Subrecipients of federal financial assistance from excluding from a program or activity, denying benefits of, or otherwise discriminating against a person on the basis of race, color, or national origin (42 U.S.C. § 2000d et seq.), as implemented by the Department of the Treasury's Title VI regulations, 31 CFR Part 22, which are herein incorporated by reference and made a part of this Agreement (or agreement). Title VI also includes protection to persons with "Limited English Proficiency" in any program or activity receiving federal financial assistance, 42 U.S.C. § 2000d et seq., as implemented by the Department of the Treasury's Title VI regulations, 31 CFR Part 22, and herein incorporated by reference and made a part of this Agreement or agreement.*

6. GPA understands and agrees that if any real property or structure is provided or improved with the aid of federal financial assistance by the Department of the Treasury, this assurance obligates GPA, or in the case of a subsequent transfer, the transferee, for the period during which the real property or structure is used for a purpose for which the federal financial assistance is extended or for another purpose involving the provision of similar services or benefits. If any personal property is provided, this assurance obligates GPA for the period during which it retains ownership or possession of the property.

7. GPA shall cooperate in any enforcement or compliance review activities by the Department of the Treasury of the aforementioned obligations. Enforcement may include investigation, arbitration, mediation, litigation, and monitoring of any settlement agreements that may result from these actions. GPA shall comply with information requests, on-site compliance reviews and reporting requirements.

8. GPA shall maintain a complaint log and inform the Department of the Treasury of any complaints of discrimination on the grounds of race, color, or national origin, and limited English proficiency covered by Title VI of the Civil Rights Act of 1964 and implementing regulations and provide, upon request, a list of all such reviews or proceedings based on the complaint, pending or completed, including outcome. GPA also must inform the Department of the Treasury if GPA has received no complaints under Title VI.

9. GPA must provide documentation of an administrative agency's or court's findings of non-compliance of Title VI and efforts to address the non-compliance, including any voluntary compliance or other agreements between GPA and the administrative agency that made the finding. If GPA settles a case or matter alleging such discrimination, the Subrecipient must provide documentation of the settlement. If GPA has not been the subject of any court or administrative agency finding of discrimination, please so state.

10. If GPA makes sub-awards to other agencies or other entities, GPA is responsible for ensuring that sub-Subrecipients also comply with Title VI and other applicable authorities covered in this document Government of Guam agencies that make sub-awards must have in place standard grant assurances and review procedures to demonstrate that that they are effectively monitoring the civil rights compliance of sub- Subrecipients.

The United States of America has the right to seek judicial enforcement of the terms of this assurances document and nothing in this document alters or limits the federal enforcement measures that the United States may take in order to address violations of this document or applicable federal law.

# Government of Guam Subgrant Agreement

| Subgrantor<br>Guam Economic Development Authority | | Agreement Number<br>2025-GEDA-GPA-0001 |
|---|---|---|
| Subgrantee<br>Guam Power Authority | | Agreement Performance Beginning Date<br>February 28, 2025 |
| Subaward Agreement Amount | | Initial Agreement Expiration Date<br>December 1, 2026 |
| SLRF | $35,448,983.97 | Fund Expenditure End Date<br>December 31, 2026 |
| Total | $35,448,983.97 | Agreement Authority<br>Authority to enter into this Agreement exists in 12 GCA § 50103. |

**Agreement Purpose:** In accordance with 12 GCA § 50103, the purpose of this Agreement is to provide funding for the installation of power infrastructure to support the Mangilao Medical Campus Project. The work to be completed under this Agreement by the Subgrantee is more specifically described in Exhibit A.

**Exhibits and Order of Precedence**

The following Exhibits and attachments are included with this Agreement:

1. Exhibit A – Statement of Work and Budget.
2. Exhibit B – Federal Provisions.
3. Exhibit C – Agreement with Subrecipient of Federal Recovery Funds

In the event of a conflict or inconsistency between this Agreement and any Exhibit or attachment, such conflict or inconsistency shall be resolved by reference to the documents in the following order of priority:

1. Exhibit B – Federal Provisions.
2. Exhibit C – Agreement with Subrecipient of Federal Recovery Funds
3. Provisions in the main body of this Agreement.
4. Exhibit A – Statement of Work and Budget.

**Principal Representatives**

For the Subgrantor:

Melanie R. Mendiola
Guam Economic Development Authority
ITC Building, Suite 511
590 S. Marine Corps Drive
Tamuning, Guam 96913
mel.mendiola@investguam.com

For Subgrantee:

John M. Benavente, P.E.
Guam Power Authority
P.O. Box 2977
Hagåtña, Guam 96932-2977
jbenavente@gpagwa.com

Docusign Envelope ID: 87E6871D-68E0-43F0-B29D-50E8A2E2B614

1. **PARTIES.** This Agreement is entered into by and between the Guam Economic Development Authority ("GEDA") and the Guam Power Authority ("GPA") (collectively "the Parties"). The Parties agree to the terms and conditions in this Agreement.

2. **SUBGRANT.** As of the Subgrant Issuance Date, GEDA hereby obligates and awards to GPA grant funds in the amounts shown on the cover page of this Agreement. By accepting the grant funds provided under this Agreement, GPA agrees to comply with the terms and conditions of this Agreement and requirements and provisions of all Exhibits to this Agreement.

3. **TERM AND EFFECTIVE DATE**

   A. **Effective Date.** This Agreement shall not be valid or enforceable until the Effective Date, and the Grant Funds shall be expended by the Fund Expenditure End Date shown on the Cover Page for this Agreement. GEDA shall not be bound by any provision of this Agreement before the Effective Date, and shall have no obligation to pay GPA for any Work performed or expense incurred before the Effective Date or after the Fund Expenditure End Date.

   B. **Initial Term.** The Parties' respective performances under this Agreement shall commence on the Agreement Performance Beginning Date shown on the Cover Page for this Agreement and shall terminate on the Initial Agreement Expiration Date shown on the Cover Page for this Agreement (the "Initial Term") unless sooner terminated or further extended in accordance with the terms of this Agreement.

   C. **Early Termination in the Public Interest.** GEDA is entering into this Agreement to serve the public interest of Guam, as determined by the Department of Administration ("DOA") and provided in the Interagency Grant Agreement executed by and between DOA and GEDA on December 30, 2024. If DOA determines that this Agreement has ceased to further the public interest of Guam or if Government of Guam, Federal or other funds used for this Agreement are not appropriated, or otherwise become unavailable to fund this Agreement, GEDA may terminate this Agreement in whole or in part by providing at least forty-five (45) days' written notice to GPA that includes, to the extent practicable, the public interest justification for the termination. If GEDA terminates this Agreement in the public interest, GEDA shall pay GPA an amount equal to the percentage of the total reimbursement payable under this Agreement that corresponds to the percentage of Work satisfactorily completed, as determined by GEDA, less payments previously made. Additionally, GEDA, in its discretion, may reimburse GPA for a portion of actual, out-of-pocket expenses not otherwise reimbursed under this Subgrant Agreement that are incurred by GPA and are directly attributable to the uncompleted portion of GPA's obligations, provided that the sum of any and all reimbursements shall not exceed the maximum amount payable to GPA hereunder, and shall be in compliance with the 2021 Interim Final Rule, the 2022 Final Rule, and the 2023 Interim Final Rule ("Treasury Rules") issued by the U.S. Department of the Treasury ("Treasury"), and other applicable federal laws or regulations. This subsection shall not apply to a termination of this Agreement by GEDA for breach by GPA.

   D. **GPA's Termination Under Federal Requirements** GPA may request termination of this Agreement by sending notice to GEDA, or to the Federal Awarding Agency with a copy to GEDA and DOA, which includes the reasons for the termination and the effective date of the termination. If this Agreement is terminated in this manner, then GPA shall return any advanced payments made for work that will not be performed prior to the effective date of the termination.

4. **STATEMENT OF WORK AND BUDGET.** GPA shall complete the Work as described in this Agreement and in accordance with the provisions of Exhibit A. GEDA shall have no liability to compensate GPA for the delivery of any goods or the performance of any services that are not

Docusign Envelope ID: 87E6871D-68E0-43F0-B29D-50E8A2E2B614

specifically set forth in this Agreement.

## 5. PAYMENTS TO GPA

**A. Subaward Maximum Amount.** GPA shall complete the Work as described in this Agreement and in accordance with the provisions of Exhibit A. GEDA shall have no liability to compensate GPA for the delivery of any goods or the performance of any services that are not specifically set forth in this Agreement.

**B. Payment Procedures**

i. GPA shall initiate payment requests by invoice to GEDA, in a form and manner approved by GEDA. To facilitate Fiscal Year End closing, final invoices for each Fiscal Year should be submitted to GEDA by November 15th of the following Fiscal Year.

ii. GEDA shall pay each invoice within 21 days following the GEDA's receipt of that invoice, so long as the amount invoiced correctly represents work completed by GPA and previously accepted by GEDA during the term that the invoice covers.

iii. GEDA shall pay GPA's allowable costs, not exceeding the maximum total amount described in this Agreement for all allowable costs described in this Agreement and shown in the Budget, except that GPA may adjust the amounts between each line item of the Budget without formal modification to this Agreement as long as GPA provides notice to GEDA of the change, the change does not modify the total maximum amount of this Agreement or the maximum amount for any Government of Guam fiscal year, and the change does not modify any requirements of the Work. GEDA shall only pay allowable costs if those costs are: (i) reasonable and necessary to accomplish the Work and for the Goods and Services provided; and (ii) equal to the actual net cost to GPA (i.e. the price paid minus any items of value received by GPA that reduce the cost actually incurred).

The U.S. Department of the Treasury has issued a 2024 Compliance Supplement for Assistance Listing 21.027 Coronavirus State and Local Fiscal Recovery Funds ("Compliance Supplement"). The Compliance Supplement provides guidance to auditors and grant recipients regarding the American Rescue Plan Act ("ARPA") State and Local Fiscal Recovery Funds ("SLFRF") and applicable federal regulations, and also provides a guide on how to audit the federal funds.

The procurement requirement under the Compliance Supplement states that, "recipients may use award funds to enter into contracts to procure goods and services necessary to complement one or more of the eligible purposes . . . recipients are expected to have procurement policies and procedures in place that comply with the procurement standards outlined in the Uniform Guidance." Uniform Guidance procurement methods are stated in 2 CFR Part 200 Subpart D - Procurement Standards.

In addition, under Procurement Standards 2 CFR §200.324(c), procurement funded by federal funds "must not use the cost plus a percentage of cost and percentage of construction cost methods of contracting."

iv. If federal funds or funds from any other non-Government of Guam funds constitute all or some of the Grant Funds, GEDA's obligation to pay GPA shall be contingent upon such non-Government of Guam funding continuing to be made available for payment. Payments to be made pursuant to this Agreement shall be made only from Grant Funds, and GEDA's liability for such payments shall be limited to the amount remaining of such Grant Funds. If State, federal or other funds are not appropriated, or otherwise become unavailable to fund this Agreement, GEDA may, upon written notice, terminate this Agreement, in whole or in part, without incurring further liability. GEDA shall, however, remain obligated to pay for

Services and Goods that are delivered and accepted prior to the effective date of notice of termination, and this termination shall otherwise be treated as if this Agreement were terminated in the public interest as described in **§3.C**.

v. The close-out of a Federal Award does not affect the right of the Federal Awarding Agency or the Government of Guam to disallow costs and recover funds on the basis of a later audit or other review. Any cost disallowance recovery is to be made within the Record Retention Period, as defined below.

**C. Close-Out.** GPA shall close out this Award within 30 days after the Fund Expenditure End Date shown on the Cover Page for this Agreement. To complete close-out, GPA shall submit to GEDA all Deliverables (including documentation) as defined in this Agreement and GPA's final reimbursement request or invoice. GEDA will withhold 5% of allowable costs set forth in reimbursement requests or invoices submitted by GPA during the final 3 months of the performance period, until all final documentation has been submitted and accepted by GEDA as substantially complete.

## 6. REPORTING - NOTIFICATION

**A. Quarterly Reports.** In addition to any reports required pursuant to any other Exhibit, for any Agreement having a term longer than three months, GPA shall submit, on a quarterly basis, a written report specifying progress made for each specified performance measure and standard in this Agreement. Such progress report shall be in accordance with the procedures developed and prescribed by GEDA. Progress reports shall be submitted to GEDA not later than five (5) Business Days following the end of each calendar quarter or at such time as otherwise specified by GEDA.

**B. Performance and Final Status.** GPA shall submit all financial, performance and other reports to GEDA no later than the closeout described in §5C, containing an evaluation and review of GPA's performance and the final status of GPA's obligations hereunder.

**C. Violations Reporting.** GPA shall disclose, in a timely manner, in writing to GEDA and DOA, all violations of federal, state, or Guam criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal Award. The Federal Awarding Agency may seek to impost any penalties for noncompliance allowed under 2 CFR Part 180 and 31 U.S.C. 3321, which may include, without limitation, suspension or debarment.

## 7. GPA RECORDS

**A. Maintenance and Inspection.** GPA shall make, keep, and maintain, all official records, documents, communications, notes and other written materials, electronic media files, and communications, pertaining in any manner to this Agreement for a period of five years following the completion of the close out of this Agreement. GPA shall permit GEDA or DOA and its delegees to audit, inspect, examine, excerpt, copy and transcribe all such records at all reasonable times and places during the term of this Agreement, unless GEDA or DOA determines that an audit or inspection is required without notice at a different time to protect the interests of GEDA, DOA or the Government of Guam.

**B. Monitoring.** GEDA will monitor GPA's performance of its obligations under this Agreement using procedures as determined by GEDA. GPA shall allow GEDA and DOA to perform all monitoring required by the Uniform Guidance and otherwise, based on GEDA and/or DOA's risk analysis of GPA. GEDA shall have the right, in its sole discretion, to change its monitoring procedures and requirements at any time during the term of this Agreement. GEDA shall monitor GPA's performance in a manner that does not unduly interfere with GPA's performance of the Work.

Docusign Envelope ID: 87E6871D-68E0-43F0-B29D-50E8A2E2B614

**C. Final Audit Report.** GPA shall promptly submit to GEDA a copy of any final audit report of an audit performed on GPA's records that relates to or affects this Agreement or the Work, whether the audit is conducted by GPA or a third party.

## 8. CONFIDENTIAL INFORMATION AND RECORDS

**A. Confidentiality.** Each Party shall treat the confidential information of the other Party with the same degree of care and protection it affords to its own confidential information, unless a different standard is set forth in this Agreement. Each Party shall notify the other Party immediately if it receives a request or demand from a third party for records or information of the other Party.

**B. Other Entity Access and Nondisclosure Agreements.** GPA may provide Government of Guam records to its agents, employees, assigns and Subcontractors as necessary to perform the Work, but shall restrict access to Government of Guam Confidential Information to those agents, employees, assigns and Subcontractors who require access to perform their obligations under this Agreement. GPA shall ensure all agents, employees, assigns, and Subcontractors sign agreements containing nondisclosure provisions at least as protective as those in this Agreement, and that the nondisclosure provisions are in force at all times the agent, employee, assign or Subcontractor has access to any Government of Guam Confidential Information. GPA shall provide copies of those signed nondisclosure provisions to the Government of Guam upon execution of the nondisclosure provisions if requested by the State.

## 9. CONFLICTS OF INTEREST

**A. Actual Conflicts of Interest.** GPA shall not engage in any business or activities or maintain any relationships that conflict in any way with the full performance of the obligations of GPA under this Agreement. GPA acknowledges that, with respect to this Agreement, even the appearance of a conflict of interest shall be harmful to the Government of Guam's interests. Absent GEDA's prior written approval, GPA shall refrain from any practices, activities or relationships that reasonably appear to be in conflict with the full performance of GPA's obligations under this Agreement.

## 10. INSURANCE. GPA shall ensure that each Subcontractor shall obtain and maintain, insurance as specified in this section at all times during the term of this Agreement. All insurance policies required by this Agreement that are not provided through self-insurance shall be issued by insurance companies as approved by the Government of Guam.

**A. Workers' Compensation.** Workers' compensation insurance as required by Guam law, and employers' liability insurance covering all Subcontractor employees acting within the course and scope of their employment.

**B. General Liability.** Commercial general liability insurance covering premises operations, fire damage, independent contractors, products and completed operations, blanket contractual liability, personal injury, and advertising liability with minimum limits as follows:

   i.  $1,000,000 each occurrence;

   ii.  $1,000,000 general aggregate;

   iii. $1,000,000 products and completed operations aggregate; and

   iv. $50,000 any 1 fire.

**C. Automobile Liability.** Automobile liability insurance covering any auto (including owned,

hired and non-owned autos) with a minimum limit of $1,000,000 each accident combined single limit.

**D. Additional Insured.** The Government of Guam shall be named as additional insured on all commercial general liability policies (leases and construction contracts require additional insured coverage for completed operations) required of GPA's Subcontractors.

**E. Primacy of Coverage.** Coverage required of each Subcontractor shall be primary over any insurance or self- insurance program carried by GPA or the Government of Guam.

**F. Cancellation.** All insurance policies shall include provisions preventing cancellation or non-renewal, except for cancellation based on non-payment of premiums, without at least 30 days prior notice to GPA and GPA shall forward such notice to GEDA and DOA in accordance with section 12 (Notices and Representatives) within seven days of GPA's receipt of such notice.

**G. Subrogation Waiver.** All insurance policies secured or maintained by GPA's Subcontractors in relation to this Agreement shall include clauses stating that each carrier shall waive all rights of recovery under subrogation or otherwise against GPA or the Government of Guam, its agencies, institutions, organizations, officers, agents, employees, and volunteers.

**H. Certificates.** GPA shall provide to GEDA and DOA certificates evidencing Subcontractor insurance coverage required under this Agreement prior to the Effective Date, except that, if GPA's subcontract is not in effect as of the Effective Date, GPA shall provide to GEDA and DOA certificates showing Subcontractor insurance coverage required under this Agreement within seven (7) Business Days following GPA's execution of the subcontract. No later than fifteen (15) days before the expiration date of GPA's or any Subcontractor's coverage, GPA shall deliver to GEDA and DOA certificates of insurance evidencing renewals of coverage. At any other time during the term of this Agreement, upon request by GEDA or DOA, GPA shall, within seven (7) Business Days following the request by GEDA or DOA, supply to GEDA or DOA evidence satisfactory to DOA of compliance with the provisions of this section.

**11. DISPUTE RESOLUTION.** The failure of a Party to perform its respective obligations in accordance with the provisions of this subgrant agreement is a breach of this subgrant agreement. In the event of disputes concerning performance hereunder or otherwise related to this subgrant agreement, the Parties shall attempt to resolve them at the agency level. Except as herein specifically provided otherwise or as required or permitted by federal regulations related to any Federal Award that provided any of the Grant Funds, disputes concerning the performance of this subgrant agreement that cannot be resolved by agency representatives shall be referred in writing to the Office of the Governor for resolution.

**12. NOTICES and REPRESENTATIVES.** Each individual identified as a Principal Representative on the Cover Page for this Agreement shall be the principal representative of the designating Party. All notices required or permitted to be given under this Agreement shall be in writing, and shall be delivered (A) by hand with receipt required, (B) by certified or registered mail to such Party's principal representative at the address set forth on the Cover Page for this Agreement or (C) as an email with read receipt requested to the principal representative at the email address, if any, set forth on the Cover Page for this Agreement. If a Party delivers a notice to another through email and the email is undeliverable, then, unless the Party has been provided with an alternate email contact, the Party delivering the notice shall deliver the notice by hand with receipt required or by certified or registered mail to such Party's principal representative at the address set forth on the Cover Page for this Agreement. Either Party may change its principal representative or principal representative contact information, or may designate specific other individuals to receive certain types of notices in addition to or in lieu of a principal representative, by notice submitted in accordance with this section without a formal amendment to this Agreement. Unless otherwise provided in this Agreement, notices shall be effective upon delivery of the written notice.

## 13. GENERAL PROVISIONS

**A. Assignment.** GPA's rights and obligations under this Agreement are personal and may not be transferred or assigned without the prior, written consent of GEDA and DOA. Any attempt at assignment or transfer without such consent shall be void. Any assignment or transfer of GPA's rights and obligations approved by GEDA and DOA shall be subject to the provisions of this Agreement.

**B. Subcontracts.** GPA shall not enter into any subaward or subcontract in connection with its obligations under this Agreement without the prior, written approval of GEDA. GPA shall submit to GEDA a copy of each such subaward or subcontract upon request by GEDA. All subawards and subcontracts entered into by GPA in connection with this Agreement shall comply with all applicable federal and Guam laws and regulations, shall provide that they are governed by the laws of Guam, and shall be subject to all provisions of this Agreement.

**C. Binding Effect.** All provisions of this Agreement, including the benefits and burdens, shall extend to and be binding upon the Parties' respective successors and assigns.

**D. Authority.** Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's obligations have been duly authorized.

**E. Captions and References.** The captions and headings in this Agreement are for convenience of reference only, and shall not be used to interpret, define, or limit its provisions. All references in this Agreement to sections (whether spelled out or using the § symbol), subsections, exhibits or other attachments, are references to sections, subsections, exhibits or other attachments contained herein or incorporated as a part hereof, unless otherwise noted.

**F. Counterparts.** This Agreement may be executed in multiple, identical, original counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

**G. Entire Understanding.** This Agreement represents the complete integration of all understandings between the Parties related to the Work, and all prior representations and understandings related to the Work, oral or written, are merged into this Agreement. Prior or contemporaneous additions, deletions, or other changes to this Agreement shall not have any force or effect whatsoever, unless embodied herein.

**H. Modification.** GEDA may modify the terms and conditions of this Agreement by issuance of an Amended Agreement, which shall be effective if GPA countersigns the Agreement or accepts Grant Funds following its receipt of the Amended Agreement. The Parties may also agree to modification of the terms and conditions of the Agreement in a formal amendment to this Agreement, properly executed and approved in accordance with applicable Guam law.

**I. Statutes, Regulations, Fiscal Rules, and Other Authority.** Any reference in this Agreement to a statute, regulation, rule, fiscal policy or other authority shall be interpreted to refer to such authority then current, as may have been changed or amended since the Grant Issuance Date. GPA shall strictly comply with all applicable Federal and Guam laws, rules, and regulations in effect or hereafter established, including, without limitation, laws applicable to discrimination and unfair employment practices.

**J. Severability.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect, provided that the Parties can continue to perform their obligations under this Agreement in accordance with the intent of this Agreement.

**K. Survival of Certain Agreement Terms.** Any provision of this Agreement that imposes an obligation on a Party after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and shall be enforceable by the other Party.

**L. Waiver.** A Party's failure or delay in exercising any right, power, or privilege under this Agreement, whether explicit or by lack of enforcement, shall not operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise of such right, power, or privilege.

**M. Standard and Manner of Performance.** GPA shall perform its obligations under this Agreement in accordance with the highest standards of care, skill and diligence in GPA's industry, trade, or profession.

**N. Licenses, Permits, and Other Authorizations.** GPA shall secure and maintain at all times during the term of this Agreement, at its sole expense, all licenses, certifications, permits, and other authorizations required to perform its obligations under this Agreement, and shall ensure that all employees, agents and Subcontractors secure and maintain at all times during the term of their employment, agency or Subcontractor, all license, certifications, permits and other authorizations required to perform their obligations in relation to this Agreement.

**O. Federal Provisions.** GPA shall comply with all applicable requirements of Exhibits B and C at all times during the term of this Agreement.

**P. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of Guam. The Parties agree that any legal action or proceeding arising out of or relating to this Agreement shall be brought exclusively in the courts of Guam, and the Parties hereby irrevocably consent to the jurisdiction of such courts.

IN WITNESS of the above provisions, the Parties have executed this Agreement on the last of the dates below stated.

**For the Guam Economic Development Authority:**     **For the Guam Power Authority:**

MW

**MELANIE R. MENDIOLA,**     **JOHN M. BENAVENTE, P.E.**
CEO/Administrator     General Manager

Date 2/28/2025     Date 3/2/2025

Docusign Envelope ID: 87E6871D-68E0-43F0-B29D-50E8A2E2B614

**EXHIBIT A. STATEMENT OF WORK AND BUDGET**

1.   **PURPOSE.** GEDA is entering into this subaward of ARPA funds with GPA to fund the installation of power infrastructure for the Mangilao Medical Campus ("MMC") project. For details on the ARPA funding, see Interagency Grant Agreement executed by and between DOA and GEDA executed on December 31, 2024.

2.   **NOTIFICATION:**

     **To GEDA:**

     Melanie R. Mendiola, CEO/Administrator
     mel.mendiola@investguam.com
     Guam Economic Development Authority
     ITC Building, Suite 511
     590 S. Marine Corps Drive
     Tamuning, Guam 96913

     **To GPA:**

     John M. Benavente, P.E., General Manager
     jbenavente@gpagwa.com
     Guam Power Authority
     P.O. Box 2977
     Hagåtña, Guam 96932-2977

3.   **PERFORMANCE PERIOD.** The performance period and expiration date are stated on the Agreement cover page. GEDA shall not be responsible or liable for goods or services delivered or performed prior to issuance of this Agreement.

4.   **DEFINITIONS**

   - **"ARPA"** means the American Rescue Plan Act of 2021.
   - **"SLFRF"** means State and Local Fiscal Recovery Fund.

5.   **PERSONNEL**

    A.  **Responsible Administrator.** GPA's performance hereunder shall be under the direct supervision of John M. Benavente, P.E., General Manager of GPA, who is hereby designated as the responsible administrator of this project. The responsible administrator may delegate oversight of the Work – not including contracting authority–to another GPA employee, if prior notice of the delegation is provided to DOA and the delegee meets at least the following minimum qualifications:

      1.  College degree or minimum of four years' experience in government administration, procurement, project administration, and/or construction management.

      2.  Strong oral and written communication and interpersonal skills.

      3.  Strong organizational and problem-solving skills.

      4.  Familiarity with Guam governmental operations.

**B. Other Personnel**

1. GPA represents that, in addition to the expertise of its current employees, GPA will leverage the available expertise of other Government of Guam agencies where it believes such expertise can be productively applied.

2. Further notwithstanding the above, GEDA and GPA agree that efficient, effective completion of the scope of work will require GEDA to procure professional services including but not limited to design and engineering services as well as inspection and construction management services, and that such procured professional services are eligible expenses for Grant Funds.

**C. Secondment from Other Government of Guam Agencies.** If GPA determines that it would be advantageous to formally second staff with particular expertise from another Government of Guam agency to GPA, GPA may make such request to the contact designated by GEDA and in the manner prescribed by GEDA, who will forward such request to DOA. The request should, at a minimum, include the expertise requested, together with any suggestions for Government of Guam staff possessing the needed expertise, the anticipated timeframe of the secondment, and the proposed funding source for the secondment.

**D. Procured Professional Services.** GEDA and GPA expressly contemplate that GPA will contract for the provision of certain professional services in support of the Work and the Services, including but not limited to architectural and engineering design, environmental assessment, construction, and construction management and inspection services.

## 6. WORK TASKS AND DELIVERABLES

**A. Work tasks.** GPA will develop a project strategy for efficient completion of the Work, consistent with the below budget narrative. GPA will procure, as necessary, professional and construction services and organize the assistance of other Government of Guam agencies and, as appropriate, enter into memoranda of agreement with those agencies and other entities. GPA will oversee all activities, ensure that all activities are consistent with this Agreement and process invoices for payment as required in memoranda of agreement with other agencies and entities. GPA will, in coordination with the GEDA and the Office of the Governor, lead public communication efforts. GPA will be lead communicator with Guam regulatory and inspection agencies for the project. GPA will oversee the budget against project completion and will coordinate the preparation of periodic reports as described below.

GEDA is authorized by 12 GCA § 50103 to finance, acquire, construct, reconstruct, rehabilitate, or improve hospital facilities, and provide such hospital facilities to serve the general public and to make reasonably accessible to all the people of Guam modern and efficient hospital facilities. To assist in achieving this objective, GEDA is subawarding grant funds to and/or contracting with other entities, including GPA, to complete the initial phase of the Mangilao Medical Campus Project, including design and construction of primary utility infrastructure (electrical power, water and wastewater), and prepare an Environmental Condition of Property report which analyzes environmental, archaeological, physical, geology and other characteristics of the MMC property or portions thereof in compliance with local and federal laws and regulations. The MMC property will be identified by DOA.

Preliminary analysis indicates that the proposed location for the medical campus lacks basic infrastructure to support not only the MMC but also developments within the surrounding area.

**Electrical Power**

GPA provides power and power infrastructure to Guam through the use of oil-fired power generators (94.3%) and renewable power generation (5.7%). Currently electricity is distributed to the grid around the medical campus site. New development would require additional electrical infrastructure. Under this Agreement, GPA agrees to design and construct the additional

Case 1:25-cv-00029    Document 9-2    Filed 08/05/25    Page 10 of 29
Writ Pet Ex B p. 10 of 29
Page 111 of 174

Docusign Envelope ID: 87E6871D-68E0-43F0-B29D-50E8A2E2B614

electrical infrastructure. Once completed, GPA will apportion sufficient electrical supply from the generating capacity installed to meet the needs of the MMC.

Preliminary analysis indicates that the following electrical infrastructure may be required:

- Power substation
- Power tie-ins from GU-15
- Transmission lines that intercept Barrigada-Pulantat for aboveground transmission lines
- Dedicated feeder serving the new hospital
- Additional circuit utilized for backfeed capabilities

The design process that will be instituted by GPA will confirm electrical infrastructure requirements.

### B. Specific deliverables:

1. Architectural and engineering design of plans and construction specifications for electrical power infrastructure to bring needed infrastructure to the campus site, including as necessary power substations, power tie-ins from Route 15, transmission lines that intercept Barrigada-Pulantat for above-ground transmission lines, a dedicated feeder serving the new campus, an additional circuit utilized for backfeed capabilities, and other electrical facilities as determined to be advisable in consultation with the Guam Power Authority.

2. GPA will procure the construction of the new Fadian Substation, which will be equipped with a 30 MVA power transformer, indoor 34.5 kV and 13.8 kV breakers, underground conductors, protective relays, and other required equipment. Additionally, GPA will procure the construction of two new transmission lines to interconnect the new Fadian Substation with island power grid. These transmission lines will include manholes, risers, and #1000 KCMIL aluminum underground conductors, routed from the intersection of Route 10 and Route 15 to the Fadian Substation.

## 7. REPORTING

### A. Annual and Final Report(s). GPA will fulfill the performance and financial reporting requirements as outlined in this section.

### B. Performance and Financial Reporting Requirements Due Date(s)

1. **Core Performance.** Within 30 days of the execution of this Agreement, GPA will prepare for review and acceptance by GEDA a master calendar with an anticipated schedule for the performance and completion of all core activities required for successful and timely completion of the Work, including but not limited to the specific deliverables detailed above. The Core Performance schedule will subdivide the project as a whole, assigning percentages to appropriate milestones quantified to appropriately state, on a weekly basis, the percentage complete the project as a whole is against the scheduled percentage of completion.

2. **Monthly.** Due by the 1st of the month, GPA will submit its Monthly Report to GEDA. The Monthly Report will include ((i) the Core Performance actual and scheduled percentages; (ii) milestones achieved in the last month; (iii) planned activities for the next two months; (iv) an abbreviated budget overview of expenses paid to date, unpaid expenses incurred, and Grant Funds that remain. The Monthly Report will also list vendor invoices received in the previous month and expected vendor billings for the next two months. The Monthly Report will also list Government of Guam staff other than GPA staff employed on the project in the previous month and any expected other-than-GPA Government of Guam staff participation requested for the next two months. Each Monthly Report should also include a brief narrative

of the previous month's project successes and, as appropriate, a brief analysis of any challenges encountered.

3. **Quarterly.** GPA will submit a quarterly Grant Itemization Report with evidence of expenditures in a form that complies with U.S. Department of Treasury reporting requirements and meet with GEDA to resolve any questions or comments. If the U.S. Department of Treasury changes reporting requirements, GPA agrees to comply with the revised requirements.

4. **Annually.** GPA shall submit an annual report as specified below. These reports shall include but are not limited to a summary of the following:

   - Progress as to Specific Deliverables
   - Budget v. Actuals
   - Anticipated potential upcoming challenges
   - Project utilization of non-GPA Government of Guam resources
   - Upcoming project efficiency or other opportunities
   - Economic impact reporting

The annual reports are due according to the schedule below:

   - Report 1: May 15, 2025
   - Report 2: May 15, 2026

GPA shall provide GEDA with an explanation and action plan for any performance measurements that are not on target.

### BUDGET AND PAYMENT

Payments shall be made in accordance with the provisions set forth in the Grant and its attached exhibits, including this Exhibit A. The maximum amount payable under the terms and conditions of this Agreement shall not exceed $35,448,983.97. Any amount in excess of these totals, must be agreed to by both parties, must be provided by a properly executed option or amendment to this Agreement.

The Guam Power Authority (GPA) provided a cost estimate for the Interagency Agreement between DOA and GEDA executed on December 30, 2024, estimating costs to provide a new looped underground transmission line from Route 10 to the MCC, a new indoor substation, and new distribution upgrades to provide upgraded service to the MCC and surrounding areas. The cost estimate, which is attached to the Interagency Agreement is incorporated by reference herein as if fully set forth in its entirety in this Agreement.

| POWER COST ESTIMATE | |
|---|---|
| New indoor substation | $ 12,484,469.26 |
| New transmission underground lines | $15,876,635.62 |
| New underground dedicated feeder and backup tie-in | $ 7,087,879.09 |
| | |
| **TOTAL** | $ 35,448,983.97 |

Docusign Envelope ID: 87E6871D-68E0-43F0-B29D-50E8A2E2B614

**Matching Funds**

No match required.

**Grant Funds**

2025-GEDA-GPA-0001     $35,448,983.97

## 8. ADMINISTRATIVE REQUIREMENTS

### A. Accounting

1. At all times from the Effective Date of this Grant until completion of the Work, GPA shall maintain properly segregated books of Grant Funds, matching funds (if any), and other funds associated with the Work.

2. All receipts and expenditures associated with said Work shall be documented in a detailed and specific manner, and shall accord with the Work Budget set forth herein.

3. GPA shall assume responsibility for seeing that all funding is expended, accounted for and reported, consistent with underlying agreements, program objectives and with allowable cost, applicable rules and regulations addressed by 2 CFR 200 and originating grant award provisions.

4. Adjustments of budget expenditure amounts in excess of ten percent (10%) must be authorized by GEDA in an amendment to this Agreement properly executed and approved pursuant to GEDA procedures.

5. In no event shall GPA's total consideration exceed the amount indicated in "Budget" above.

6. Reimbursement requests must include the standard reimbursement summary sheet and supporting documentation of the amounts listed on the summary sheet, including but not limited to an original ticked general ledger from the host accounting system.

### B. Monitoring.
GEDA shall monitor this Work on an as-needed basis. GEDA may choose to audit the business activities performed under this Grant. GPA shall maintain a complete file of all records, documents, communications, notes and other written materials or electronic media, files or communications, which pertain in any manner to the operation of activities undertaken pursuant to an executed Grant. Such books and records shall contain documentation of the participant's pertinent activity under this Grant in a form consistent with good accounting practice.

### C. Discretionary Audit.
GEDA, or any of its duly authorized representatives, including an independent Certified Public Accountant of GEDA's choosing, or the federal government or any of its properly delegated or authorized representatives shall have the right to inspect, examine, and audit GPA's (and any of GPA's contractor's) records, books, accounts and other relevant documents. Such a discretionary audit may be requested at any time and for any reason from the effective date of this Agreement until three (3) years after the date final payment for the project is received by GPA or applicable federal audit period, whichever is later. The cost of a discretionary audit will be borne by the GEDA.

### D. Mandatory Audit.
Whether or not GEDA calls for a discretionary audit as provided above, GPA

shall provide GEDA copies of annual audit reports for the period of the project. In addition, GPA shall supply GEDA with copies of all correspondence from any auditor related to any findings relevant to the project. If an audit reveals evidence of non-compliance with applicable requirements, or other issues pertaining to the administration of federal funds, GEDA reserves the right to institute compliance, or other appropriate measures, to address audit findings.

**E. Specific Terms and Conditions**

1. Expenses incurred by GPA in association with this project **prior to the Effective Date** and **after December 31, 2026** are not eligible Grant expenditures under this grant and will not be reimbursed by GEDA.

2. GPA will maintain an office conveniently located and easily accessible to the community.

3. GPA will maintain a publicly listed telephone in the name of the "Guam Power Authority" The phone will be answered "Guam Power Authority" or "GPA."

4. GPA's office will be staffed and operational during normal business hours.

5. All advertising or other promotional materials developed or distributed in connection with conferences or other meetings or gatherings must contain the following statement: "Reasonable accommodations for persons with disabilities will be made, if requested in advance."

6. GPA employees, volunteers, and paid consultants must sign and abide by the applicable conflict of interest policy.

7. The responsible administrator or his delegate must actively participate in any calls scheduled by GEDA or DOA concerning the Grant Work and must respond to all email inquiries from either as soon as reasonably possible.

8. All off-island travel using grant funds must be approved by GEDA and DOA before travel occurs.

9. **Additional Terms and Conditions.** All terms and provisions from the following Exhibits apply in full effect for this Grant Award:

This Exhibit A: Statement of Work and Budget

Exhibit B: Federal Provisions

Exhibit C. Agreement with Subrecipient of Federal Recovery Funds

## EXHIBIT B. FEDERAL PROVISIONS

### 1. APPLICABILITY OF PROVISIONS.

1.1. The Grant to which these Federal Provisions are attached has been funded, in whole or in part, with an Award of Federal funds. In the event of a conflict between the provisions of these Federal Provisions, the Special Provisions, the body of the Grant, or any attachments or exhibits incorporated into and made a part of the Grant, the provisions of these Federal Provisions shall control.

1.2. The Government of Guam is accountable to Treasury for oversight of their subrecipients, including ensuring their subrecipients comply with federal statutes, Award Terms and Conditions, applicable Treasury Rules, and reporting requirements, as applicable.

1.3. Additionally, any subrecipient that issues a subaward to another entity (2nd tier subrecipients), must hold the 2nd tier subrecipient accountable to these provisions and adhere to reporting requirements.

1.4. These Federal Provisions are subject to the Award as defined in §2 of these Federal Provisions, as may be revised pursuant to ongoing guidance from the relevant Federal or Government of Guam agency or institutions of higher education.

### 2. DEFINITIONS.

2.1. For the purposes of these Federal Provisions, the following terms shall have the meanings ascribed to them below.

2.1.1. "Award" means an award of Federal financial assistance, and the Grant setting forth the terms and conditions of that financial assistance, that a non-Federal Entity receives or administers.

2.1.2. "Entity" means:

2.1.2.1. a Non-Federal Entity;

2.1.2.2. a foreign public entity;

2.1.2.3. a foreign organization;

2.1.2.4. a non-profit organization;

2.1.2.5. a domestic for-profit organization (for 2 CFR parts 25 and 170 only);

2.1.2.6. a foreign non-profit organization (only for 2 CFR part 170) only);

2.1.2.7. a Federal agency, but only as a subrecipient under an Award or Subaward to a non-Federal entity (or 2 CFR 200.1); or

2.1.2.8. a foreign for-profit organization (for 2 CFR part 170 only).

2.1.3. "Executive" means an officer, managing partner or any other employee in a management position.

2.1.4. "Expenditure Category (EC)" means the category of eligible uses as defined by the US

Department of Treasury in "Appendix I of the Compliance and Reporting Guidance, State and Local Fiscal Recovery Funds" report available at www.treasury.gov.

2.1.5. "Federal Awarding Agency" means a Federal agency providing a Federal Award to a Recipient as described in 2 CFR 200.1

2.1.6. "Grant" means the Grant to which these Federal Provisions are attached.

2.1.7. "Grantee" means the party or parties identified as such in the Grant to which these Federal Provisions are attached.

2.1.8. "Non-Federal Entity means a State, local government, Indian tribe, institution of higher education, or nonprofit organization that carries out a Federal Award as a Recipient or a subrecipient.

2.1.9. "Nonprofit Organization" means any corporation, trust, association, cooperative, or other organization, not including IHEs, that:

    2.1.9.1. Is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest;

    2.1.9.2. Is not organized primarily for profit; and

    2.1.9.3. Uses net proceeds to maintain, improve, or expand the operations of the organization.

2.1.10. "OMB" means the Executive Office of the President, Office of Management and Budget.

2.1.11. "Pass-through Entity" means a non-Federal Entity that provides a Subaward to a subrecipient to carry out part of a Federal program.

2.1.12. "Prime Recipient" means the Government of Guam or institution of higher education identified as the Grantor in the Grant to which these Federal Provisions are attached.

2.1.13. "Subaward" means an award by a Prime Recipient to a subrecipient funded in whole or in part by a Federal Award. The terms and conditions of the Federal Award flow down to the Subaward unless the terms and conditions of the Federal Award specifically indicate otherwise in accordance with 2 CFR 200.101. The term does not include payments to a Contractor or payments to an individual that is a beneficiary of a Federal program.

2.1.14. "Subrecipient" or "Subgrantee" means a non-Federal Entity (or a Federal agency under an Award or Subaward to a non-Federal Entity) receiving Federal funds through a Prime Recipient or a subgrantor to support the performance of the Federal project or program for which the Federal funds were awarded. A subrecipient is subject to the terms and conditions of the Federal Award to the Prime Recipient, including program compliance requirements. The term does not include an individual who is a beneficiary of a federal program. For SLFRF Grants, a subrecipient relationship continues to exist for Expenditure Category 6.1 Revenue Replacement.

2.1.15. "System for Award Management (SAM)" means the Federal repository into which an Entity must enter the information required under the Transparency Act, which may be found at http://www.sam.gov.

2.1.16. "Transparency Act" means the Federal Funding Accountability and Transparency Act of 2006 (Public Law 109-282), as amended by §6202 of Public Law 110-252.

2.1.17. "Uniform Guidance" means the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. The terms and conditions of the Uniform Guidance flow down to Awards to GPAs unless the Uniform Guidance or the terms and conditions of the Federal Award specifically indicate otherwise.

2.2. "Unique Entity ID Number" means the Unique Entity ID established by the federal government for a Grantee/Subgrantee at https://sam.gov/content/home

## 3. COMPLIANCE.

3.1. GPA shall comply with all applicable provisions of the Transparency Act and the regulations issued pursuant thereto, all provisions of the Uniform Guidance, and all applicable Federal Laws and regulations required by this Federal Award. Any revisions to such provisions or regulations shall automatically become a part of these Federal Provisions, without the necessity of either party executing any further instrument. The Government of Guam, at its discretion, may provide written notification to Grantee of such revisions, but such notice shall not be a condition precedent to the effectiveness of such revisions.

3.2. Per US Treasury Final Award requirements, grantee programs or services must not include terms or conditions that undermine efforts to stop COVID-19 or discourage compliance with recommendations and CDC guidelines.

## 4. SYSTEM FOR AWARD MANAGEMENT (SAM) AND UNIQUE ENTITY ID SYSTEM (UEI) REQUIREMENTS.

4.1. SAM. GPA shall maintain the currency of its information in SAM until GPA submits the final financial report required under the Award or receives final payment, whichever is later. GPA shall review and update SAM information at least annually.

4.2. UEI. GPA shall provide its Unique Entity ID to GEDA and DOA, and shall update GPA's information in SAM.gov at least annually.

## 5. REPORTING.

5.1. If GPA is a subrecipient of the Award pursuant to the Transparency Act, GPA shall report data elements to SAM, to GEDA and to DOA as required in this Exhibit. No direct payment shall be made to GPA for providing any reports required under these Federal Provisions and the cost of producing such reports shall be included in the Grant price. The reporting requirements in this Exhibit are based on guidance from the OMB, and as such are subject to change at any time by OMB. Any such changes shall be automatically incorporated into this Grant and shall become part of GPA's obligations under this Grant.

## 6. SUBRECIPIENT REPORTING REQUIREMENTS

6.1. Subrecipient shall report as set forth below.

6.1.1. To SAM. A Subrecipient shall register in SAM and report the following data elements in SAM *for each* Federal Award Identification Number (FAIN) assigned by a Federal agency to a Recipient no later than the end of the month following the month in which the Subaward was made:

6.1.1.1. Subrecipient Unique Entity ID;

Case 1:25-cv-00029   Document 9-2   Filed 06/03/25   Page 116 of 174

Writ. Pet. Ex. B p. 17 of 29

6.1.1.2. Subrecipient Unique Entity ID if more than one electronic funds transfer (EFT) account;

6.1.1.3. Subrecipient parent's organization Unique Entity ID;

6.1.1.4. Subrecipient's address, including: Street Address, City, State, Country, Zip + 4, and Congressional District;

6.1.1.5. Subrecipient's top 5 most highly compensated Executives if the criteria in §4 above are met; and

6.1.1.6. Subrecipient's Total Compensation of top 5 most highly compensated Executives if the criteria in §4 above met.

6.1.2. To Recipient. A Subrecipient shall report to its Recipient, upon the effective date of the Grant, the following data elements:

6.1.2.1. Subrecipient's Unique Entity ID as registered in SAM.

6.1.2.2. Primary Place of Performance Information, including: Street Address, City, State, Country, Zip code + 4, and Congressional District.

6.2. Subrecipient also agrees to comply with any reporting requirements established by the US Treasury, Governor's Office and DOA. DOA may need additional reporting requirements after this agreement is executed. If there are additional reporting requirements, DOA will provide notice of such additional reporting requirements via Exhibit D: SLFRF Reporting Modification Form.

## 7. PROCUREMENT STANDARDS.

7.1. Procurement Procedures. A subrecipient shall use its own documented procurement procedures which reflect applicable Guam law and applicable regulations, provided that the procurements conform to applicable Federal law and the standards identified in the Uniform Guidance, including without limitation, 2 CFR 200.318 through 200.327 thereof.

7.2. Domestic preference for procurements (2 CFR 200.322). As appropriate and to the extent consistent with law, the non-Federal entity should, to the greatest extent practicable under a Federal award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other manufactured products). The requirements of this section must be included in all subawards including all Agreements and purchase orders for work or products under this award.

7.3. Procurement of Recovered Materials. If a subrecipient is a Government of Guam Agency, its Contractors must comply with section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 CFR part 247, that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired during the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

Docusign Envelope ID: 87E6871D-68E0-43F0-B29D-50E8A2E2B614

7.4. Never contract with the enemy (2 CFR 200.215). Federal awarding agencies and recipients are subject to the regulations implementing "Never contract with the enemy" in 2 CFR part 183. The regulations in 2 CFR part 183 affect covered contracts, grants and cooperative agreements that are expected to exceed $50,000 within the period of performance, are performed outside the United States and its territories, and are in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

7.5. Prohibition on certain telecommunications and video surveillance services or equipment (2 CFR 200.216). Subrecipient is prohibited from obligating or expending loan or grant funds on certain telecommunications and video surveillance services or equipment pursuant to 2 CFR 200.216.

## 8. ACCESS TO RECORDS.

8.1. GPA shall permit GEDA and/or DOA and their auditors to have access to GPA's records and financial statements as necessary for DOA to meet the requirements of 2 CFR 200.332 (Requirements for pass-through entities), 2 CFR 200.300 (Statutory and national policy requirements) through 2 CFR 200.309 (Period of performance), and Subpart F-Audit Requirements of the Uniform Guidance.

## 9. SINGLE AUDIT REQUIREMENTS.

9.1. If GPA expends $750,000 or more in Federal Awards during GPA's fiscal year, GPA shall procure or arrange for a single or program-specific audit conducted for that year in accordance with the provisions of Subpart F-Audit Requirements of the Uniform Guidance, issued pursuant to the Single Audit Act Amendments of 1996, (31 U.S.C. 7501-7507). 2 CFR 200.501.

9.2. Election. GPA shall have a single audit conducted in accordance with Uniform Guidance 2 CFR 200.514 (Scope of audit), except when it elects to have a program-specific audit conducted in accordance with 2 CFR 200.507 (Program- specific audits). GPA may elect to have a program-specific audit if GPA expends Federal Awards under only one Federal program (excluding research and development) and the Federal program's statutes, regulations, or the terms and conditions of the Federal award do not require a financial statement audit of Prime Recipient. A program-specific audit may not be elected for research and development unless all of the Federal Awards expended were received from Recipient and Recipient approves in advance a program-specific audit.

9.2.1. Exemption. If GPA expends less than $750,000 in Federal Awards during its fiscal year, GPA shall be exempt from Federal audit requirements for that year, except as noted in 2 CFR 200.503 (Relation to other audit requirements), but records shall be available for review or audit by appropriate officials of the Federal agency, the Government of Guam, and the Government Accountability Office.

9.2.2. Subrecipient Compliance Responsibility. GPA shall procure or otherwise arrange for the audit required by Subpart F of the Uniform Guidance and ensure it is properly performed and submitted when due in accordance with the Uniform Guidance. GPA shall prepare appropriate financial statements, including the schedule of expenditures of Federal awards in accordance with 2 CFR 200.510 (Financial statements) and provide the auditor with access to personnel, accounts, books, records, supporting documentation, and other information as needed for the auditor to perform the audit required by Uniform Guidance Subpart F-Audit Requirements.

## 10. GRANT PROVISIONS FOR SUBRECIPIENT AGREEMENTS.

10.1. In addition to other provisions required by the Federal Awarding Agency or the Prime Recipient, Grantees that are Subrecipients shall comply with the following provisions.

Subrecipients shall include all of the following applicable provisions in all Subcontractors entered into by it pursuant to this Grant.

10.1.1. [Applicable to federally assisted construction Agreements.] Equal Employment Opportunity. Except as otherwise provided under 41 CFR Part 60, all Agreements that meet the definition of "federally assisted construction Agreement" in 41 CFR Part 60-1.3 shall include the equal opportunity clause provided under 41 CFR 60- 1.4(b), in accordance with Executive Order 11246, "Equal Employment Opportunity" (30 FR 12319, 12935, 3 CFR Part, 1964-1965 Comp., p. 339), as amended by Executive Order 11375, "Amending Executive Order 11246 Relating to Equal Employment Opportunity," and implementing regulations at 41 CFR part 60, Office of Federal Agreement Compliance Programs, Equal Employment Opportunity, Department of Labor.

10.1.2. [Applicable to on-site employees working on government-funded construction, alteration and repair projects.] Davis-Bacon Act. Davis-Bacon Act, as amended (40 U.S.C. 3141-3148).

10.1.3. Rights to Inventions Made Under a grant or agreement. If the Federal Award meets the definition of "funding agreement" under 37 CFR 401.2 (a) and the Prime Recipient or subrecipient wishes to enter into an Agreement with a small business firm or nonprofit organization regarding the substitution of parties, assignment or performance of experimental, developmental, or research work under that "funding agreement," the Prime Recipient or Subrecipient must comply with the requirements of 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Agreements and Cooperative Agreements," and any implementing regulations issued by the Federal Awarding Agency.

10.1.4. Clean Air Act (42 U.S.C. 7401-7671q.) and the Federal Water Pollution Control Act (33 U.S.C. 1251-1387), as amended. Agreements and subgrants of amounts in excess of $150,000 must contain a provision that requires the non-Federal awardees to agree to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act (42 U.S.C. 7401-7671q) and the Federal Water Pollution Control Act as amended (33 U.S.C. 1251-1387). Violations must be reported to the Federal Awarding Agency and the Regional Office of the Environmental Protection Agency (EPA).

10.1.5. Debarment and Suspension (Executive Orders 12549 and 12689). An Agreement award (see 2 CFR 180.220) must not be made to parties listed on the government wide exclusions in SAM, in accordance with the OMB guidelines at 2 CFR 180 that implement Executive Orders 12549 (3 CFR part 1986 Comp., p. 189) and 12689 (3 CFR part 1989 Comp., p. 235), "Debarment and Suspension." SAM Exclusions contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under statutory or regulatory authority other than Executive Order 12549.

10.1.6. Byrd Anti-Lobbying Amendment (31 U.S.C. 1352). Contractors that apply or bid for an award exceeding $100,000 must file the required certification. Each tier certifies to the tier above that it will not and has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a member of Congress, officer or employee of Congress, or an employee of a member of Congress in connection with obtaining any Federal Agreement, grant or any other award covered by 31 U.S.C. 1352. Each tier must also disclose any lobbying with non-Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier to tier up to the non-Federal award.

10.1.7. Never Contract with the Enemy (2 CFR 200.215). Federal awarding agencies and

recipients are subject to the regulations implementing "Never Contract with the Enemy" in 2 CFR part 183. The regulations in 2 CFR part 183 affect covered Agreements, grants and cooperative agreements that are expected to exceed $50,000 within the period of performance, are performed outside the United States and its territories, and are in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

10.1.8. Prohibition on certain telecommunications and video surveillance services or equipment (2 CFR 200.216). Grantee is prohibited from obligating or expending loan or grant funds on certain telecommunications and video surveillance services or equipment pursuant to 2 CFR 200.216.

10.1.9. Title VI of the Civil Rights Act. The Subgrantee, Contractor, Subcontractor, transferee, and assignee shall comply with Title VI of the Civil Rights Act of 1964, which prohibits recipients of federal financial assistance from excluding from a program or activity, denying benefits of, or otherwise discriminating against a person on the basis of race, color, or national origin (42 U.S.C. § 2000d et seq.), as implemented by the Department of Treasury's Title VI regulations, 31 CFR Part 22, which are herein incorporated by reference and made a part of this Agreement (or agreement). Title VI also includes protection to persons with "Limited English Proficiency" in any program or activity receiving federal financial assistance, 42 U.S. C. § 2000d et seq., as implemented by the Department of the Treasury's Title VI regulations, 31 CRF Part 22, and herein incorporated by reference and made part of this Agreement or agreement.

## 11. CERTIFICATIONS.

11.1. Subrecipient Certification. GPA shall sign a "Government of Guam Agreement with Recipient of Federal Recovery Funds" Certification Form in Exhibit C and submit to GEDA with signed grant agreement.

11.2. Unless prohibited by Federal statutes or regulations, GEDA and/or DOA may require GPA to submit certifications and representations required by Federal statutes or regulations on an annual basis. 2 CFR 200.208. Submission may be required more frequently if GPA fails to meet a requirement of the Federal award. GPA shall certify in writing to the Government of Guam at the end of the Award that the project or activity was completed or the level of effort was expended. 2 CFR 200.201(3). If the required level of activity or effort was not carried out, the amount of the Award must be adjusted.

## 12. EVENT OF DEFAULT AND TERMINATION.

12.1. Failure to comply with these Federal Provisions shall constitute an event of default under the Grant and GEDA may terminate the Grant upon 30 days prior written notice if the default remains uncured five calendar days following the termination of the 30-day notice period. This remedy will be in addition to any other remedy available to the GEDA under the Grant, at law or in equity.

12.2. Termination (2 CFR 200.340). The Federal Award may be terminated in whole or in part as follows:

12.2.1. By the Federal Awarding Agency or Pass-through Entity, if a Non-Federal Entity fails to comply with the terms and conditions of a Federal Award;

12.2.2. By the Federal awarding agency or Pass-through Entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

12.2.3. By the Federal awarding agency or Pass-through Entity with the consent of the Non-Federal Entity, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;

12.2.4. By the Non-Federal Entity upon sending to the Federal Awarding Agency or Pass-through Entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal Awarding Agency or Pass-through Entity determines in the case of partial termination that the reduced or modified portion of the Federal Award or Subaward will not accomplish the purposes for which the Federal Award was made, the Federal Awarding Agency or Pass-through Entity may terminate the Federal Award in its entirety; or

12.2.5. By the Federal Awarding Agency or Pass-through Entity pursuant to termination provisions included in the Federal Award.

Docusign Envelope ID: 87E6871D-68E0-43F0-B29D-50E8A2E2B614

## Exhibit C. AGREEMENT WITH SUBRECIPIENT OF FEDERAL RECOVERY FUNDS

Section 602(b) of the Social Security Act (the Act), as added by section 9901 of the American Rescue Plan Act (ARPA), Pub. L. No. 117-2 (March 11, 2021), authorizes the Department of the Treasury (Treasury) to make payments to certain Subrecipients from the Coronavirus State Fiscal Recovery Fund. The Government of Guam has signed and certified a separate agreement with Treasury as a condition of receiving such payments from the Treasury. This agreement is between your organization and GEDA, a subrecipient of ARPA funds awarded to the Government of Guam, and your organization is signing and certifying the same terms and conditions included in the Government of Guam's separate agreement with Treasury. Your organization is referred to as a Subrecipient.

As a condition of your organization receiving federal recovery funds from GEDA, the authorized representative below hereby (i) certifies that your organization will carry out the activities listed in section 602(c) of the Act and (ii) agrees to the terms attached hereto. Your organization also agrees to use the federal recovery funds as specified by the Governor.

Under penalty of perjury, the undersigned official certifies that the authorized representative has read and understood the organization's obligations in the Assurances of Compliance and Civil Rights Requirements, that any information submitted in conjunction with this assurances document is accurate and complete, and that the organization is in compliance with the nondiscrimination requirements.

Subrecipient Name: <u>GUAM POWER AUTHORITY</u>

Authorized Representative: <u>JOHN M. BENAVENTE</u>

Title: <u>GENERAL MANAGER</u>

Signature: _____

3/2/2025

## TERMS AND CONDITIONS

### 1. USE OF FUNDS.

A. GPA understands and agrees that the funds disbursed under this award may only be used in compliance with section 602(c) of the Social Security Act (the Act) and Treasury's regulations implementing that section and guidance.

B. GPA will determine prior to engaging in any project using this assistance that it has the institutional, managerial, and financial capability to ensure proper planning, management, and completion of such project.

### 2. PERIOD OF PERFORMANCE.
The period of performance for this subaward is shown on page one of this Agreement. GPA may use funds to cover eligible costs incurred, as set forth in Treasury's implementing regulations, during this period of performance.

### 3. REPORTING.
GPA agrees to comply with any reporting obligations established by Treasury as they relate to this award. GPA also agrees to comply with any reporting requirements established by the Governor's Office and DOA.

### 4. MAINTENANCE OF AND ACCESS TO RECORDS.

A. GPA shall maintain records and financial documents sufficient to evidence compliance with section 602(c), Treasury's regulations implementing that section, and guidance issued by Treasury regarding the foregoing.

B. The Treasury Office of Inspector General and the Government Accountability Office, or their authorized representatives, shall have the right of access to records (electronic and otherwise) of GPA in order to conduct audits or other investigations.

C. Records shall be maintained by GPA for a period of five (5) years after all funds have been expended or returned to Treasury, whichever is later.

### 5. PRE-AWARD COSTS.
Pre-award costs, as defined in 2 C.F.R. § 200.458, may not be paid with funding from this award.

### 6. ADMINISTRATIVE COSTS.
GPA may use funds provided under this award to cover both direct and indirect costs. GPA shall follow guidance on administrative costs issued by the Governor's Office and DOA.

### 7. COST SHARING.
Cost sharing or matching funds are not required to be provided by GPA.

### 8. CONFLICTS OF INTEREST.
The Government of Guam understands and agrees it must maintain a conflict of interest policy consistent with 2 C.F.R. § 200.318(c) and that such conflict of interest policy is applicable to each activity funded under this award. GPA and Contractors must disclose in writing to the DOA or the pass-through entity, as appropriate, any potential conflict of interest affecting the awarded funds in accordance with 2 C.F.R. §200.112. DOA shall disclose such conflict to Treasury.

### 9. COMPLIANCE WITH APPLICABLE LAW AND REGULATIONS.

A. GPA agrees to comply with the requirements of section 602 of the Act, regulations adopted by Treasury pursuant to section 602(f) of the Act, and guidance issued by Treasury regarding the

foregoing. Subrecipient also agrees to comply with all other applicable federal statutes, regulations, and executive orders, and GPA shall provide for such compliance by other parties in any agreements it enters into with other parties relating to this award.

B. Federal regulations applicable to this award include, without limitation, the following:

    i.    Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, other than such provisions as Treasury may determine are inapplicable to this Award and subject to such exceptions as may be otherwise provided by Treasury. Subpart F – Audit Requirements of the Uniform Guidance, implementing the Single Audit Act, shall apply to this award.

    ii.    Universal Identifier and System for Award Management (SAM), 2 C.F.R. Part 25, pursuant to which the award term set forth in Appendix A to 2 C.F.R. Part 25 is hereby incorporated by reference.

    iii.    Reporting Subaward and Executive Compensation Information, 2 C.F.R. Part 170, pursuant to which the award term set forth in Appendix A to 2 C.F.R. Part 170 is hereby incorporated by reference.

    iv.    OMB Guidelines to Agencies on Government wide Debarment and Suspension (Nonprocurement), 2 C.F.R. Part 180, including the requirement to include a term or condition in all lower tier covered transactions (Agreements and Subcontractors described in 2 C.F.R. Part 180, subpart B) that the award is subject to 2 C.F.R. Part 180 and Treasury's implementing regulation at 31 C.F.R. Part 19.

    v.    Subrecipient Integrity and Performance Matters, pursuant to which the award term set forth in 2 C.F.R. Part 200, Appendix XII to Part 200 is hereby incorporated by reference.

    vi.    Government wide Requirements for Drug-Free Workplace, 31 C.F.R. Part 20.

    vii.    New Restrictions on Lobbying, 31 C.F.R. Part 21.

    viii.    Uniform Relocation Assistance and Real Property Acquisitions Act of 1970 (42 U.S.C. §§ 4601-4655) and implementing regulations.

    ix.    Generally applicable federal environmental laws and regulations.

C. Statutes and regulations prohibiting discrimination applicable to this award include, without limitation, the following:

    i.    Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d et seq.) and Treasury's implementing regulations at 31 C.F.R. Part 22, which prohibit discrimination on the basis of race, color, or national origin under programs or activities receiving federal financial assistance;

    ii.    The Fair Housing Act, Title VIII of the Civil Rights Act of 1968 (42 U.S.C. §§ 3601 et seq.), which prohibits discrimination in housing on the basis of race, color, religion, national origin, sex, familial status, or disability;

    iii.    Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794), which prohibits discrimination on the basis of disability under any program or activity receiving federal financial assistance;

iv. The Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101 et seq.), and Treasury's implementing regulations at 31 C.F.R. Part 23, which prohibit discrimination on the basis of age in programs or activities receiving federal financial assistance; and

v. Title II of the Americans with Disabilities Act of 1990, as amended (42 U.S.C.§§ 12101 et seq.), which prohibits discrimination on the basis of disability under programs, activities, and services provided or made available by state and local governments or instrumentalities or agencies thereto.

10. **REMEDIAL ACTIONS.** In the event of GPA's noncompliance with section 602 of the Act, other applicable laws, Treasury's implementing regulations, guidance, or any reporting or other program requirements, Treasury may impose additional conditions on the receipt of a subsequent tranche of future award funds, if any, or take other available remedies as set forth in 2 C.F.R. § 200.339. In the case of a violation of section 602(c) of the Act regarding the use of funds, previous payments shall be subject to recoupment as provided in section 602(e) of the Act and any additional payments may be subject to withholding as provided in sections 602(b)(6)(A)(ii)(III) of the Act, as applicable.

11. **HATCH ACT.** GPA agrees to comply, as applicable, with requirements of the Hatch Act (5 U.S.C.§§ 1501-1508 and 7324-7328), which limit certain political activities of State or local government employees whose principal employment is in connection with an activity financed in whole or in part by this federal assistance.

12. **FALSE STATEMENTS.** GPA understands that making false statements or claims in connection with this award is a violation of federal law and may result in criminal, civil, or administrative sanctions, including fines, imprisonment, civil damages and penalties, debarment from participating in federal awards or Agreements, and/or any other remedy available by law.

13. **DEBTS OWED THE FEDERAL GOVERNMENT.**

A. Any funds paid to GPA (1) in excess of the amount to which the GPA is finally determined to be authorized to retain under the terms of this award; (2) that are determined by the Treasury Office of Inspector General to have been misused; or (3) that are determined by Treasury to be subject to a repayment obligation pursuant to sections 602(e) and 603(b)(2)(D) of the Act and have not been repaid by GPA shall constitute a debt to the federal government.

B. Any debts determined to be owed to the federal government must be paid promptly by GPA. A debt is delinquent if it has not been paid by the date specified in Treasury's initial written demand for payment, unless other satisfactory arrangements have been made or if the GPA knowingly or improperly retains funds that are a debt as defined in paragraph 14(a). Treasury will take any actions available to it to collect such a debt.

14. **DISCLAIMER.**

A. The United States expressly disclaims any and all responsibility or liability to GPA or third persons for the actions of GPA or third persons resulting in death, bodily injury, property damages, or any other losses resulting in any way from the performance of this award or any other losses resulting in any way from the performance of this award or any Agreement, or Subcontractor under this award.

B. The acceptance of this award by GPA does not in any way establish an agency relationship between the United States and GPA.

15. **PROTECTIONS FOR WHISTLEBLOWERS.**

A. In accordance with 41 U.S.C. § 4712, GPA may not discharge, demote, or otherwise discriminate against an employee in reprisal for disclosing to any of the list of persons or entities provided below, information that the employee reasonably believes is evidence of gross mismanagement of a federal Agreement or grant, a gross waste of federal funds, an abuse of authority relating to a federal Agreement or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal Agreement (including the competition for or negotiation of an Agreement) or grant.

B. The list of persons and entities referenced in the paragraph above includes the following:

   i.    A member of Congress or a representative of a committee of Congress;

   ii.   An Inspector General;

   iii.  The Government Accountability Office;

   iv.   A Treasury employee responsible for Agreement or grant oversight or management;

   v.    An authorized official of the Department of Justice or other law enforcement agency;

   vi.   A court or grand jury; or

   vii.  A management official or other employee of GPA, Contractor, or Subcontractor who has the responsibility to investigate, discover, or address misconduct.

C. GPA shall inform its employees in writing of the rights and remedies provided under this section, in the predominant native language of the workforce.

16. **INCREASING SEAT BELT USE IN THE UNITED STATES.** Pursuant to Executive Order 13043, 62 FR 19217 (Apr. 18, 1997), GPA should encourage its Contractors to adopt and enforce on-the-job seat belt policies and programs for their employees when operating company- owned, rented or personally owned vehicles.

17. **REDUCING TEXT MESSAGING WHILE DRIVING.** Pursuant to Executive Order 13513, 74 FR 51225 (Oct. 6, 2009), GPA should encourage its employees, Subrecipients, and Contractors to adopt and enforce policies that ban text messaging while driving, and GPA should establish workplace safety policies to decrease accidents caused by distracted drivers.

Docusign Envelope ID: 87E6871D-68E0-43F0-B29D-50E8A2E2B614

## ASSURANCES OF COMPLIANCE WITH TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

As a condition of receipt of federal financial assistance from the Department of the Treasury, GPA provides the assurances stated herein. The federal financial assistance may include federal grants, loans and Agreements to provide assistance to GPA's beneficiaries, the use or rent of Federal land or property at below market value, Federal training, a loan of Federal personnel, subsidies, and other arrangements with the intention of providing assistance. Federal financial assistance does not encompass Agreements of guarantee or insurance, regulated programs, licenses, procurement Agreements by the Federal government at market value, or programs that provide direct benefits.

The assurances apply to all federal financial assistance from or funds made available through the Department of the Treasury, including any assistance that the Subrecipient may request in the future.

The Civil Rights Restoration Act of 1987 provides that the provisions of the assurances apply to all of the operations of the Subrecipient's program(s) and activity(ies), so long as any portion of the Subrecipient's program(s) or activity(ies) is federally assisted in the manner prescribed above.

1. GPA ensures its current and future compliance with Title VI of the Civil Rights Act of 1964, as amended, which prohibits exclusion from participation, denial of the benefits of, or subjection to discrimination under programs and activities receiving federal financial assistance, of any person in the United States on the ground of race, color, or national origin (42 U.S.C. § 2000d *et seq.*), as implemented by the Department of the Treasury Title VI regulations at 31 CFR Part 22 and other pertinent executive orders such as Executive Order 13166, directives, circulars, policies, memoranda, and/or guidance documents.

2. GPA acknowledges that Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency," seeks to improve access to federally assisted programs and activities for individuals who, because of national origin, have Limited English proficiency (LEP). GPA understands that denying a person access to its programs, services, and activities because of LEP is a form of national origin discrimination prohibited under Title VI of the Civil Rights Act of 1964 and the Department of the Treasury's implementing regulations. Accordingly, GPA shall initiate reasonable steps, or comply with the Department of the Treasury's directives, to ensure that LEP persons have meaningful access to its programs, services, and activities. GPA understands and agrees that meaningful access may entail providing language assistance services, including oral interpretation and written translation where necessary, to ensure effective communication in the GPA's programs, services, and activities.

3. GPA agrees to consider the need for language services for LEP persons when GPA develops applicable budgets and conducts programs, services, and activities. As a resource, the Department of the Treasury has published its LEP guidance at 70 FR 6067. For more information on taking reasonable steps to provide meaningful access for LEP persons, please visit http://www.lep.gov.

4. GPA acknowledges and agrees that compliance with the assurances constitutes a condition of continued receipt of federal financial assistance and is binding upon GPA and GPA's successors, transferees, and assignees for the period in which such assistance is provided.

5. GPA acknowledges and agrees that it must require any sub-grantees, contractors,

Page 28 of 29

subcontractors, successors, transferees, and assignees to comply with assurances 1-4 above, and agrees to incorporate the following language in every Agreement or agreement subject to Title VI and its regulations between the GPA and GPA's sub-grantees, Contractors, Subcontractors, successors, transferees, and assignees:

*The sub-grantee, Contractor, Subcontractor, successor, transferee, and assignee shall comply with Title VI of the Civil Rights Act of 1964, which prohibits Subrecipients of federal financial assistance from excluding from a program or activity, denying benefits of, or otherwise discriminating against a person on the basis of race, color, or national origin (42 U.S.C. § 2000d et seq.), as implemented by the Department of the Treasury's Title VI regulations, 31 CFR Part 22, which are herein incorporated by reference and made a part of this Agreement (or agreement). Title VI also includes protection to persons with "Limited English Proficiency" in any program or activity receiving federal financial assistance, 42 U.S.C. § 2000d et seq., as implemented by the Department of the Treasury's Title VI regulations, 31 CFR Part 22, and herein incorporated by reference and made a part of this Agreement or agreement.*

6. GPA understands and agrees that if any real property or structure is provided or improved with the aid of federal financial assistance by the Department of the Treasury, this assurance obligates GPA, or in the case of a subsequent transfer, the transferee, for the period during which the real property or structure is used for a purpose for which the federal financial assistance is extended or for another purpose involving the provision of similar services or benefits. If any personal property is provided, this assurance obligates GPA for the period during which it retains ownership or possession of the property.

7. GPA shall cooperate in any enforcement or compliance review activities by the Department of the Treasury of the aforementioned obligations. Enforcement may include investigation, arbitration, mediation, litigation, and monitoring of any settlement agreements that may result from these actions. GPA shall comply with information requests, on-site compliance reviews and reporting requirements.

8. GPA shall maintain a complaint log and inform the Department of the Treasury of any complaints of discrimination on the grounds of race, color, or national origin, and limited English proficiency covered by Title VI of the Civil Rights Act of 1964 and implementing regulations and provide, upon request, a list of all such reviews or proceedings based on the complaint, pending or completed, including outcome. GPA also must inform the Department of the Treasury if GPA has received no complaints under Title VI.

9. GPA must provide documentation of an administrative agency's or court's findings of non-compliance of Title VI and efforts to address the non-compliance, including any voluntary compliance or other agreements between GPA and the administrative agency that made the finding. If GPA settles a case or matter alleging such discrimination, the Subrecipient must provide documentation of the settlement. If GPA has not been the subject of any court or administrative agency finding of discrimination, please so state.

10. If GPA makes sub-awards to other agencies or other entities, GPA is responsible for ensuring that sub-Subrecipients also comply with Title VI and other applicable authorities covered in this document Government of Guam agencies that make sub-awards must have in place standard grant assurances and review procedures to demonstrate that that they are effectively monitoring the civil rights compliance of sub- Subrecipients.

The United States of America has the right to seek judicial enforcement of the terms of this assurances document and nothing in this document alters or limits the federal enforcement measures that the United States may take in order to address violations of this document or applicable federal law.

TOP STORY

# AG: Spending on new hospital illegal, funds could be 'clawed back' from vendors

By Joe Taitano II Pacific Daily News

Mar 4, 2025



Attorney General Douglas Moylan gestures as he addresses senators during a public hearing on a bill at the Guam Congress Building in Hagåtña on April 1, 2024.

Rick Cruz/Pacific Daily News

f          X          ©          ✉          🖶          📋          🔖

Attorney General Douglas Moylan says government officials may be subject to criminal prosecution and vendors could see money "clawed back" if any funding is put towards the "illegal project" of constructing a hospital in Mangilao.

Moylan said government officials who could certify the spending of any funds on the hospital project and any vendors have been put on notice that the Office of the Attorney General considers the project illegal.

"They will assume the consequences of the law if in fact they are breaking them," Moylan said.

Gov. Lou Leon Guerrero has obligated some $104.5 million in federal American Rescue Plan money to install infrastructure for the new hospital and medical campus.

Both the Office of the Governor and the Guam Housing and Urban Renewal Authority have moved to dismiss Moylan's federal court lawsuit alleging illegalities in the transfer of federal funds and condemnation of land for a new hospital in Mangilao.

Adelup has called Moylan "simply wrong" on the matter, called his legal analysis "underbaked and unsound," and asserted all laws were followed in acquiring land for the hospital.

The AG has already promised not to approve any contract for the construction of the new hospital.

Now, Moylan says his office believes any use of funds towards the project will itself be illegal.

Last week, the Consolidated Commission on Utilities gave the green light for the Guam Power Authority to accept $35.4 million in ARP money to install a substation and underground power lines at the site of the Mangilao hospital.

Any mention of a "medical campus" was struck from the resolution authorizing GPA to accept grant money from the Guam Economic Development Authority, with commissioners and GPA arguing the project will benefit the entire community of Mangilao.

The grant-funded project will not require approval from the AG, and is not expected to warrant any legal challenge of merit, GPA legal counsel Marianne Woloschuk advised the commission.

Likewise, the Guam Waterworks Authority has been authorized to take $750,000 in ARP money to start planning and surveying for water and sewer infrastructure at the hospital site.

"When any certifying officer receives a notice from an attorney general that's empowered and elected by the people of Guam that an act is illegal, they better look twice," Moylan said, when asked about the projects.

He pointed to the two legal opinions his office has prepared finding illegalities on the condemnation of the hospital land, and violations of the Open Government Law when GHURA accepted $12.5 million from the Office of the Governor for the project.

Moylan said the utilities' advice from their own attorneys "does not obviate them from the importance and significance of an attorney general opinion saying it's illegal."

"If they continue to proceed, and the people of Guam are hurt with the loss of money, millions of dollars. They're not just going to walk away from this," Moylan said.

That was especially true if the District Court of Guam found that the hospital and medical campus project was, in fact, illegal, the AG said.

Attorneys for the government have accused Moylan in court filings of being politically motivated in his opposition to the new hospital.

"It is clear from AG Moylan's inconsistent actions that he does not actually have a legal objection to the governor's use of ARPA funds without legislative approval, he has a political objection to her specific decision to direct ARPA funds to a particular project: the Mangilao Medical Campus Project," attorneys wrote in motions to dismiss filed in January.

Moylan said any future action on the hospital project spending will be decided at the discretion of prosecutors and the Government Corruption Division at his office.

Vendors that might bid on any hospital work should "think twice," he said.

"To the vendors...if they are engaging in these bids and stuff, they may be gone after to return the money," Moylan added.

_Reach reporter Joe Taitano II at JTaitano@guampdn.com._

**Joe Taitano II**
Reporter





January 31, 2025
**SECOND NOTICE**

Miguel Bordallo
Guam Waterworks Authority
688 Route 15, Gloria Nelson Public Building,
Mangilao, Guam 96913

### Subject: Certifying Officers Statute; 4 GCA § 14110 & 14117

*Hafa Adai* Certifying Officer Bordallo:

It is our understanding that you are a certifying officer. Under Guam law you may be held personally and criminally culpable if you make an expenditure that is in violation of Guam law. See 4 GCA §§ 14110 and 14117.

Recently Guam's elected Attorney General issued 2 formal legal opinions that determined that the Governor's attempt to build a Mangilao medical facility with GHURA violated Guam law. Please find a copy of those 2 legal opinions attached. Further, it was reported in today's news that the Consolidated Commission on Utilities ("CCU") may have voted to authorize ratepayer / taxpayer funds to expend upon this Mangilao medical facility. We consider this CCU authorization to proceed with expending funds illegal, and is now under criminal investigation.

We request that you do not take any actions to authorize the expenditure of ratepayer / taxpayer monies in furtherance of this Mangilao medical complex. We further recommend that you seek the assistance of private legal counsel to advise you as to your potential personal criminal culpability if you in fact proceed to authorize any expenditure as discussed herein. Thank you.

Sincerely,

*W. Lyle Stamps*

**William Lyle Stamps**
Acting Deputy,
Government Corruption Division

Attachments (2)

### Office of the Attorney General
### Douglas B. Moylan · Attorney General of Guam

590 S. Marine Corps. Drive, ITC Bldg. Ste. 902 · Tamuning, Guam, 96913 · USA
Phone 671-475-3324 · Fax 671-477-4703 · *dbmoylan@oagguam.org* · www.oagguam.org
**"Guam's Toughest Law Enforcers"**

**GUAM LEGISLATURE**
**Protocol Office**

DEC 12 2024

Time: 1:10 [ ] AM [X] PM
Reg. by: ~~~~
December 12, 2024

ERIN GRAJEK (FOR BARNETT'S OFFICE)

**OFFICE OF THE GOVERNOR**
CENTRAL FILES OFFICE
Rec'd By: Elaine Tajalle
Date: ___ Elaine Tajalle ___

**RECEIVED**
Office of the Compile ....
By: Jarod Tortos
Date: 12/12/24
Time: 1:30pm

**REF No. 24-0631**

Honorable Christopher D. Barnett
Chairperson, Committee on Rules and Senator
37th Guam Legislature
Guam Congress Building
163 Chalan Santo Papa
Hagåtña, Guam 96910

**GUAM LEGISLATURE**
**Protocol Office**

For Shulton's
office DEC 12 2024
Time: 107 [ ] AM [X] PM
Reg. by: ___

**Subject:** Legal Opinion Open Government Law Compliance

Dear Senator Barnett:

You requested a November 25, 2024 legal opinion as to whether the Guam Housing and Urban Renewal Authority ("GHURA") violated Guam's Open Government Law in its consideration of entering into a loan agreement with the Governor's Office at their May 28, 2024 meeting. For purposes of this legal opinion, we also consider the same question regarding GHURA's acceptance of additional loan proceeds under the same loan agreement at their November 26, 2024 meeting.

## Question Presented

What is the minimum amount of information that must be made available as part of an agenda in order to comply with the Open Government Law's requirement that, "*Agenda items must be in sufficient detail, to put the public on notice as to what is to be discussed.*" 5 GCA § 8107(d)?

## Summary

We conclude that in both cases, GHURA violated the Open Government Law. The agenda items in question here refer to a potential business transaction, i.e. whether the agency should enter into or expand a loan agreement. We believe that an agency is required to provide the public in advance of a meeting, in writing, the essential terms of the transaction recommended by the agency's staff. In this case the minimum terms of a proposed loan agreement would include the amount to be borrowed, the term of the loan, the interest rate and other charges associated with the loan, a schedule of payments and any collateral offered to secure the loan. The essential terms of other kinds of business transactions may be different.

**Office of the Attorney General**
Douglas B. Moylan · Attorney General of Guam

590 S. Marine Corps. Drive · ITC Bldg., Ste. 902 · Tamuning, Guam 96913 · USA
671-475-3324 · 671-475-4703 (fax) · dbmoylan@oagguam.org · www.oagguam.org
*"Guam's Toughest Law Enforcers"*

## Discussion

Guam adopted an Open Government Law to guarantee that *"the public's business is conducted in a forum open to the public."* *In re AB Won Pat International Airport Authority,* 2019 Guam 6 ¶ 35. An important part of open government is government's obligation to provide the public with notice of the day, time, location and agenda of meetings where a quorum of an agency's directors may be present and taking action on listed items. Guam law requires that this notice *"must be in sufficient detail to put the public on notice as to what is to be discussed."* 5 GCA § 8107(d).

For purposes of this analysis the term "notice" includes both the meeting notice/meeting agenda typically published in a newspaper and the additional materials made available that support and explain each agenda item. These additional materials are typically collectively known as a *"board packet"* and are made available by agencies, such as GHURA, on their website in advance of any particular meeting.

Our Courts have adopted a reasonableness standard to evaluate whether any particular notice is sufficient. *Joseph v. Guam Board of Allied Health Examiners,* 2015 Guam 4. In *Joseph* the Supreme Court of Guam adopted a multi-factor test set forth by the Wisconsin Supreme Court in *Buswell v. Tomah,* to evaluate reasonableness. *Id. at 18* citing *State ex rel. Buswell v. Tomah Area School District,* 732 NW2d 804 (Wis. 2007).

The reasonableness of any particular notice will be evaluated on a case-by-case basis and will consider:

> The burden of providing more specific information on the body noticing the meeting,

> Whether the subject is of particular public interest, and

> Whether it involves non-routine action that the public would be unlikely to anticipate.

*Id.* We will consider the reasonableness of GHURA's meeting notices at both the May 28 and the November 26 meeting using these three factors.

GHURA's May 28, 2024 meeting notice informed the public that its' board may consider a resolution authorizing GHURA to "accept" a loan for up to $10 million for "community development projects." Given the formalities GHURA is required to accomplish before it can undertake any project, at a minimum the notice should identify with some specificity the particular project to be considered. *See,* 12 GCA § 5111 for a description of the requirements GHURA must complete before initiating any project. At the November 26 meeting GHURA considered whether to accept additional loan proceeds of $2.5 million for the same purpose. The minutes of each meeting indicate that each of these agenda items contemplated final approval by the board for the GHURA to enter into a binding commitment with the lender, in both cases the Governor's Office. Approval of these resolutions would result in the lender funding the loan and GHURA would be obligated to repay the debt.

The draft resolution provided to GHURA's board and made available to the public in advance of the May 28 meeting indicated that the terms of the loan are *"to be negotiated."* The draft resolution provided to GHURA's board and made available to the public in advance of the November 26 meeting is silent on the terms and conditions of the additional funding. In its simplest terms, the question presented here is, *whether the agendas for the May 28 and November 26 GHURA board meetings, together with the draft resolutions, meet the Open Government Law's requirements for "sufficient detail" so that the public is aware of what is being considered.*

The first criteria the Court adopted to examine sufficiency is the burden of providing more specific information on the body noticing the meeting. *Id.* We contrast the quantity and quality of information that GHURA was able to provide the public about other business transactions with the quantity and quality of information provided for these two transactions. For example, the May 28 board packet included a report from GHURA's Executive Director on their "Fleet Vehicle Bid." In advance of the meeting the board members and the public knew the identity of all bidders and a description of each bidder's offer. The report included a description of the products on offer, the quantity offered, the unit cost of each product, the unit cost of additional warranties and the total cost of each bidders offer. There was also a short description of why staff undertook this procurement and the rationale for choosing the successful bidder. *See,* GHURA Board packet for its May 28, 2024 meeting.

The October 15th board meeting packet made available in advance of the meeting included a resolution and supporting materials regarding the write-off of $24,969.00 in tenant accounts receivable. The write-offs covered accounts receivable at four different GHURA managed properties. To support the request for the write-off each property manager provided a listing of the tenant, why the tenant left the property, and substantial detail as to nature of the due but unpaid charges as well as the local efforts to collect the account. Each property also provided a five-year trend chart detailing approved write-offs, including the net write-off after security deposits were applied. *See* GHURA Board packet for its October 15, 2024 meeting.

Contrast the detail provided concerning a $600,000.00 vehicle purchase and a $25,000.00 bad debt write-off with the detail provided the public concerning the Authority taking on $12,500,000.00 in debt. The public was made aware of the total amount of the debt but no information was provided to either the Board or to the public regarding the term of the loan, the interest rate or other charges, repayment obligations and collateralization of the loans. In fact, the minutes of the May 28 board meeting report that Vice-Chair Sanchez asked about terms of the loan. GHURA's Deputy Director informed the Vice-Chair, other board members and members of the public that there were no terms available yet, and that GHURA had terms that *"will be asked."* The Deputy Director suggested that in this case it was the borrower not the lender that would be articulating the terms of the loan. He offered no assurances either orally or in writing that the lender was prepared to agree to these terms. *See* 5/28/24 GHURA Board Meeting Minutes.

In sum, it is clear that GHURA can and does provide its Board and the public more than cursory information about proposed business transactions. Our review of the 2024 board packets suggests that these two loans are the only business transactions proposed by staff where GHURA's Board and the public were <u>not</u> provided with advance information detailing the fundamental terms of the request.[1]

The second factor to evaluate the reasonableness of a public notice requires a judgment as to whether there is significant public interest in a matter under consideration. Generally, the higher the public interest, the greater the expectation that the public will be provided with details concerning governmental action in advance of a meeting. In this instance, there can be no dispute that the matter of a new hospital on Guam, where it will be located, and how to pay for it is a matter of <u>great</u> public interest. That "public interest" is evident by the introduction and passage and failures to pass many legislations and bills pertaining to the existing hospital and Governor's attempt to build a medical complex, as well as the private medical community's outcries. In addition, *see*, for example:

A.  Pacific Daily News December 1, 2024 article;
B.  Pacific Daily News November 31, 2024 article;
C.  Guam Daily Post October 21, 2024 article;
D.  Guam Daily Post October 15, 2024 article;
E.  Guam Daily Post October 12, 2024 article;
F.  KUAM September 24, 2024 article;
G.  Pacific Daily News September 23 article; and
H.  Pacific Daily News May 30, 2024 article.

In fact, the matter before the Governor and Guam Legislature of fixing or constructing a new hospital has been a topic of significant interest to the public for many years as the current facilities face struggles. *See also* AG Legal Opinion to Gov. (3/31/23).

The third factor to evaluate the reasonableness of a notice is whether the subject is routine or novel. The Supreme Court of Guam noted that, "*novel issues are more likely to catch the public unaware. Novel issues may therefore require more specific notice." Id.* GHURA's involvement in the development of a new hospital on Guam is certainly novel. The Guam Legislature in its enabling law authorized GHURA the task of studying and improving Guam's housing and urban renewal needs. 12 GCA § 5104(r). GHURA has an extensive list of powers and duties, but those powers and duties are limited to those "necessary and convenient to carryout and perform the purposes and provisions of this Chapter . . . ." 12 GCA § 5104. In articulating the purpose of GHURA the Guam Legislature charged it with improving the housing stock of Guam. 12 GCA § 5101(a). GHURA was also to engage in "*prompt and vigorous action*" to eliminate and prevent slums and blighted areas. 12 GCA §§ 5101(e) and (f).

---

[1] The notice must "*inform a person of ordinary education and intelligence*" what an agency is actually contemplating with regard any particular agenda item. *Wilson v. City of Tecumseh*, 194 P.3d 140 (2008). In *Wilson*, the Court concluded that a reference to an employee's employment status was <u>not</u> adequate notice to the public that, under this agenda item, the City was contemplating paying the employee an employment bonus.

Contrast GHURA's legislative purpose with the legislative purpose of the Guam Economic Development Agency ("GEDA"). GEDA, too, is assigned the function of remedying the *"substantial and serious shortage of housing in all categories"* on Guam. 12 GCA § 50103. But, unlike GHURA, GEDA is specifically charged with providing *"the means necessary for the acquisition, construction and provision of hospital facilities to serve the general public . . .."* *Id.* GEDA served as the contracting agency for the procurement of the Guam Medical Campus Master Pan provided by Matrix Design Group, Inc. This Master Plan was published in December of 2022 and appears to continue to serve as the guiding document regarding the development requirements of new hospital complex.

The question for today is not whether GHURA or GEDA has the legal authority to undertake the development of a new hospital on Guam, or to borrow money to facilitate its construction. Our inquiry focuses upon whether GHURA borrowing $12.5 million is a new or novel undertaking for the agency. *"Novel issues require more specific notice."* *Joseph v. Guam Board of Allied Health Examiners*, 2015 Guam 4 ¶ 18. Given the Legislative directive to GEDA, no reasonable person would expect GHURA to borrow money for any purpose remotely related to constructing a new hospital. We conclude that this borrowing is a <u>new</u> or <u>novel undertaking</u>, and that more specific notice should have been provided.

This conclusion is further supported by the Guam Legislature's assignment to GEDA, <u>not</u> GHURA, to serve as the *"central financial manager"* for Government agencies requiring financial assistance. This financial assistance includes working with Government agencies and investment bankers to facilitate obtaining funds for development projects. 12 GCA § 5103(k). A reasonable Guam citizen, seeking to understand how the Government planned to pay for a new hospital, would likely start to consider such a question by turning first to the activities of GEDA.

Finally, please note that today our Office also issues a related legal opinion pertaining to GHURA for a requested legal opinion from Minority Leader and Senator Frank F. Blas, Jr. pertaining to GHURA's recent exercise of its purported eminent domain authority in constructing a hospital medical complex.

## Summary

Based upon the foregoing analysis, GHURA failed to satisfy the three (3) components of the Supreme Court of Guam's test for whether the meeting notices and associated additional materials provided by GHURA concerning the $10 million loan and the $2.5 million additional loan gave the public sufficient detail about these proposals. The first component is whether it is a burden on an agency to provide specific detail regarding an action item. As GHURA regularly provides members of the public with advance notice of the business terms of its proposed transactions, we conclude that it was not a burden on GHURA to inform the public not only of the amount of these loans but also their term, interest rate or other charges, repayment obligations and collateralization of the loans.

The second component of the test is an evaluation of whether a reasonable person is likely to care about this particular matter and therefore prefer more information rather than less. As the matter of the development of a new hospital on Guam is likely among the most salient issues to the Guam public, the Open Government Law required that GHURA provided the public with more information in advance about these loans rather than less. The third factor is whether the activity being discussed was a routine, typical activity for the agency or something new and different from the agency's standard affairs. We conclude that borrowing money to facilitate the development of a hospital is a novel activity for GHURA. Again, this opinion does not address whether GHURA's activities regarding the construction of a new hospital exceed its legal authority. Our focus is on whether GHURA's providing the public with no advance information regarding the fundamental terms of its two borrowings was a violation of the Guam Open Government law.

When the GHURA Board considered each of its two borrowings the information provided to the Board and the public as part of the meeting notice contained nothing to explain the terms of the loans other than the amount of each borrowing; the first being $10 million and the second $2.5 million. Any reasonable person considering borrowing money would also want to know what is the interest rate, how long to repay the loan, are their other fees and what kind of collateral is required? Whether one is borrowing $10,000.00 to buy a car or $1 billion to build a hospital anyone would ask the same basic questions about a loan. Simply put, GHURA should have erred on the side of providing the public with more information than it did. Because GHURA provided almost none of the essential terms of a loan agreement, we conclude that GHURA's Notice failed to satisfy the notice requirements of the Guam Open Government law. All actions taken therein are void, and voidable. Thank you.

Respectfully,

Douglas B. Moylan
Attorney General of Guam



GUAM LEGISLATURE
Protocol Office

for Shuttons
Office
DEC 12 2024
Time: 107 [ ] AM [✓] PM
Rec. by: ___

December 12, 2024



OFFICE OF THE GOVERNOR
CENTRAL FILES OFFICE
Rec'd By: Elaine Tajalle
Date: 12/12/24  Time: 2:31 pm

**RECEIVED**
Office of the Compile
By: Jacol Trotman  Jul 3t
Date: 12/12/24
Time: 1:30pm

**REF No. 24-0630**

Honorable Frank F. Blas, Jr.
Minority Leader and Senator
37th Guam Legislature
DNA Building, Suite 502
238 Archbishop Flores Street
*Hagåtña*, Guam 96910

Judy Shockley
Judy Shockley
12/12 24  1.34 p.m.

Subject: **Legal Opinion Hospital Construction & Eminent Domain**

*Hafa Adai* Senator Blas:

This legal opinion responds to your November 27, 2024 request that the undersigned Attorney General review the November 26, 2024 action by the Guam Housing and Urban Renewal Authority ("GHURA") to acquire various parcels of real estate via eminent domain. The purpose of the acquisition is to assist the Governor in constructing a medical facility.

## Question Presented

Did GHURA comply with Guam law in the acquisition of various parcels of land via eminent domain as more fully described in GHURA Resolution No. FY2025-009 ("Resolution")?

## Summary

GHURA did *not* comply with Guam law in the acquisition of land via the Resolution. While GHURA is authorized to acquire property via eminent domain, it must do so according to a very specific process, with several checks and balances.

That legal process was not followed.

**Office of the Attorney General**
Douglas B. Moylan · Attorney General of Guam

590 S. Marine Corps. Drive · ITC Bldg., Ste. 902 · Tamuning, Guam 96913 · USA
671-475-3324 · 671-475-4703 (fax) · dbmoylan@oagguam.org · www.oagguam.org
*"Guam's Toughest Law Enforcers"*

## Discussion

GHURA may take land to build housing or to fulfill an "*Urban Renewal Plan*." 12 GCA § 5104(n). The statutory purpose of an "*Urban Renewal Plan*" is to enhance and improve the health, safety and welfare of the people of Guam by removing unsafe physical conditions and enhancing and improving the conditions that remain. 12 GCA § 5110(a). We do not find that raw and undeveloped land, or land that sits undisturbed for decades, can satisfy the definition of a slum or blighted area which is the focus of a "*Urban Renewal Plan*," to improve or re-develop an existing developed area. Guam law does not empower GHURA to develop undeveloped property, except for housing, which is our understanding of the condemned or to be taken real property.

Perhaps raw land that exists *incidental* to unused and potentially unsafe physical structures may be included in an "*Urban Renewal Plan*." However, Guam law neither envisions, states nor allows GHURA to take undeveloped (raw) land for public use, except for housing. Any actions outside the statute are *ultra vires*. The only property taken by GHURA pursuant to the Resolution was raw land. When one further considers the importance of real property, the decades of Guam laws passed protecting indigenous, familial rights to land and continuing laws returning real property to original indigenous land owners, as well as the Organic Act due process protections afforded to American citizens, one must interpret any laws delegating the fundamental and Organic Act-based legislative power to take land narrowly and with the utmost caution.

The Guam Legislature delegated its power of eminent domain to a certain extent to GHURA and with strict limitation. *Infra*. GHURA's *delegated* power of eminent domain states, "[GHURA] may [e]xercise the power of eminent in the manner now or which may be hereafter provided by law." 12 GCA § 5104(n). Likewise, GHURA may "[e]nter into and execute contracts and instruments of every kind and nature, necessary or convenient to the exercise of its powers and functions." *Id.* at (d). GHURA acknowledges that it may exercise its legislatively authorized eminent domain power in accordance with the authority the Guam Legislature delegated the agency, and only when GHURA finds that it met these requirements that the Agency acquire properties for a necessary and authorized purpose. *See*, GHURA Resolution No. FY2025-009, adopted November 26, 2024. In its Resolution GHURA determined that "*reasonable consistency*" to the 2022 Guam Medical Campus Master Plan (the "Master Plan) was adequate legal justification for taking these properties. This opinion does not address legal issues pertaining to whether that legal burden was satisfied, nor the "straw person" use of GHURA to circumvent the underlying problem that GHURA is being used to achieve an end requiring Legislative involvement and approval through funding this medical complex, which has not been authorized. *See* AG Legal Opinion to Gov. (3/31/23).

This legal opinion focuses upon whether acquiring land that was reasonably consistent with the Master Plan is within the allowable powers delegated to GHURA by the Guam Legislature. The Guam Legislature gave GHURA a wide array of powers to undertake two (2) basic duties. Duty number one was to undertake efforts to achieve the goal of "*decent housing*" in a "*suitable living environment*" for the People of Guam. 12 GCA § 5101(a). The Guam Legislature also tasked GHURA with "*rehabilitating*" slums

and blighted areas. *Id.* at (d). GHURA's articulated purpose for condemning the properties in the Resolution was to expand its' land holdings to meet the stated requirements of the Master Plan. The Master Plan does not contemplate the development of housing, so we turn our inquiry to address the question whether the condemnation will rehabilitate a "*slum*" or "*blighted area.*" Such is not the case.

The Guam Legislature provided comprehensive definitions for each of these terms. A "*slum*" is an area with a "*predominance of buildings*" which "*endanger life or property.*" 12 GCA § 5102(a)(7). Similarly, a "*blighted area*" is an area "*other than a slum*" with a "*presence of a substantial number of deteriorated structures*" or where historical anomalies of land use and planning,

> [S]ubstantially impair the sound growth of a community, retards the provision of housing accommodation or constitutes an economic or social liability and is a menace to the public health, safety and welfare in its present condition and use.

*Id.* at (a)(9). Again, GHURA failed to direct its limited condemnation authority to the only area the Guam Legislature delegated its power of eminent domain to them. The property intended to be condemned is raw, undeveloped real property.

The Legislature delegated and limited its authority of eminent domain to GHURA only to remedy a slum or blighted area GHURA will adopt an Urban Renewal Plan and undertake Urban Renewal Projects. *Supra.* Urban Renewal Plans must conform to the master plan for Guam and be comprehensive in identifying the boundaries of the land subject to the plan. The Plan must identify which parcels are within the planning area of the Plan, as well as the remedial Urban Renewal Projects that are part of the Plan. *Id.* at (a)(14). Urban Renewal Projects are undertakings "*for the elimination and for the prevention of the development or spread of slums and blight . . . .*" *Id.* at (a)(12).

Before making an Urban Renewal Plan GHURA has to determine that an area is a "*slum*" or "*blighted area*" and is appropriate for urban renewal projects. 12 GCA § 5111(a). Prior to adopting an Urban Renewal Plan, GHURA must consult with the Guam Land Use Commission on the Agency's proposals. *Id.* at (a)(3). A public hearing, with various legal requirements, must take place prior to the Plan's adoption. *Id.* at (c). After GHURA adopts the Plan, Guam law requires the Plan is sent to the Governor for review and approval. *Id.* at (e)(6). Thereafter, with the Governor's consent, the Plan goes to the Guam Legislature for review and approval. *Id.* at (f). Only after the Guam Legislature approves the Plan, then the Governor then may authorize its implementation. *Id.* at (g). All of the foregoing components of adopting the Plan must be accomplished before GHURA may acquire any real estate for any project. *Id.* at (a). To do otherwise is not just *ultra vires* and in violation of Guam law, but violates the private property owners due process rights in the manner in which the power of eminent domain has been exercised. The actions taken by GHURA and the Governor to date are not only void, and voidable, but exposes the Authority and its directors to legal action, and Guam and the potentially Federal taxpayers to unjustified financial expenditures in not just taking the actions to date, but the legal consequences of their having proceeded in clear violation of Guam law.

Furthermore, in executing an authorized Plan, GHURA may sell or transfer property acquired <u>ONLY</u> to eliminate "*slums*" or "*blight*" to other agencies of the Government of Guam. 12 GCA § 5112(a). Likewise, other Guam governmental agencies may cooperate in the execution of a Plan by undertaking their own activities in support of a Plan. *Id.* at (a)(3). This is important as the Legislature designated the Guam Economic Development Agency ("GEDA") as the lead government agency for the planning and development of a new hospital. 12 GCA §50103(a). *See also*, 12 GCA § 50119. GEDA did not do so.

GHURA utilized its power of eminent domain to acquire various lots in accordance with a plan - the hospital Master Plan. This Master Plan does <u>not</u> meet the requirements the Guam Legislature set forth for the plan GHURA was supposed to comply with – an "Urban Renewal Plan." The Master Plan makes no designation of an area deemed a "slum" or "blighted area." There were no public hearings or community input as to whether the designated parcels constituted a "slum" or "blighted area." The Plan's development did not take any input from the Guam Land Use Commission. There was no opportunity for the Guam Legislature to review and consent to the Plan, nor was there an official authorization from the Governor to move forward with the Plan's implementation. In fact, without clear public input a "*plan*" to acquire a land and start a medical facility was hurriedly and surreptitiously made, without any written documentation for legislative and public scrutiny. *Infra*.

In addition to the foregoing, Guam law requires that before the Governor may sign a contract, that the Attorney General of Guam review the contract for legality. 5 GCA § 5150. Upon earlier Sunshine Reform Act of 1999 requests to GHURA and the Governor, no agreements (contracts) or other legal documents were provided showing the nature of the transaction between GHURA, an autonomous agency, and the Governor that purportedly would allow the transfer and payment to GHURA of Federal monies under the Governor's control, or other rights, obligations or other provisions typically required be in the form of a written contract or agreement. This raises concerns that GHURA and the Governor expressly chose not do so in order to prevent the Attorney General from scrutinizing the transaction and thereby endangering the proper application and enforcement of Guam law. *Id.*

The power of eminent domain is an "awesome" power. *Miles v. Texas Cent. RR & Infrastructure, Inc.*, 647 SW3d 613 (Tex. 2022). So "awesome" that the Organic Act addresses the Government's authority to take property three different times. A person shall not be deprived of their property without due process. 48 USC § 1421b(e). Property taken for public use must be paid for with just compensation. *Id.* at (f). And, to reiterate these limitations on the power to take property, the Organic Act specifically extended to the People of Guam the protections of the Fifth Amendment of the United States Constitution. *Id.* at (u). The Fifth Amendment, among other things, requires that any taking of property be pursuant to due process and come with just compensation. All of the components of an Urban Renewal Plan, including input from the Land Use Commission, the Legislature, Governor and the public are part of the checks and balances – the due process - which GHURA must meet in order to involuntarily take someone's private property. Based upon all the facts available, they failed to do so, wholly disregarding the law. *Supra*. With

regard the properties condemned pursuant to the Resolution, GHURA clearly failed to meet important statutory obligations. Their actions are *ultra vires*, void and voidable.

Importantly, as it relates to GHURA, "[b]ecause *eminent domain is in derogation of private rights, any legislative authority for its use must be strictly construed in favor of the landowner.*" *Reading Area Water Authority v. Schuylkill River Greenway Ass'n*, 627 Pa. 357, 368-69, 100A.3d 572, 579 (2014). "[T]he *fundamental principle - espoused by the vast majority of states - [is] that eminent domain statutes are strictly construed in favor of the property owner.*" *See Clarke Cnty. Reservoir Comm'n v. Robins*, 862 N.W.2d 166, 171 (Iowa 2015) ('*Statutes that delegate the power of eminent domain should be strictly construed and restricted to their expression and intention.*')." *Betty Jean Strom Tr. v. SCS Carbon Transp., LLC*, 2024 S.D. 48, ¶ 48, 11 N.W.3d 71, 89, reh'g denied (Oct. 9, 2024).

> In construing statutes that delegate the power of eminent domain, the language used by the legislature may be accorded a full meaning so as to carry out the manifest purpose and intention of the statute; however, the application of the law will be <u>restricted to only those cases clearly falling within its terms</u>. These rules of construction must also be considered in conjunction with the overriding policy that <u>because the exercise of the power of eminent domain is in derogation of the rights of the citizen that statutes conferring such power are strictly construed in favor of the landowner and against those corporations and subdivisions of the State vested therewith</u>. (Emphasis added).

*Burch v. City of San Antonio*, 518 S.W.2d 540, 545 (Tex. 1975) (citation omitted). When the Legislature delegates its power of eminent domain, the agency must "*both allege and prove compliance with statutory procedural requirements.*" *City of Charlotte v. McNeely*, 8 N.C. App. 649, 653, 175 S.E.2d 348, 351 (1970). In sum, "[s]*ince the power of eminent domain is an attribute of sovereignty and inherent in the state, only those agencies to whom the legislature has delegated the power can exercise the right, and it must be exercised only on the occasion, in the mode or manner, and by the agency prescribed by the legislature.*" *State ex rel. Nelson v. Butler*, 145 Neb. 638, 638, 17 N.W.2d 683, 685 (1945).

Finally, please note that today our Office also issues a related legal opinion pertaining to GHURA for a requested legal opinion from Chairman and Senator Chris Barnett pertaining to Open Government Law compliance on matters pertaining to their constructing a hospital medical complex.

## Summary

GHURA's takings under its Resolution consisted of only raw land. Unless GHURA acts in a manner fulfilling its housing development purpose, which is not the case, *supra*, this Autonomous Agency may only take raw land that is incidental to a "slum" or "blighted area."

Under any construction Guam law GHURA's actions in taking any land is in clear violation of Guam law. Before GHURA can take any property via eminent domain, an Urban Renewal Plan must be approved by several entities, including the Guam Legislature and the Governor, with several opportunities for public input. The Master Plan does not meet the statutory requirements to be considered en Urban Renewal Plan. As a consequence, GHURA lacked the legal authority to condemn the properties described in its Resolution. Thank you.

Respectfully,

**Douglas B. Moylan**
Attorney General of Guam

https://www.guampdn.com/news/ags-office-no-idle-threat-of-arp-being-returned-hospital-lawsuit-should-proceed/article_6188469c-fa5b-11ef-ab1a-cba18e1c5444.html

# AG's office: No 'idle threat' of ARP being returned, hospital lawsuit should proceed

By Joe Taitano II Pacific Daily News
Mar 7, 2025



A truck, traveling along Route 15 on Jan. 24, 2025, passes the approximate area across the street from the Gloria B. Nelson Public Service Building in Mangilao, where the government plans to construct a new public hospital.

Rick Cruz/Pacific Daily News

f     X     ☉     ✉     🖨     📋     🔖

The threat of the U.S. government taking back federal money put towards the Mangilao hospital project is real, and a lawsuit needs to move forward to determine any illegalities in the project, the Office of the Attorney General argues in the latest federal court filings in the hospital suit.

Both the Office of the Governor and the Guam Housing and Urban Renewal Authority have asked the federal court to dismiss Attorney General Douglas Moylan's lawsuit over the hospital project.

Attorneys for the AG's office, in an opposition filed March 4, argue the case should not be thrown out.

The U.S. Department of Treasury has already laid out a process for demanding the return of improperly spent federal American Rescue Plan Act funds used for the hospital, the AG's office opposition stated.

Once a final notice from the Treasury was issued, any jurisdiction would get only 120 days to return the funds, it noted.

It was "not an idle threat," the AG's office said.

"In January 2025, the State of Massachusetts entered into an agreement with the federal government to repay $2.1 billion for federal COVID-19 relief funds improperly used to pay unemployment benefits," the opposition stated. "The current federal executive administration is also pursuing an agenda of recovering and unburdening federal monies appropriated to myriad ends."

Moylan has alleged various illegalities in the $12.5 million ARP loan to GHURA to acquire land for the hospital, and in the condemnation of 42 acres of private land for the facility.

The AG is asking the court to block any more spending of the $104 million ARP funding the governor has earmarked for infrastructure installs on the hospital property.

The March 4 opposition likewise questions whether construction of a brand-new hospital is a proper use of ARP funds, and questions numerous reporting requirements related to the funds.

Adelup for years has asserted that a new hospital is eligible for ARP funding, and has relied on U.S. Treasury guidelines since 2022.

Besides the question of eligibility, ARP funds can't be used as a loan, and no documents exist for the loan from Adelup to GHURA, according to the March 4 opposition from the AG's office.

Moving forward with the lawsuit, and moving to discovery, was the only way to determine what impact the hospital project could have on federal funds held by GovGuam.

Attorneys for GHURA and Adelup in January motioned to strike the "government of Guam" as a named plaintiff in the case.

"The law does not authorize AG Moylan to initiate actions against the governor on behalf of the government of Guam at his whim," the joint motion states.

In their March 4 opposition, the AG's office contends that Moylan can clearly bring the case forward.

"The state of Guam law and the common law is clear, the Attorney General is authorized to bring this action on behalf of the Government of Guam without the express consent of the Governor," the opposition stated. "The Government of

Guam is properly named as a Plaintiff in this action. This Court should decline Defendants' request to strike the Government of Guam as a party to this action."

Adelup and GHURA also argued that besides being wrong, the AG's allegations are all related to local laws.

The federal court does not have jurisdiction over those matters, they asserted.

According to the March 4 opposition from the AG's office, the substantial amount of federal funding involved, and requirements that ARP money complied with federal law, made it clear that the District Court of Guam had jurisdiction to hear the case.

A response from Adelup and GHURA is due March 25, according to court filings.

As District Court Chief Judge Frances Tydingco-Gatewood weighs whether to throw out AG Moylan's lawsuit, GHURA is asking the Superior Court of Guam to proceed with condemning Mangilao property sought for the hospital.

Veterinarian Dr. Joel Joseph, one of two landowners facing condemnation, asked the court in January to pause the condemnation pending the outcome of the federal court lawsuit.

GHURA has opposed the pause, and a decision is pending from Superior Court Judge Elyze Iriarte.

*Reach reporter Joe Taitano II at JTaitano@guampdn.com.*

**Joe Taitano II**
Reporter



March 13, 2025

**Via Email:** jbenavente@gpagwa.com

**Mr. John M. Benavente, PE**
General Manager
Guam Power Authority
PO Box 2977
Hagåtña, GU 96932



## RE: March 7, 2025 Correspondence

Dear Mr. Benavente:

I write in response to your letter of March 7, 2025 wherein you asked for an assignment of an "independent, conflict-free attorney" to undertake procurement reviews as required by 5 GCA §5150. The review conducted by the Attorney General's Office pursuant to this section of Guam law is not undertaken to provide advice and counsel to the procuring agency. The Guam Power Authority ("GPA") has its own attorney for that role. Instead, the role set forth in the statue has this Office determining an agency's compliance with its own and with GovGuam procurement statutes and regulations and Guam law. Our function is to ensure the proper legal review by the Government's / People's "watchdog" to ensure proper government spending. In this context the signature of the Attorney General on a contract is an *independent* verification that the procurement complies with Guam law.

We believe that our law firm complies with the Guam Supreme Court's *In re Leon Guerro* decision, and that the statute in question requires the AG to specifically protect the legal and financial interests of the Govt., and generally the public interest.

Before making a final decision on this matter, so that we may better evaluate your request, you indicate that the Consolidated Commission on Utilities ("CCU") first authorized work on the Mangilao Medical Campus ("MMC") at its January 28, 2025 meeting. We reviewed the CCU's website and information regarding this meeting and subsequent meetings is not yet posted. Please provide us with the following information so that we can complete our review:

---

**Office of the Attorney General**
**Douglas B. Moylan · Attorney General of Guam**

590 S. Marine Corps. Drive, ITC Bldg. Ste. 902 · Tamuning, Guam, 96913 · USA
Phone 671-475-3324 · Fax 671-477-4703 · dbmoylan@oagguam.org · www.oagguam.org
**"Guam's Toughest Law Enforcers"**

1. The "Board Book" for this and any subsequent meetings that included discussions of the MMC.
2. CCU Resolutions considered for this and any subsequent meetings that included directives in regard the MMC.
3. Minutes for this and any subsequent meetings that included discussions of the MMC.
4. We are unclear as to the source of the funding GPA has obtained to undertake work on the MMC. We assume that your funding is in the form of a grant of Federal "State and Local Recovery Funds" from the Governor's Office. On that assumption, please provide a copy of the Grantee-Subgrantee Agreement by and between the Guam Governor's Office and GPA regarding the transfer of these funds. If our assumption is incorrect, please advise on the source of funding for GPA projects related to the MMC.

These materials can be provided to Deputy Attorney General Lee Miller via email at nmillerjr@oaggaum.org. Thank you for your timely response.

Respectfully,

**Douglas B. Moylan**
Attorney General of Guam

Docusign Envelope ID: A7ED5B5A-A748-4190-9DB2-E06E20B504B5



# GUAM POWER AUTHORITY
ATURIDÅT ILEKTRESEDÅT GUÅHAN
P.O.BOX 2977 • HAGÅTÑA, GUAM U.S.A. 96932-2977

March 31, 2025

**Via Email**
Honorable Douglas B. Moylan
Attorney General of Guam
Office of the Attorney General
590 S. Marine Corps Dr., ITC Bldg. Ste. 902
Tamuning, Guam 96913
Email: dbmoylan@oagguam.org

Re: Electrical Infrastructure Projects Supporting the Mangilao Medical Campus (MMC)

Dear Attorney General Moylan:

We are responding to your letter of March 13, 2025, regarding GPA's request for an independent, conflict-free attorney. We reiterate our request for independent counsel to conduct a review of the above-referenced procurement under 5 GCA § 5150 of the Guam Procurement Law and a copy of the documents establishing an ethical screening wall that meet the requirements set out by the Guam Supreme Court in *In re Leon Guerrero*, 2024 Guam 18.

In your letter, you state that you believe that the Office of the Attorney General complies with the court's decision in *In re Leon Guerrero*, and that you need various documents to ascertain whether your office has a conflict regarding 5150 review of the MMC procurements. You further state that 5150 review "is not undertaken to provide advice and counsel to the procuring agency" because the agency "has its own attorney for that role". Instead, you believe that the purpose of 5150 is "to ensure proper government spending".

Section 5150 states that, for a solicitation that will result in an award of $500,000 or more, the Attorney General or his designee "shall *act as legal advisor* during all phases of the solicitation or procurement process." 5 GCA § 5150 (emphasis added). The Guam Supreme Court stated that, although GPA does not require the Attorney General's approval for all contracts, "the Attorney General must still *act as legal advisor* during all phases of the solicitation or procurement process [involving an award of $500,000 or more]". *In re Leon Guerrero*, 2024 Guam 18 ¶ 24 (emphasis added) (citation and internal quotations marks omitted). Thus, in a 5150 review, the agency is the Attorney General's client.

Section 5150 permits the Attorney General to delegate the legal advisor role to a special assistant attorney general. *See* 5 GCA § 5150 ("[O]ne (1) or more Special Assistant Attorneys General [ ] may be so designated or appointed by the Attorney General and . . . shall act as legal advisor during all phases of the solicitation or procurement process."); *see also In re Leon Guerrero*, 2024 Guam 18 ¶ 26 ("In the event of a conflict of interest or

Docusign Envelope ID: A7ED5B5A-A748-4190-9DB2-E06E20B504B5

disagreement over the public interest, the procurement code empowers the Attorney General to appoint special assistant attorneys general."). However, you have withdrawn the SAAG appointments from the in-house counsel of other autonomous agencies and declined to designate GPA's in-house counsel as a SAAG for this or any other GPA procurement. The Attorney General must therefore act as GPA's legal advisor for purposes of 5150. This is a duty from which the Attorney General cannot withdraw. *In re Leon Guerrero*, 2024 Guam 18 ¶ 42 (recognizing that the Attorney General has mandatory duties from which he cannot withdraw, including review of contracts or procurements worth $500,000 or more for all executive branch agencies).

The Guam Supreme Court has noted that "the Attorney General cannot participate both in the prosecution and defense of a public official." *In re Leon Guerrero*, 2024 Guam 18 ¶ 40 (quoting *State ex rel. McLeod v. Snipes*, 223 S.E.2d 853, 855-56 (S.C. 1976)). "[W]hen the responsibilities of the Attorney General to represent the government and the public come into conflict, he must assign his staff in a way that both (1) affords independent legal counsel and representation to the agencies and (2) seeks justice in prosecutions brought in the People's name." *In re Leon Guerrero*, 2024 Guam 18 ¶ 41.

In *In re Leon Guerrero*, the court held that "the GRPC [(Guam Rules of Professional Conduct)] apply to the Attorney General's relationship with executive branch agencies—he owes a duty of undivided loyalty to executive agencies and must exercise the utmost good faith to protect their interests." *Id.* ¶ 46 (citation and internal quotation marks omitted). "The Attorney General may not represent an agency one day, give agency officials legal advice regarding certain issues, withdraw, and then prosecute the same officials the next day for following his legal advice." *Id.* ¶ 54. The GRPC apply equally to the other attorneys in the OAG.

Under GRPC 1.7, you have a concurrent conflict of interest that prevents you from working on a potential criminal matter on behalf of the People of Guam against GPA and its officers on the one hand, and representing GPA in the civil matter of 5150 review on the other. The concurrent conflict of interest extends to any attorney whom you supervise or who reports to you directly regarding the potential criminal matter. The conflict prevents you and them from working on the 5150 review. But the court in *In re Leon Guerrero* observed that the OAG "may represent an executive branch agency in civil matters while investigating and prosecuting an agency official in criminal matters without violating ethical duties if the Attorney General's staff can be assigned in a way that affords independent legal counsel and representation in the civil matter, and so long as such representation does not result in prejudice to the official in the criminal matter." *In re Leon Guerrero*, 2024 Guam 18 ¶ 60.

In our request of March 7, 2025, for independent, conflict-free counsel, GPA is not seeking to recuse the entire OAG from reviewing the MMC infrastructure procurement. Rather, GPA is asking you to assign your staff in a way that affords GPA independent legal counsel and representation, entirely separate from your proposed prosecution. In other words, GPA is asking you, the Attorney General, specifically, to recuse yourself, based on your statements in the media and letters to GWA officials and testimony before the Legislature,

Hon. Douglas B. Moylan
March 31, 2025
Page 3

opining that criminal action has taken place or is about to take place regarding the utility infrastructure projects in Mangilao.

Through your words and deeds, you have established your own conflict of interest. The conflict extends to any attorney who reports to you with regard to the potential criminal matter. You and your direct reports are not able to represent GPA officials in a 5150 review and advise them as to this procurement, because you have voiced your intention to prosecute the same officials for this same procurement.

Because you have indicated your intention to proceed against GPA's certifying officers criminally, we cannot assist you in any way that could be construed as participating in the criminal prosecution; this includes providing the documents you requested. In any event, since you and your direct reports have a clear concurrent conflict of interest, you do not need the documents to determine whether you have a conflict. You may contact the board secretary of the Consolidated Commission on Utilities, Lourissa Gilman, by email at llgilman@gpagwa.com for assistance in navigating the CCU's website.

We look forward to learning the identity of the independent, conflict-free attorney assigned to conduct a 5150 review of this procurement, as well as a copy of the ethical wall conflict procedures implemented to ensure that the assigned attorney is acting independent of your influence and that of your direct reports in the potential criminal prosecution. Please provide this information by no later than <u>April 4, 2025</u>. Otherwise, GPA will explore the options listed by the court in *In re Leon Guerrero*, 2024 Guam 18, for when the Attorney General is unavailable to undertake the representation of an agency client.

Very truly yours,

John M. Benavente, P.E.
General Manager





April 9, 2025



**Mr. John M. Benavente, P.E.**
**General Manager**
**c/o Ms. Marianne Woloschuk**
Guma Power Authority
P.O. Box 2977
*Hagåtña*, GU 96932-2977

### Subject: Procurement Review; Your 3/31/25 Letter; Infrastructure MMC

*Hafa Adai* Mr. Benavente:

I write in response to your March 31, 2025 letter concerning the appointment of conflict-free attorneys within the Office of the Attorney General who are available to review procurements associated with the Mangilao Medical Campus. Any such reviews should be directed to the Office's Solicitors Division using the same process by which Guam Power Authority sends all other procurements for review. The Division will review and address any legal concerns associated with these procurements in the same professional manner as they review all other Government of Guam procurements submitted for their consideration.

The Attorney General's Office is very well aware of the direction set forth in the *Leon Guerro* declaratory judgement. We are confident that the attorneys in the Solicitors Division are operating in full compliance with their various obligations. On a daily basis the Division receives new procurements for review and undertakes those reviews in an expeditious manner. No board, commission or agency has raised any concerns about the manner in which the Division accomplishes its objectives on behalf of its clients. We see no reason why Guam Power Authority will have any concerns.

Cordially,

*Douglas B. Moylan*

**Douglas B. Moylan**
Attorney General of Guam

**Office of the Attorney General**
Douglas B. Moylan · Attorney General of Guam

590 S. Marine Corps. Drive · ITC Bldg., Ste. 902 · Tamuning, Guam 96913 · USA
671-475-3324 · 671-475-4703 (fax) · dbmoylan@oagguam.org · www.guamattorneygeneral.org
*"Guam's Toughest Law Enforcers"*

Docusign Envelope ID: B7DB97A5-8037-4697-AD9A-555865DFE600



# GUAM POWER AUTHORITY
### ATURIDÅT ILEKTRESEDÅT GUÅHAN
P.O.BOX 2977 · HAGÅTÑA, GUAM U.S.A. 96932-2977

April 10, 2025

**Via Email**
Honorable Douglas B. Moylan
Attorney General of Guam
Office of the Attorney General
590 S. Marine Corps Dr., ITC Bldg. Ste. 902
Tamuning, Guam 96913
Email: dbmoylan@oagguam.org

Re: Electrical Infrastructure Projects Supporting the Mangilao Medical Campus (MMC)

Dear Attorney General Moylan:

Thank you for your letter of April 9, 2025, by which we understand you to mean that the attorneys of the OAG Solicitors Division will conduct an independent and conflict-free review of the above-referenced procurement under 5 GCA § 5150 of the Guam Procurement Law. Please be sure to send us a copy of the documents establishing the ethical wall that will screen you and your prosecutors from participating in the MMC procurement review.

In various public statements and otherwise, you have identified the MMC project as a potential criminal matter. As the lead prosecutor in that matter, you have a conflict of interest that prevents you from participating in a civil review of the procurement for the project. The same is true of the prosecutors who report to you in the criminal matter.

The Guam Supreme Court has noted that the disqualification of the entire OAG is necessary only "in extraordinary circumstances—such as where a conflicted assistant attorney general remains unscreened and continues to participate in or discuss the matters where they have a conflict". *In re Leon Guerrero*, 2024 Guam 18 ¶ 58. But a court must disqualify the entire OAG "once the conflict wall surrounding the Attorney General has been shown to be ineffective." *Id.* ¶ 66 (quoting *People v. Tennessen*, 2009 Guam 3 ¶ 43).

We trust that the situation here presents no extraordinary circumstances requiring the OAG's disqualification, because you will erect an effective conflict wall separating yourself and your prosecutors from the MMC procurement review. *See In re Leon Guerrero*, 2024 Guam 18 ¶ 66 (citing *Tennessen*, 2009 Guam 3 ¶ 36). We look forward to receiving a copy of your ethical screening documents no later than Tuesday, April 15, 2025.

Very truly yours,

*/s/*

John M. Benavente, P.E.
General Manager

https://www.guampdn.com/news/moylan-govguam-employees-should-contact-ags-office-for-guidance-on-hospital-project/article_01522864-ae1c-493f-a7fb-fb7160f99e7d.html

# Moylan: GovGuam employees should contact AG's office for guidance on hospital project

By Joe Taitano II Pacific Daily News
Apr 21, 2025



A Notice to Rezone sign, posted by the Guam Housing and Urban Renewal Authority on behalf of the government of Guam, proposes a zone change from Agricultural (A) to Public Facility (PF) for a tract of land in Mangilao, as seen on April 15, 2025. Reasons stated on the sign for the rezoning is to construct water, sewer, power infrastructure and public facility at the site.

Rick Cruz/Pacific Daily News

*(Editor's note: This story has been updated to clarify the AG's advice to government certifying officers in paragraphs eight and nine.)*

With construction of the Mangilao hospital project moving forward, Attorney General Douglas Moylan says any government official who gets involved in the "illegal" project, especially those authorizing the use of funds for the project, should contact his office for legal guidance.

Both the governor and the Guam Housing and Urban Renewal Authority have asserted all laws were followed in securing land for the project, and are now moving to have a lawsuit brought by the AG over the hospital land acquisitions thrown out of federal court.

The Office of the Governor last week announced a formal notice to rezone was posted on the 48 acres of Mangilao land meant for the new hospital.

Adelup called the rezoning a significant step towards starting water and power infrastructure installations at the planned hospital site.

"The governor can continue spending taxpayer money," Moylan said Friday, but added that it will be clawed back from the hospital project, if deemed illegal by a District Court of Guam judge or appellate court.

Moylan said certifying officers of the government have been put on notice that authorizing the use of funds for the Mangilao hospital project could open them up to civil or criminal liability.

Asked for comment about what, if any, liability the Guam Land Use Commission might face in addressing the rezoning application for the hospital, Moylan said that all GovGuam employees who may get involved should contact the Office of the Attorney General.

"If certifying officers are in doubt as to the legality of their intended payment of funds, they should contact the AG's office for written guidance," Moylan said.

There were already two formal legal opinions that found the governor's use of ARP funds for the Mangilao medical project were illegal, he stressed. Any payments authorized by any certifying officer could expose them to civil or criminal prosecution, he added.

The AG said opinions on the legality of the project from the governor's legal counsel and other attorneys hired on by GovGuam do not trump the AG's legal opinion.

Moylan has opined on multiple alleged violations in the use of federal funds and in the condemnation process for land eyed for the hospital.

Only a judge's order would trump those opinions, Moylan asserted Friday.

Movement on the Mangilao hospital project was now wrongly using up both government funds and administrative resources, as in the case of a rezoning brought to the GLUC, the AG added.

The Guam Power Authority and Guam Waterworks Authority have both been notified that they will be held criminally liable if they move to start infrastructure work at the hospital, Moylan said.

GPA has agreed to take $35 million in federal American Rescue Plan money from the administration to install power infrastructure at the new hospital site, while GWA will take $62.9 million ARP sum for water and sewer installs.

Any action taken by the AG's office against the utilities will depend on what steps GPA and GWA take, Moylan said Friday.

Guam law will require Moylan to review and sign off on any contract for water or power installs at the new hospital site worth over $500,000.

Moylan told the Pacific Daily News that GPA's legal counsel has already sent a letter to his office "threatening" to disqualify the AG from the project.

*Reach reporter Joe Taitano II at JTaitano@guampdn.com.*

**Joe Taitano II**
Reporter

**Notice to Recipients of Coronavirus State and Local Fiscal Recovery Funds**
**U.S. Department of the Treasury**
**Compliance Reviews and Related Recoupment Efforts**
**March 25, 2025**

Through this notice, the U.S. Department of the Treasury (Treasury) is informing recipients of Coronavirus State and Local Fiscal Recovery Funds (SLFRF) awards that Treasury intends to vigorously monitor recipients' methods of obligating funds by the December 31, 2024, deadline. Treasury is committed to recouping funds that recipients obligated or expended impermissibly, as well as to recapturing funds that they did not obligate by the deadline.

Many recipients have now provided reports covering obligations through the December 31, 2024, obligation deadline, while others soon will. Quarterly reporters were required to submit their latest report to Treasury by January 31, 2025, covering obligations through the obligation deadline. Annual reporters will submit their next report to Treasury between April 1 and April 30, 2025, covering obligations through the obligation deadline.

Treasury intends to take several actions in alignment with its commitment to recoup funds used impermissibly and to recapture funds not obligated by the deadline, including enhancing compliance checks on the obligation data submitted by recipients as part of its efforts to ensure taxpayer funds are used in accordance with program requirements. Recipients may receive Information Document Requests and will be expected to promptly comply with such requests.

In the coming days, Treasury also will begin sending "Financial Instructions to Return Unobligated Funds" to recipients that did not fully obligate their award funds by the deadline, based on the latest data available to Treasury. These instructions will:
- Inform the recipient how much it owes, based on its most recently submitted report.
- Provide a date by which funds must be repaid.
- Direct the recipient to Pay.gov for repayment options.

If a recipient does not repay the amount owed by the specified date, Treasury will establish a debt and follow standard debt collection policy and procedures in coordination with Treasury's Bureau of the Fiscal Service. Interest and penalties will accrue once the debt is established.

OFFICE OF THE SPEAKER
THERESE M. TERLAJE

OCT 0 6 2023

Time: 3:46 pm
Received: MARIE CRUZ



October 6, 2023

RECEIVED
Office of the Compile
By: Magen Jorden (GLL)
Date: 10/6/23
Time: 3:29 pm

received
Jen 3:49 10/6/23

Ref: AG 23-0458

RECEIVED

OFFICE OF SENATOR WILLIAM PARKINSON
DANICA CACAYAN
Tabagan    10/06/202

Honorable Therese M. Terlaje
Speaker
Thirty-Seventh Guam Legislature
Guam Congress Building
163 Chalan Santo Papa
Hagåtña, Guam  96910

**Subject:**   **Organicity of the Consolidated Commission on Utilities**

*Hafa Adai* Madam Speaker:

It is this law firm's opinion that the Consolidated Commission on Utilities ("CCU") is an illegal body whose existence directly interferes with the Governor of Guam's authority under the 1950 Organic Act of Guam (Title 48 USC Chapter 8A).

The CCU was created in 2002 by Public Law No. 26-76 for the purpose of managing and exercising the powers of the Guam Power Authority ("GPA") and the Guam Waterworks Authority ("GWA"). 12 GCA § 79100.  The CCU is comprised of five part-time (5) Commissioners, each of whom is elected at-large in a General Election. 12 GCA § 79101.

The election of the part-time Commissioners deprives the Governor of Guam, who is elected by the People, of the Governor's Organic Act authority to supervise the government and to appoint the heads of executive branch agencies as part of the Governor's cabinet.   Those cabinet members and board members are under the Governor's direct supervision and control.  As discussed below, this law firm finds that the CCU and sections of P.L. 26-76 that created it, are void as contrary to the 1950 Organic Act of Guam.

OFFICE OF THE GOVERNOR
CENTRAL FILES
Moises Gomez

RECEIVED BY
TIME 4:01PM    10/06/23

**Office of the Attorney General**
**Douglas B. Moylan · Attorney General of Guam**

590 S. Marine Corps Drive · Ste. 902, ITC Bldg. · Tamuning, Guam 96913 · USA
671-475-2709/10 · 671-475-2493 (fax) · publicservice@oagguam.org · www.oagguam.org
*"Guam's Toughest Law Enforcer"*

# I.     The CCU Illegally Infringes Upon the Governor of Guam's Authority Under the 1950 Organic Act of Guam.

The Organic Act vests the Governor with the power to supervise and manage the executive branch and to appoint, with the advice and consent of the Legislature, all heads of the executive agencies.

## A.     The CCU Usurps the Governor's Organic Act Power to Supervise and Control the Executive Branch.

The Governor's powers of general supervision and control over the executive agencies are set forth in § 1422 of the Organic Act (Title 48 USC) which vests the executive power of the government in the Governor of Guam, and that the Governor has *"general supervision and control"* over all agencies and instrumentalities of the executive branch, including the power to appoint its officers and employees: The 1950 Organic Act of Guam expressly states,

> **48 USC § 1422. Governor; Lieutenant Governor: Powers, Duties**. The executive power of Guam shall be vested in an executive officer whose official title shall be the "Governor of Guam.". .***The Governor shall have general supervision and <u>control</u> of all the departments, bureaus, agencies, and other instrumentalities of the executive branch*** of the government of Guam.. . ***<u>He shall appoint</u>, and <u>may</u> <u>remove</u>, <u>all</u> <u>officers</u> <u>and</u> <u>employees</u> <u>of</u> <u>the</u> <u>executive</u> <u>branch</u>*** of the government of Guam, except as otherwise provided in this or any other Act of Congress, or under the laws of Guam, and shall commission all officers he may be authorized to appoint.

*Id*. The Supreme Court of Guam ruled that the Governor's power of general supervision and control granted by Organic Act Section 1422 ***"means that the Governor is vested with the <u>overall power to manage, direct, or oversee</u> such entities."*** *In re Request of Governor Felix P. Camacho*, 2004 Guam 10 ¶ 38.

It is without question that GPA and GWA are fully executive branch agencies of the Government of Guam. Title 5 GCA § 12104 expressly defines GPA and GWA as one of the *"departments, bureaus, agencies, commissions, or other instrumentalities, **whether autonomous**, semi-autonomous, or non-autonomous **in the Executive Branch of the government of Guam."***

On its face, CCU's exclusive management over executive branch agencies GPA and GWA violates the Organic Act of Guam and is an impermissible violation of the separation of powers doctrine, because it unlawfully usurps the Governor's function and authority by interfering with the Governor's ability to perform the Governor's rightful constitutional duties.

Neither the CCU nor Public Law No. 25-146 which created it is, or ever was, authorized to strip the Governor of her Organic Act powers to supervise, control and manage GPA and GWA. The CCU's existence as a wholly elected body is inorganic, unconstitutional, and *void ab initio*. *See, Santos v. Calvo*, 1982 WL 30790, at \*4 (D. Guam App. Div. 1982), <u>*citing Bordallo v. Baldwin*</u>, 624 F.2d 932 (9th Cir. 1980); *Nelson v. Ada*, 1988 WL 242618, at \*3 (D. Guam App. Div. 1988) (an inorganic law is *void ab initio*).

### B. The CCU Usurps the Governor's Organic Act Power to Appoint the Heads of Executive Branch Agencies.

As autonomous agencies within the executive branch, GPA and GWA are subject to the Governor's Organic Act power to appoint and remove "*all heads of executive branch* agencies and instrumentalities." 48 USC § 1422. The Governor's appointment power is reaffirmed in 48 USC § 1422c, which provides that *"[t]he Governor shall*, except as otherwise provided in this chapter or the laws of Guam, *appoint*, by and with the advice and consent of the legislature, *all heads of executive agencies and instrumentalities.*"

Because the part-time members of the CCU are elected at-large, the Governor is deprived of the Governor's authority to appoint the governing board and heads of GPA and GWA. The Governor is the full-time chief executive that is directly answerable to our People, and has the ability of coordination and control of the rest of the Governor's Cabinet to protect and serve the People's best interests. This deprivation violates § 1422 and § 1422c of the Organic Act of Guam, and constitutes an impermissible encroachment on the Separation of Powers. *See In re Request of Governor Felix P. Camacho*, 2004 Guam 10 ¶ 46.

## II. The CCU Illegally Infringes Upon the Legislature's Powers Under the Organic Act of Guam.

The CCU is a creature of the Legislature, having been enabled into being by the passage of P.L. No. 26-76 in 2002. In creating the CCU, the Legislature delegated to a single elected body similar to itself all of the powers of GPA and GWA, which are the two agencies that most impact the daily lives of the People of Guam due to their governance over the Island's electrical and water / wastewater systems. *See,* 12 GCA § 79100 (the purpose of the CCU "is to exercise powers vested in them by the laws establishing the [GPA] and [GWA]."); *see also,* 12 GCA § 8107 (CCU exercises GPA's powers); 12 GCA § 14105 (CCU exercises GWA's powers).

Not only did P.L. No. 26-76 strip the Governor of any voice in the management or policies of utilities that are vital to the health, safety and welfare of this U.S. Territory, it also unlawfully divested much of the Guam Legislature's own oversight over the utilities,

including confirming utility board members. Except for bonds and debt financing, the CCU is free to run GPA and GWA unchecked, and to make decisions on its own without consideration of, or consultation with, either the executive or legislative branches.

The result is a *de facto* privatization of government executive branch agencies that places the ***"[CCU] Commission members <u>on equal elective footing with, rather than subordinate to, governors and legislators</u>."*** *Guam Waterworks Authority v. Badger Meter, Inc.*, 2022 WL 892223 *6 (D. Ct. Guam 2022).

The creation of a body that is "subordinate to governors and legislatures" is completely contrary to the Organic Act of Guam and far exceeds the boundaries of authority permissible of any administrative agency. The Organic Act of Guam is Guam's Constitution and blueprint for how our People are best served. The fact that the failures of GPA and GWA are now directly adversely affecting all of Guam's People's healthcare, public safety and education, brings their existence and competence into question, vs. what the framers of the 1950 Organic Act of Guam intended to be how our Government and its People were to be governed.

## Conclusion

The 1950 Organic Act of Guam is clear and ambiguous. The Legislature has no authority to enact legislation or to create a body that exists on *"equal elective footing with, rather than subordinate to"* our elected Governor of Guam or itself.

As re-created, the elected part-time CCU is illegal, inorganic and unconstitutional. The CCU unlawfully appropriates unto itself the Governor's rightful powers under Section 1422 and Section 1422c(a) of the Organic Act to supervise, control and to appoint the heads of GPA and GWA, both of which are utterly executive branch agencies. There is no law or authority that permits the Legislature to create a govt. body that is on *"equal elective footing"* with itself or the Governor or which authorizes the CCU or any other entity to undertake functions that are purely executive in nature.

The Organic Act of Guam is the Constitution of Guam. *In re Gov. Camacho*, 2004 Guam 10 ¶ 53. Laws in derogation of the Organic Act of Guam are invalid. *Haeuser v. Dept. of Law, Government of Guam*, 97 F.3d 1152, 1156 (9th Cir. Guam 1996). In creating the CCU, the Legislature acted *ultra vires* without in derogation of both the Governor and it's Organic Act vested duties. The enabling provisions of Public Law No. 26-76 and the CCU itself are *void initio*. Thank you.

Respectfully,

*Douglas B. Moylan*

**Douglas B. Moylan**
Attorney General of Guam

# MINA'BENTE SAIS NA LIHESLATURAN GUÅHAN
## 2001 (FIRST) Regular Session

## CERTIFICATION OF PASSAGE OF AN ACT TO *I MAGA'LAHEN GUÅHAN*

This is to certify that Substitute Bill No. 241 (LS) "AN ACT TO CREATE THE CONSOLIDATED COMMISSION ON UTILITIES, TO REORGANIZE AND CONSOLIDATE SEVERAL GOVERNMENT OF GUAM AGENCIES AND FOR OTHER PURPOSES," was on the 14th day of December, 2001, duly and regularly passed.

_____
**ANTONIO R. UNPINGCO**
**Speaker**

Attested:

_____
**JOANNE M.S. BROWN**
**Senator and Legislative Secretary**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This Act was received by *I Maga'lahen Guåhan* this ___9th___ day of ___January___, 2001, at ___4:25___ o'clock ___P___.M.

_____
Assistant Staff Officer
*Maga'lahi's* Office

APPROVED:

_____
**CARL T.C. GUTIERREZ**
*I Maga'lahen Guåhan*

Date: _____

Public Law No. _____



**CARL T.C. GUTIERREZ**
GOVERNOR OF GUAM

JAN 1 8 2002

The Honorable Joanne M. S. Brown
Legislative Secretary
I Mina'Bente Sais na Liheslaturan Guåhan
Twenty-Sixth Guam Legislature
Suite 200
130 Aspinal Street
Hagåtña, Guam 96910

OFFICE OF THE LEGISLATIVE SECRETARY
ACKNOWLEDGMENT RECEIPT

Received By _____

Time 10:35 AM

Date 1/18/02

Dear Legislative Secretary Brown:

Enclosed please find Substitute Bill No. 241 (LS) "AN ACT TO CREATE THE CONSOLIDATED COMMISSION ON UTILITIES, TO REORGANIZE AND CONSOLIDATE SEVERAL GOVERNMENT OF GUAM AGENCIES AND FOR OTHER PURPOSES" which was I have **vetoed.**

This legislation is a second retread of provisions from former vetoed bills, namely Substitute Bill No. 57, passed June 30, 2001 and vetoed on June 29, 2001, and Substitute Bill No. 190, passed September 28, 2001 and vetoed on December 10, 2001. Veto messages for those bills are attached for your reference. The same objections apply to this legislation that were put forth for the two prior bills.

### 1. Guam Power Authority and Guam Waterworks Authority.

The sections of this bill dealing with a new combined elected utilities board to have authority over the Guam Power Authority and the Guam Waterworks Authority have been reworked slightly to acknowledge that prior vetoed bills on the same subject were defective in leaving the employees of those agencies in limbo concerning their rights and duties as either employees of the government or employees of the private sector. While the language in this legislations states that the employees have the same rights and duties as government employees, the language also omits reference to the government in the new enabling statutes of the two new agencies. This omission basically takes the two government agencies and makes them non-government entities. This would still affect the rights and duties of the employees under numerous federal laws, and still privatizes the agencies without a benefit to the people of Guam. In other words, if the agencies are to be sold, or public-private partnerships entered into, some benefit will accrue to the people of Guam. Merely making a government entity into a non-government entity, by law, does not.

The impairment of contracts objection to the prior vetoed legislation still exists in reference to this new legislation. The GPA bond indentures still state "Authority shall at all times use its best efforts to preserve its existence as a **public corporation and autonomous instrumentality of**

0653

Ricardo J. Bordallo Governor's Complex, Post Office Box 2950 • Hagåtña • Guam • 96932 • (671) 472-8931 • Fax (671) 477-GUAM

**the Government.** (Emphasis added.) As readily seen, this new legislation also takes the two agencies, GPA and GWA, out of the government and eliminates their status as autonomous instrumentalities of the government.

The conflict of interest objection to the prior vetoed legislation still exists in reference to this new legislation. GWA still owes the GPA a sizeable amount of money, and a combined board will have to serve both Peter and Paul in owing allegiance to collecting money for the two agencies. If the same board members owe a duty to GWA to keep it financially viable, they will not want to pay overdue bills to GPA. On the other hand, the same board members owe a duty to GPA to collect this money and comply with bond covenants – a clear conflict of interest.

The tax law application objection to the prior vetoed legislation still exists in reference to this new legislation. The two new entities would not be part of the government, as they previously are.

The increase in liability objection to the prior vetoed legislation still exists in reference to this new legislation. The sovereign immunity enjoyed by the government under the Organic Act will not apply to these two new entities, as they are no longer part of the government.

A new objection to this legislation is to point out that the qualifications for General Manager for both of the agencies is very onerous. It is not likely that there will be many individuals on Guam who have at least 10 years experience managing a public or private utility of a size that is similar to the GPA or the GWA. The duties of the General Manager and the Chief Financial Manager in both of the new entities would appear to overlap slightly, both having charge and control of "administration of the business affairs of the Authority" as well as charge and control of the "business. . . operations of the Authority. The chain of command is blurred.

As a new objection to an elected utilities board, it may be pointed out that an elected board will find it very difficult to act in the interest of the utilities in respect to the proper requests to the Public Utilities Commission for the setting of rates. In order to keep being elected, a commission member will begin to pander to the public in order to get elected, as some other elected individuals have done, and will object to any increases in rates, no matter what the expenses of the utilities are for providing services. Also, the high caliber of the present members of the Board of Directors of the Guam Power Authority and the Guam Waterworks Authority will not be maintained. An elected board will yield commission members who are perhaps popular people, promising to lower rates, not commission members with proper functioning of the utilities in mind.

It is also pointed out again, as a continuing objection, that the new combined elected utilities board is not off limits to politicians. While a government employee cannot run for this position, elected officials can. For the stipend of $1,000 per month, or $12,000 per year, it is not likely that someone will run for this position in order to feed their family. It is more likely that an elected official, or perhaps formerly elected officials, will run for this position to supplement their income and gain control over utility hiring, contracts, and financing.

There is no transition period between the new and the old in this legislation, as there was none in prior vetoed legislation. Also, the same date that new commission members take office is the same date that new directors and financial officers are to take office. This is not logical. It is also not logical that qualified General Managers or Chief Financial Officers would be on board within thirty days.

Please review again the lengthy and detailed veto messages to Substitute Bill No.57 and Substitute Bill No. 190, attached. All of the objections are herein raised again and incorporated in this veto message. Nothing is new in Substitute Bill No. 241 which would change these objections. The few changes made in Substitute Bill No. 241 from the last version transmitted in Substitute Bill No. 190 are changes without a difference.

2.      **Guam Mass Transit Authority.**

The Guam Mass Transit Authority sections of the legislation transfer only those employees who were hired before a certain date. Since the sections concerning this agency were retyped verbatim from Substitute Bill No. 190, it is recommended that if changes are made that all of the employees be treated equally. Also, it is pointed out that some unclassified employees may have classified employee rights. This should be taken into effect in any legislation concerning their status.

3.      **Bureau of Statistics and Planning.**

The sections concerning this new agency reroutes the collection of fines for violations of the Guam Product Seal law into the General Fund instead of to the Guam Product Seal Fund. There are other inconsistencies of language where the term "authority" is used rather than the new term, "bureau". As previously noted, a reference in Section 43 to "South Pacific Commission" should be changed to the correct term of "Secretariat of the Pacific Community". This organization changed its name several years ago.

4.      **Guam Economic Development and Commerce Authority.**

Please note the objections previously outlined by transferring some functions of the Department of Commerce to the Guam Economic Development Authority and changing the name of GEDA. The Qualifying Certificate program is an exception to existing federal law, and relies on the fact that the GEDA law was enacted prior to a certain date. Changing or repealing and reenacting, or otherwise tinkering with the GEDA law subject the QC program to possible elimination. The name change alone will undermine the advertisement efforts for Guam in promotional materials, and will tend to confuse and impact existing potential investor confidence negatively.

5.      **Typographical errors or unclear language.**

On a final note, there seem to be several typographical defects or unclear language in the legislation. For example, there is no majority needed to make a decision before the new combined elected utilities commission. On Page 5, lines 15-16, the requirement for a majority to make a

decision has been deleted from prior transmitted legislation on the same subject. Affirmative votes of the commissioners holding office are now needed to make a decision; apparently a unanimous decision of all commissioners holding office are needed, as the decision of a jury in a criminal case must be unanimous.

Also, on Page 21, line 17, it states that Sections18-22 and 24-25 of the legislation are to go into effect 90 days after the effective date of the Act. On Page 41, line 9, it states that Sections 26-46 shall be in effect 90 days after the effective date of the Act. The reference to the 90 day time frame on Page 41 includes the same reference on Page 21, as the Page 21 reference is contained in Section 28 of the legislation. These references to section numbers seem to be incorrect, and may refer to section numbers in prior legislation or drafts. This leaves it unclear just when the various sections should go into effect, as the meaning of the sections is inconsistent.

Very truly yours,

Carl T. C. Gutierrez
I Maga'Lahen Guåhan
Governor of Guam

Attachments:   original bill for vetoed legislation or
               copy of bill for signed or overridden legislation
                   and legislation enacted without signature
               veto messages Substitute Bill Nos. 57 and 190

cc:     The Honorable Antonio R. Unpingco
          Speaker



**Douglas B. Moylan**
**Attorney General of Guam**
Office of the Attorney General
General Crimes Division
134 W. Soledad Avenue
Bank of Hawaii Building, 3rd Floor Suite 301
Hagåtña, Guam 96910 ● USA
671-475-3324 ● 671-475-3390 (fax)
prosecution@oagguam.org ● www.oagguam.org

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

GUAM POWER AUTHORITY,                     Civil Case No. 1:24-cv-00029

          Petitioner,

   vs.

ATTORNEY GENERAL OF GUAM,

          Respondent.

_____)

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that I have this date served a copy of the within and foregoing Respondent

Attorney General of Guam's Notice of Removal in the United States District Court for the District

of Guam by depositing a copy of the same in the United States Mail in a properly addressed

envelope with adequate postage thereon, and by electronic mail and/or by hand delivery to:

Marianne Woloschuk
Legal Counsel
Guam Power Authority
Gloria B. Nelson, Public Service Bldg.
688 Route 15, Fadian

Mangilao, Guam 96913

Ph: (671) 300-6848

Fax: (671) 648-3290

E-Mail: mwoloschuk@gpagwa.com

This 17th day of June, 2025.              Respectfully submitted,

_W. Lyle Stamps_

WILLIAM LYLE STAMPS